1

2

3

4

5 UNITED STATES DISTRICT COURT

6 NORTHERN DISTRICT OF CALIFORNIA

7

8 AUDLEY BARRINGTON LYON, JR., *et al.*,  No. C-13-5878 EMC
 on behalf of themselves and all others

9 similarly situated,

             **ORDER GRANTING PLAINTIFFS'**
10     Plaintiffs,       **MOTION FOR CLASS**
             **CERTIFICATION**
11   v.
             **(Docket No. 14)**
12 UNITED STATES IMMIGRATION AND
 CUSTOMS ENFORCEMENT, *et al.*,

13

14     Defendants.
 _____/

15

16    Plaintiffs in this putative class action are Audley Barrington Lyon, Jr.; Edgar Cornelio; Jose

17 Elizandro Astorga-Cervantes; and Lourdes Hernandez-Trujillo.  They have filed suit against the

18 Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE") and

19 certain employees of both agencies on the ground that their constitutional and statutory rights are

20 being violated while they are held in government custody pending deportation proceedings.  In

21 particular, Plaintiffs assert that there are certain policies and practices in the Northern California

22 immigration detention facilities (located in Contra Costa County, Sacramento County, and Yuba

23 County) that "deny and severely restrict their ability to make telephone calls."  Compl. ¶ 2.  This has

24 impacted Plaintiffs' ability to obtain counsel, consult with counsel, and gather information and

25 evidence necessary for their immigration cases.  In addition, the denial and restriction of telephone

26 access has substantially prolonged their incarceration because, *e.g.*, they have been forced to ask for

27 continuances to retain counsel, consult with counsel, or prepare their cases.

28

**United States District Court**
For the Northern District of California

1    In the currently pending motion, Plaintiffs seek class certification.  For the reasons explained

2    below, the motion is **GRANTED**.

3                            **I.    FACTUAL & PROCEDURAL BACKGROUND**

4    Plaintiffs filed their complaint on December 19, 2013.  In their complaint, they allege as

5    follows.

6    "ICE contracts with Yuba County, Sacramento County, and Contra Costa County to hold

7    immigration detainees in the Yuba, Elk Grove and Richmond Facilities."  Compl. ¶ 33.  These

8    facilities are "geographically isolated from the San Francisco Immigration Court" as well as "the

9    immigration attorneys who practice removal defense, most of whom are based in or near San

10   Francisco."  Compl. ¶ 34.  In addition, the facilities are often geographically isolated from detainees'

11   family members or friends who might be able to help them in their immigration proceedings.

12   Compl. ¶ 35.  Because of this geographic isolation, communication by telephone is critical for

13   detainees in these facilities.  *See* Compl. ¶ 32.

14   Apparently, detainees are not charged for making telephone calls to nonprofit legal service

15   providers and certain government entities, *see* Compl. ¶ 41 (discussing the "free call program").

16   Otherwise, however, detainees appear to be charged for calls.  In general, there are two ways to

17   make a telephone call from the Yuba, Elk Grove, and Richmond facilities: (1) a detainee can place a

18   collect call, or (2) a family member or friend can contact the telephone service provider for the

19   detention facility to establish a prepaid account which funds a detainee's calls to a specific telephone

20   number.  For the Yuba and Elk Grove facilities – but not the Richmond facility – there is also a third

21   option, namely, a detainee can use his own money to purchase a calling card.  *See* Compl. ¶ 42.

22   The above system poses significant problems for detainees.

23   •    For the Richmond facility, the third option is not available.  As a practical matter, this means

24        that a detainee will often have to rely on collect calls, and, not surprisingly, there is no

25        guarantee that the receiving party will accept the collect call.  For example, if a government

26        entity is a receiving party, it likely will not accept a collect call.  Even if a family member

27        would want to accept a collect call, the cost may still be an obstacle.

28

**United States District Court**
For the Northern District of California

2

**United States District Court**
For the Northern District of California

- For all facilities, the cost of phone calls is unreasonably expensive, particularly as many detainees are indigent. *See* Compl. ¶ 46. For example, in the Richmond facility, "an intrastate, long-distance call costs $3.00 to connect plus $0.25 per minute, totaling $5.50 for a ten-minute call." Compl. ¶ 46. The government admits this cost in its answer. *See* Ans. ¶ 46. Notably, when a call automatically disconnects after 15 minutes, a detainee has to pay a new connection fee to continue a conversation, thus increasing the cost of a call dramatically. Aside from cost-related issues, there are other problems with telephone access at the detention facilities. For example:

- A call can be completed "only if a live person answers the telephone and accepts the call." Compl. ¶ 43. This means that detainees cannot leave voicemail messages. *See* Compl. ¶ 43. Also, detainees cannot complete calls to, *e.g.*, offices that use "voicemail trees, *i.e.*, automated systems that require selection of options to reach a live person." Compl. ¶ 43. In its answer, the government admits that "the telephone systems generally available to detainees at the Yuba, Sacramento and Contra Costa facilities require a live person to answer and accept any call; this feature is deemed necessary to prevent detainees, including criminal inmates not in ICE custody but housed at the same facilities, from calling any crime victims or leaving threatening messages." Ans. ¶ 43.

- Calls can be made during a detainee's "free time" only, but free time often takes place early in the morning or at night – *i.e.*, not during business hours – and therefore detainees "are unable to reach law offices or any other offices." Compl. ¶ 44. Also, free time occurs at inconsistent hours and therefore detainees "cannot reliably arrange to call people at particular times." Compl. ¶ 44.

- Telephone calls automatically disconnect after 15 minutes. *See* Compl. ¶ 46. In their papers, Plaintiffs maintain that this is disruptive even if, as the complaint suggests, a detainee may make more than one 15-minute call in order to have a longer conversation. *See* Compl. ¶ 46. In its answer, the government denies that there is an automatic disconnect at the Contra Costa facilities; however, it admits that "a call placed from the Yuba facility or the

Sacramento facility will be cut off after fifteen minutes in order to prevent ICE detainees and criminal inmates housed at the facility from monopolizing the phones."  Ans. ¶ 46.

• Telephones that detainees are allowed to use are located in the common areas of each housing unit, and therefore detainees "have absolutely no privacy when making privileged calls to current or prospective attorneys, which are often about sensitive topics."  Compl. ¶ 45.

• Detainees cannot receive incoming calls.  *See* Compl. ¶ 47.  In its answer, the government admits that "attorneys cannot call or arrange calls with ICE detainees at the Contra Costa facility."  Ans. ¶ 52.

All four named Plaintiffs have submitted declarations which address many of the above-identified problems with telephone access at the facilities at issue.

1.      **Mr. Lyon.**  Mr. Lyon has been in custody since approximately October 22, 2013.  *See* Lyon Decl. ¶ 5.  He is currently in custody at the West County Detention Facility in Richmond.  *See* Lyon Decl. ¶ 5.  He does not have an attorney.  *See* Lyon Decl. ¶ 7 (explaining that he cannot afford one).

Mr. Lyon has not been able to gather evidence to support his claim that he is eligible for a U visa as a victim of a violent crime.  *See* Lyon Decl. ¶ 8.  For example, he needs to get information from the East Palo Alto Police Department and the victim services unit of the San Mateo District Attorney's Office, but neither accepts collect calls.  *See* Lyon Decl. ¶ 8.  As he is in a Richmond facility, he does not have the option of calling them by using a calling card or phone credit.  *See* Lyon Decl. ¶ 8.  And when Mr. Lyon's wife has tried to get information from the police department herself, she has been rejected.  *See* Lyon Decl. ¶ 10 ("I believe that my wife has thus far been unable to obtain the police report from the shooting because the East Palo Alto Police Department will only release it to me or my legal representative.").  Furthermore, Mr. Lyon's wife is of limited assistance because Mr. Lyon is not able to call her by phone either.  She cannot afford collect calls, and, as noted above, Mr. Lyon does not have the option of calling her by using a calling card or phone credit.  *See* Lyon Decl. ¶ 9.

**United States District Court**
For the Northern District of California

2.    **Mr. Astorga-Cervantes.**  Mr. Astorga-Cervantes has been in custody since approximately November 20, 2013.  *See* Astorga-Cervantes Decl. ¶ 4.  He is currently in custody at the Rio Cosumnes Correctional Center in Elk Grove.  *See* Astorga-Cervantes Decl. ¶ 4.  He does not have an attorney.  *See* Astorga-Cervantes Decl. ¶ 8.

Mr. Astorga-Cervantes has had difficulty finding a lawyer to represent him.  He does not have enough money in his inmate account to purchase phone credit to call a lawyer.  *See* Astorga-Cervantes Decl. ¶ 7.  He is not able to have his family help him find a lawyer because he cannot afford to call his family, and his family cannot afford collect calls.  *See* Astorga-Cervantes Decl. ¶¶ 8, 11.  While detainees are not charged for making calls to nonprofit legal service providers, *see* Compl. ¶ 41 (discussing the "free call program"), Mr. Astorga-Cervantes has not had success with the free call program – two organizations that he called for free told him that they were not accepting new cases.  *See* Astorga-Cervantes Decl. ¶ 12.

Mr. Astorga-Cervantes has also been unable to obtain documents that may assist in his release from custody – *e.g.*, certificates and awards from his involvement with a domestic workers union.  *See* Astorga-Cervantes ¶ 10.  As noted above, he has not been able to get his family to help both because he cannot afford the cost of phone calls and because his family cannot afford the cost of phone calls.  *See* Astorga-Cervantes Decl. ¶ 10.

3.    **Mr. Cornelio.**  Mr. Cornelio has been in custody since approximately September 17, 2013.  *See* Cornelio Decl. ¶ 3.  He is currently in custody at the West County Detention Facility in Richmond.  *See* Cornelio Decl. ¶ 3.  He currently does not have counsel.  *See* Cornelio Decl. ¶ 6 (adding that he was previously represented by counsel but counsel withdrew after he could not afford to pay him).

Mr. Cornelio has had difficulty finding a lawyer to represent him.  Mr. Cornelio does not have the money to pay for phone calls, but, even if he did, there is no way to purchase a calling card or phone credit at the Richmond facility.  *See* Cornelio Decl. ¶ 7.  Accordingly, Mr. Cornelio must resort to collect calls.  Most free legal service providers did not answer his calls because he was trying to make collect calls.  Those who did answer told him that they were not accepting new cases.  *See* Cornelio Decl. ¶ 7.

In addition to the above, Mr. Cornelio has been unable to gather evidence in support of his immigration case because "there is no way for detainees to make international phone calls from [the Richmond facility]." Cornelio Decl. ¶ 10. For Mr. Cornelio, international phone calls are important because he is seeking asylum on the basis that he will be persecuted by gangs if he returns to Guatemala. *See* Cornelio Decl. ¶ 5.

**4.      Ms. Hernandez-Trujillo.** Ms. Hernandez-Trujillo has been in custody since November 14, 2012. *See* Hernandez-Trujillo Decl. ¶ 5. She is currently in custody at the Yuba County Jail in Marysville and was previously in custody at the Sacramento County Mail Jail. *See* Hernandez-Trujillo Decl. ¶ 4.

While Ms. Hernandez-Trujillo was in custody in the Sacramento County Main Jail, Ms. Hernandez-Trujillo's ability to find legal representation was severely hampered. She was locked down in her call for 22 hours a day, and free time hours (when phone calls could be made) were inconsistent and often occurred late at night. *See* Hernandez-Trujillo Decl. ¶ 9. Also, because she could not afford the cost of phone calls, she would have to make collect calls, and law offices did not accept such calls. Nor did government offices, from whom Ms. Hernandez-Trujillo needed information in order to obtain evidence for her immigration case. *See* Hernandez-Trujillo Decl. ¶ 11. Ms. Hernandez-Trujillo was finally able to find legal representation (pro bono) after multiple continuances in her immigration case. *See* Hernandez-Trujillo Decl. ¶ 13.

As noted above, Ms. Hernandez-Trujillo is now in custody in the Yuba County Jail in Marysville. She still cannot afford the cost of phone calls. *See* Hernandez-Trujillo Decl. ¶ 15 (stating that the calls at the Yuba County Jail are even more expensive than the calls at the Sacramento County Main Jail). In addition, her attorney cannot afford to accept collect calls on a regular basis. *See* Hernandez-Trujillo Decl. ¶ 17. When Ms. Hernandez-Trujillo does call her attorney, the call is cut-off if no live person answers. *See* Hernandez-Trujillo Decl. ¶¶ 16-17. This means that Ms. Hernandez-Trujillo cannot leave voicemail messages. *See* Hernandez-Trujillo Decl. ¶ 17. Also, when her attorney's office used to use an automated phone tree, this prevented Ms. Hernandez-Trujillo was prevented from getting in touch with her counsel. Notably, when Ms.

1  Hernandez-Trujillo asked for assistance to deal with this problem, her request was denied.  *See*

2  Hernandez-Trujillo Decl. ¶ 16.

3         In addition to declarations from Plaintiffs themselves, Plaintiffs have submitted two

4  declarations from immigration attorneys that detail their problems with communicating with clients

5  because of telephone access issues at the detention facilities.  *See generally* Lee Decl.; Vincent Decl.

## II.    DISCUSSION

7  A.    Legal Standard

8         Plaintiffs seek certification of the following class pursuant to Federal Rule of Civil Procedure

9  23(b)(2): "All current and future immigration detainees who are or will be held by ICE in Contra

10  Costa, Sacramento, and Yuba Counties."  Mot. at 1.

11        Under Rule 23(b)(2), a class action may be maintained if:

12  •   Rule 23(a) is satisfied – *i.e.*, "(1) the class is so numerous that joinder of all members is

13       impracticable; (2) there are questions of law or fact common to the class; (3) the claims or

14       defenses of the representative parties are typical of the claims or defenses of the class; and

15       (4) the representative parties will fairly and adequately protect the interests of the class"; and

16  •   "the party opposing the class has acted or refused to act on grounds that apply generally to

17       the class, so that final injunctive relief or corresponding declaratory relief is appropriate

18       respecting the class as a whole."

19  Fed. R. Civ. P. 23(a), (b)(2).

20        As indicated aby the above, Rule 23(b)(2) class actions are so-called "injunction" class

21  actions, which stand in contrast to "damages" class actions brought pursuant to Rule 23(b)(3).  *See*

22  *Frank v. United Airlines, Inc.*, 216 F.3d 845, 849 (9th Cir. 2000).  Rule 23(b)(2) class actions are

23  treated more liberally than Rule 23(b)(3) class actions to the extent the latter has strict requirements

24  of mandatory notice to the class upon certification as well as an opportunity to opt out.  *See* Fed. R.

25  Civ. P. 23(c)(2).  In contrast, in a Rule 23(b)(2) class action, notice may be given but is not required,

26  and there is no requirement that a class member be given an opportunity to exclude himself or

27  herself from the lawsuit.  The Court also notes that, Rule 23(b)(2) was adopted precisely "in order to

28  permit the prosecution of civil rights actions."  *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir.

1998); *see also Cal. for Disability Rights, Inc. v. Cal. DOT*, 249 F.R.D. 334, 349 (N.D. Cal. 2008) (Armstrong, J.) (stating that "[t]he Court's analysis of the commonality requirement of Rule 23(a) necessarily touched on the propriety of certifying the class under Rule 23(b)(2)[;] [a]s noted, this case is precisely the sort of civil rights class action contemplated by Rule 23(b)(2)").  Rule 23(b)(2) only requires that the defendant act or refuse to act on grounds that apply "generally to the class."

Plaintiffs have the burden of demonstrating that they have met the Rule 23(a) and (b)(2) requirements.  *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011).

B.    Class Definition

Before addressing the Rule 23(a) and (b)(2) requirements, the Court considers first the government's challenge to the definition of the proposed class – *i.e.*, "[a]ll current and future immigration detainees who are or will be held by ICE in Contra Costa, Sacramento, and Yuba Counties."  Mot. at 1.  The government contends in particular that the proposed class definition is overly broad and not precisely defined.[1]  *See* Opp'n at 6.

The Court rejects the government's argument.  Courts have held that "[a]n identifiable class exists if its members can be ascertained by reference to objective criteria," *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 679 (S.D. Cal. 1999) – *i.e.*, "[t]he order defining the class should avoid subjective standards (e.g., a plaintiff's state of mind) or terms that depend on resolution of the merits (e.g., persons who were discriminated against)."  Manual for Complex Litigation, Fourth § 21.222, at 270.  *See, e.g.*, *Schwartz*, 183 F.R.D. at 679 (stating that "[a] class description is insufficient . . . if membership is contingent on the prospective member's state of mind").  Here, Plaintiffs' proposed class definition does not use subjective standards or terms that depend on the resolution of the merits.

Furthermore, "[a] class definition is sufficient if the description of the class is definite enough so that it is administratively feasible for the court to ascertain whether an individual is a

---

[1] According to the Ninth Circuit, the requirements of Rule 23(a) and (b) are designed to "'designed to protect absentees by blocking unwarranted or overbroad class definitions.'"  *Narouz v. Charter Communs., LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).  However, many district courts have considered the issue of whether a class definition is overbroad independent of the requirements of Rule 23(a) and (b).

United States District Court

For the Northern District of California

1 | member." *Rodman v. Safeway, Inc.*, No. 11-cv-03003-JST, 2014 U.S. Dist. LEXIS 31438, at *53

2 | (N.D. Cal. Mar. 10, 2014) (internal quotation marks omitted).  Here, it is easily administratively

3 | feasible to determine whether a person falls within Plaintiffs' proposed class.

4 | The government protests still that the "proposed class is overly broad [because it is] not

5 | limited to those individuals who are or will be 'held in government custody *pending deportation*

6 | *proceedings*.'" Opp'n at 5 (quoting complaint; emphasis added).  But contrary to what the

7 | government suggests, there is no need to add the phase "pending deportation proceedings" to limit

8 | the class definition.  There is no real dispute that the reason why Plaintiffs and other ICE detainees

9 | are in the facilities in the first place is because of the potential for removal.  As Plaintiffs argue, the

10 | government fails "to explain how or why distinctions in the procedural posture of detainees'

11 | immigration cases[2] have any significance for purposes of class certification."  Reply at 4.

12 | Furthermore, even if a detainee has gone through the IJ and BIA process, he or she may still have

13 | additional avenues for relief (*e.g.*, judicial review).  *See* 8 U.S.C. § 1252.

14 | Accordingly, the Court rejects the government's contention that the proposed class definition

15 | is overbroad and turns now to the Rule 23(a) and (b)(2) requirements.[3]

16 | C.    Rule 23(a)

17 | 1.    Numerosity: Class So Numerous that Joinder of All Members is Impracticable

18 | Plaintiffs argue that the numerosity requirement is easily satisfied because "[t]he Facilities

19 | hold a combined total of 500 to 600 immigration detainees on an average day."  Mot. at 9.  Plaintiffs

---

20–24 | [2] The government notes that "not all ICE detainees who are detained under 8 U.S.C. § 1225(b) or § 1231 in Yuba, Contra Costa, or Sacramento County will necessarily have or have had proceedings before the San Francisco Immigration Court."  Opp'n at 7.  Section 1225(b) concerns the inspection of alien applicants for admission to the United States, "such as those apprehended at the border or at a port of entry."  *Rodriguez v. Robbins*, 715 F.3d 1127, 1132 (9th Cir. 2013).  Applicants are screened and, if found inadmissible, shall be removed from the United States unless, *e.g.*, the alien is referred for an interview by an asylum officer.  *See* 28 U.S.C. § 1225(b)(1)(A)-(B).  Section 1231 concerns the detention and removal of aliens ordered removed.

25–28 | [3] The Court also notes that class definitions of actions maintained under Rule 23(b)(2) generally command less precision than those brought under Rule 23(b)(3).  *See* Manual for Complex Litigation, Fourth § 21.222, at 270 (stating that, "[b]ecause individual class members must receive the best notice practicable and have an opportunity to opt out, and because individual damage claims are likely, Rule 23(b)(3) actions require a class definition that will permit identification of individual class members, while Rule 23(b)(1) or (b)(2) actions may not").

**United States District Court**
For the Northern District of California

1    add that joinder is impracticable not only because there is a large number of class members but also

2    because class members are "transitory" (*e.g.*, they may be transferred to other facilities, they may be

3    removed, or they may be permitted to stay). *See* Mot. at 9.

4        The Court finds Plaintiffs' position on numerosity meritorious, particularly in the absence of

5    any challenge by the government.

6        2.    <u>Adequacy: Representative Parties Will Fairly and Adequately Protect Interests of the</u>

7           <u>Class</u>

8           To determine whether named plaintiffs will adequately
represent a class, courts must resolve two questions: "(1) do the named

9       plaintiffs and their counsel have any conflicts of interest with other
class members and (2) will the named plaintiffs and their counsel

10      prosecute the action vigorously on behalf of the class?" Adequate
representation depends on, among other factors, an absence of

11      antagonism between representatives and absentees, and a sharing of
interest between representatives and absentees.

12

13    *Ellis*, 657 F.3d at 985.

14        Here, the government does not question the ability of Plaintiffs' counsel to adequately

15    represent the proposed class, *see* Opp'n at 7, and the Court finds that counsel is in fact adequate to

16    represent the proposed class.

17        As for Plaintiffs' ability to adequately represent the proposed class, the government makes

18    the following arguments: (1) Mr. Cornelio is not an adequate representative because he was removed

19    to Guatemala on February 11, 2014, and he waived any right to appeal the removal order; (2) all

20    four Plaintiffs cannot "adequately represent any ICE detainee who alleges that his or her detention

21    has been prolonged by inadequate telephone access" because none "can evidence any causation

22    between their detention and allegedly inadequate telephone access"; (3) all Plaintiffs except for Ms.

23    Hernandez-Trujillo are not adequate representatives because they never asked to make a "private

24    legal phone call that will not automatically cut off after a certain time period and that is free for any

25    indigent detainee"; and (4) at best, Plaintiffs can only adequately represent persons detained by ICE

26    pursuant to 8 U.S.C. § 1226 – and not, *e.g.*, § 1231 or § 1225(b). Opp'n at 8-10. None of these

27    arguments is compelling.

28    ///

**United States District Court**
For the Northern District of California

1       1.     <u>Mr. Cornelio's Removal</u>

2          As noted above, the government argues first that Mr. Cornelio is not an adequate

3  representative because he was removed to Guatemala on February 11, 2014, and he waived any right

4  to appeal the removal order.

5          As a preliminary matter, the Court takes note that, even if the government were right that Mr.

6  Cornelio was not an adequate representative, that still leaves three other Plaintiffs willing to take on

7  the mantle of class representative.

8          However, contrary to what the government argues, Mr. Cornelio is an adequate

9  representative in spite of his removal and waiver of the right to appeal.  The government does not

10  dispute that, at the time the lawsuit was filed, Mr. Cornelio did have standing to pursue the instant

11  action.  While Mr. Cornelio's standing may have mooted out his specific claim for relief, that does

12  not automatically mean he can no longer be a class representative for other detainees who still want

13  relief.

14          As Plaintiffs point out, the critical case on point is *Gerstein v. Pugh*, 420 U.S. 103 (1975).

15  *Gerstein*, like the instant case, was a class action.  The plaintiffs were two individuals who had been

16  charged with crimes by information, instead of indictment, under Florida law.  Under Florida law, a

17  person charged by information could be detained for a substantial period of time without getting a

18  preliminary hearing to test probable cause.  *See id.* at 105-06.  The plaintiffs argued that they and

19  other putative class members had a constitutional right to a timely judicial hearing on the issue of

20  probable cause.

21          In a footnote, the Supreme Court took into account that the plaintiffs had ultimately been

22  convicted and therefore their pretrial detention had ended.  Nevertheless, the Court still proceeded

23  with the case because it

> belongs . . . to that narrow class of cases in which the termination of a
> class representative's claim does not moot the claims of the unnamed
> members of the class.  Pretrial detention is by nature temporary, and it
> is most unlikely that any given individual could have his constitutional
> claim decided on appeal before he is either released or convicted.  The
> individual could nonetheless suffer repeated deprivations, and it is
> certain that other persons similarly situated will be detained under the
> allegedly unconstitutional procedures.  The claim, in short, is one that
> is distinctly "capable of repetition, yet evading review."

United States District Court

For the Northern District of California

> At the time the complaint was filed, the named respondents were members of a class of persons detained without a judicial probable cause determination, but the record does not indicate whether any of them were still in custody awaiting trial when the District Court certified the class. Such a showing ordinarily would be required to avoid mootness under *Sosna*. But this case is a suitable exception to that requirement. The length of pretrial custody *cannot be ascertained at the outset*, and it may be ended at any time by release on recognizance, dismissal of the charges, or a guilty plea, as well as by acquittal or conviction after trial. It is by no means *certain* that any given individual, named as plaintiff, would be in pretrial custody long enough for a district judge to certify the class. Moreover, in this case the *constant existence of a class of persons suffering the deprivation is certain*. The attorney representing the named respondents is a public defender, and we can safely assume that he has other clients with a continuing live interest in the case.

*Id.* at 111 n.11 (emphasis added).

The Supreme Court subsequently upheld *Gerstein* in *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991). In *McLaughlin*, the plaintiffs brought a class action similar to that in *Gerstein*. *See id.* at 47 (challenging the manner in which the County of Riverside provided probable cause determinations to persons arrested without a warrant – in particular, the delay in providing such determinations). The County challenged the plaintiffs' standing, arguing that "the main thrust of plaintiffs' suit is that they are entitled to 'prompt' probable cause determinations" and, "[o]nce sufficient time has passed, . . . it is too late for them to receive a prompt hearing and, under *Lyons*, they cannot show that they are likely to be subjected again to the unconstitutional conduct." *Id.* at 50-51.

The Supreme Court rejected the standing argument, explaining as follows:

> The County does not dispute that, at the time the second amended complaint was filed, plaintiffs James, Simon, and Hyde had been arrested without warrants and were being held in custody without having received a probable cause determination, prompt or otherwise. Plaintiffs alleged in their complaint that they were suffering a direct and current injury as a result of this detention, and would continue to suffer that injury until they received the probable cause determination to which they were entitled. Plainly, plaintiffs' injury was at that moment capable of being redressed through injunctive relief. The County's argument that the constitutional violation had already been "completed" relies on a crabbed reading of the complaint. This case is easily distinguished from *Lyons*, in which the constitutionally objectionable practice ceased altogether before the plaintiff filed his complaint.

United States District Court

For the Northern District of California

> It is true, of course, that the claims of the named plaintiffs have since been rendered moot; eventually, they either received probable cause determinations or were released.  Our cases leave no doubt, however, that by obtaining class certification, plaintiffs preserved the merits of the controversy for our review. In factually similar cases we have held that "the termination of a class representative's claim does not moot the claims of the unnamed members of the class."  That the class was not certified until after the named plaintiffs' claims had become moot does not deprive us of jurisdiction.  We recognized in *Gerstein* that "some claims are so *inherently transitory* that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires."  In such cases, the "relation back" doctrine is properly invoked to preserve the merits of the case for judicial resolution.  Accordingly, we proceed to the merits.

*Id.* at 51-52 (emphasis added).

Finally, in *Wade v. Kirkland*, 118 F.3d 667 (9th Cir. 1997), the Ninth Circuit followed the principles articulated in *Gerstein* and *McLaughlin*.  In *Wade*, the plaintiff brought a class action challenging the working conditions of "chain gang" labor at the county jail where he was then housed.  While the plaintiff's motion for class certification was pending, he was transferred to a different facility.  The district court denied the motion to certify as premature – *i.e.*, because the transfer had mooted out the plaintiff's individuals claims.  The question for the Ninth Circuit was whether the plaintiff had standing on appeal to challenge the ruling on the class certification motion.  According to the Ninth Circuit, he did.

> The Supreme Court in *Geraghty* recognized that even after mootness of a named plaintiff's own claim, a plaintiff may continue to have a "'personal stake' in obtaining class certification."  The plaintiff in *Geraghty* sought to have a denial of certification  reversed; Wade seeks a ruling on an outstanding class certification motion; each "continues vigorously to advocate his right to have a class certified."
>
> As an appellate court, however, "we cannot review [class certification] decisions before they are made."  We therefore remand for the district court to decide the outstanding certification motion, including whether Wade can continue as class representative or whether other putative class members should be allowed to intervene.
>
> On remand, the district court should decide the class certification motion before proceeding further.  We recognize that, in some cases, it may be appropriate in the interest of judicial economy to resolve a motion for summary judgment or motion to dismiss prior to ruling on class certification.  This is not one of those cases. Wade purported to represent short-term inmates in a county jail, presenting a classic example of a *transitory claim* that cries out for a ruling on certification as rapidly as possible.

> We note only that the claims have the potential for being "inherently transitory"; whether the class claims are in fact "inherently transitory" is ultimately a decision for the district court, and we do not in any way suggest what result that court should reach. Indeed, we could not, as the record at this point is devoid of any evidence of the average length of detention in the county jail. We write only to clarify that in making this determination, the district court must look at the claims of the class as a whole, as opposed to Wade's individual claims for relief.
>
> If the district court finds the claims are indeed "inherently transitory," then the action qualifies for an exception to mootness even if there is no indication that Wade or other current class members may again be subject to the acts that gave rise to the claims. This is because there is a constantly changing putative class that will become subject to these allegedly unconstitutional conditions. Moreover, if transitory, the court could validly certify a class on remand, even though the named plaintiff's claims are already moot, since the "relation back" doctrine will relate to Wade's standing at the outset of the case in order "to preserve the merits of the case for judicial resolution."
>
> On the other hand, if the district court finds that the class claims are not sufficiently transitory to qualify for this exception to the mootness doctrine, it should then consider whether putative class members with live claims should be allowed to intervene.

*Id.* at 669-70 (emphasis added).

Accordingly, per *Gerstein*, *MacLaughlin*, and *Wade*, the question for the Court is whether Plaintiffs' class claims are "inherently transitory." They are. As in *Gerstein*, the length of detention cannot be ascertained at the outset and may be ended before class certification by various circumstances. It is not certain that any given individual, named as a plaintiff, would stay in detention long enough for a district judge to certify the class, and the constant existence of a class of persons suffering the alleged deprivation is certain. *See Gerstein*, 420 U.S. at 111 n.11.

2.  Prolonged Detention Caused by Limited Telephone Access

The government argues next that all four Plaintiffs cannot "adequately represent any ICE detainee who alleges that his or her detention has been prolonged by inadequate telephone access" because none "can evidence any causation between their detention and allegedly inadequate telephone access." Opp'n at 8-9. According to the government, Mr. Lyon has been detained because a statute, 8 U.S.C. § 1226(c), precludes him from seeking release on bond at this time. Mr. Cornelio had been out on bond but that bond was revoked in September 2013 after he was arrested

United States District Court

For the Northern District of California

1  and incarcerated for driving under the influence of alcohol in July 2013.  Mr. Astorga-Cervantes has

2  been granted release on a bond.  Finally, Ms. Hernandez-Trujillo has declined to seek release on a

3  bond.  *See* Opp'n at 8-9.

4       The government's argument lacks merit.  First, the key harm asserted here transcends the

5  length of detention.  What is centrally at issue is access to counsel and other persons so that

6  Plaintiffs can effectively pursue vindication of their legal rights.  Telephone access may affect the

7  likelihood of their ultimate success in avoiding deportation.  This interest does not necessarily turn

8  on the length of detention.

9       To the extent part of the harm includes the lengthening of detention because of telephone

10  issues, Plaintiffs have presented evidence of such.  According to Plaintiffs, the denial and restriction

11  of telephone access has substantially prolonged their incarceration because *e.g.*, they have been

12  forced to ask for continuances to retain counsel, consult with counsel, or prepare their cases.  *See,*

13  *e.g.*, Hernandez-Trujillo Decl. ¶ 12; Cornelio Decl. ¶ 8.  That a plaintiff may or may not be released

14  on bonds does not negate the fact that, whatever the length of their detention, the need for

15  continuances prolongs or did prolong the detention.  As to those detainees denied bond in particular,

16  the deficient process in the facilities prolongs their detention.  Reply at 9.

17       3.    Request to Make Legal Phone Call

18       In its third argument on adequacy, the government contends that all Plaintiffs except for Ms.

19  Hernandez-Trujillo are not adequate representatives because they never asked to make a "private

20  legal phone call that will not automatically cut off after a certain time period and that is free for any

21  indigent detainee."  Opp'n at 9.

22       Similar to above, the Court takes note that, even if the government were right that three of

23  the four Plaintiffs were not adequate representatives, that still leaves Ms. Hernandez-Trujillo willing

24  to take on the mantle of class representative.

25       In any event, the government's position on inadequacy is problematic.  The government

26  argues that "a detainee's decision not to pursue such options [as identified above] will be a defense

27  in this litigation," Opp'n at 9, but, even if so, that does not automatically mean there is an apparent

28  conflict of interest between Plaintiffs and other class members or that Plaintiffs will not prosecute

the action vigorously on behalf of the class.  *See, e.g.*, *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003) (stating that "this circuit does not favor denial of class certification on the basis of speculative conflicts"); *Blackie v. Barrack*, 524 F.2d 891, 909 (9th Cir. 1975) (noting that class members might have differing interests at later stages of litigation, but that "potential conflicts" do not present a valid reason for refusing to certify a class; adding that "courts have generally declined to consider conflicts, particularly as they regard damages, sufficient to defeat class action status at the outset unless the conflict is apparent, imminent, and on an issue at the very heart of the suit"); *Allied Orthopedic Appliances, Inc. v. Tyco HealthCare Group L.P.*, 247 F.R.D. 156, 177 (C.D. Cal. 2007) (stating that "[c]lass certification will be inappropriate if fundamental conflicts of interest are determined to exist among the proposed class members"; adding that "[a] conflict is 'fundamental' when it goes to the specific issues in controversy, or where . . . some plaintiffs claim to have been harmed by the same conduct that benefited other members of the class, preventing the named representatives from 'vigorously prosecut[ing] the interests of the class through qualified counsel'"). The fact that every class representative has not been harmed in the same way as others does not in itself create a conflict precluding adequate representation.

The Court notes that, in some ways, the government's argument here is not one of adequacy, but rather typicality.  More specifically, courts have generally held that, where a named plaintiff is subject to a unique defense that threatens to preoccupy him or her, he or she may lack typicality. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (stating that "a named plaintiff's motion for class certification should not be granted if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it'"; also indicating that "'class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation'").  Here, even if there were a defense to a particular plaintiff based on his or her failure to ask to make a phone call, nothing suggests that such a defense would threaten to become such a focus of the litigation that the affected Plaintiff would no longer be adequate representative for the class.

///

///

16

**United States District Court**
For the Northern District of California

1    4.    Section 1226 Class

2    Finally, the government asserts that, at best, Plaintiffs can only adequately represent persons

3  detained by ICE pursuant to 8 U.S.C. § 1226 – and not, *e.g.*, § 1231 or § 1225(b).  (The government

4  admits that Mr. Cornelio was subject to removal under § 1231 but argues that he is still an

5  inadequate representative because, as discussed above, he has already been removed to Guatemala.

6  *See* Opp'n at 10.)  This argument relates back to the government's argument above that Plaintiffs'

7  class definition is overbroad because, *e.g.*, it includes § 1231 and § 1225(b) detainees.  *See* note 2,

8  *supra*.

9    Similar to above, the current argument is not persuasive.  While there may be some

10  differences when a detainee is subject to § 1231 or § 1225(b) as opposed to § 1226, post-removal

11  order detention pursuant to 8 U.S.C. § 1226(a) which provides for bond hearing), *see Rodriguez v.*

12  *Hayes*, 591 F.3d 1105, 1113-14 (9th Cir. 2010) (noting that "§ 1225(b) provides for discretionary

13  detention of aliens pending a determination of admissibility," that "§ 1226 provides for both

14  discretion detention generally and mandatory detention for certain narrow categories of aliens

15  pending a determination of their removability," and that "§ 1231(a) provides for mandatory

16  detention of aliens ordered removed during the 90 day removal period and discretionary detention

17  after the end of the removal period"), the government has failed to identify how this would create a

18  conflict of interest between Plaintiffs and other class members or cause a named Plaintiff to fail to

19  vigorously prosecute.

20    3.    Commonality: There Are Questions of Law or Fact Common to the Class

21    "To show commonality, Plaintiffs must demonstrate that there are questions of fact and law

22  that are common to the class."  *Ellis*, 657 F.3d at 981.  "'[A]ll questions of fact and law need not be

23  common to satisfy [Rule 23(a)],'" but it is not sufficient "to merely allege any common question, for

24  example, 'Were Plaintiffs passed over for promotion?'  Instead, [Plaintiffs] must pose a question that

25  'will produce a common answer to the crucial question *why was I disfavored*.'"  *Id.*; *see also Wal-*

26  *Mart Stores, Inc. v. Duke*, 131 S. Ct. 2541, 2551 (2011) (stating that "[c]ommonality requires the

27  plaintiff to demonstrate that the class members have suffered the same injury").  "What matters to

28  class certification . . . is not the raising of common questions – even in droves – but, rather the

United States District Court
For the Northern District of California

1   capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the

2   litigation." *Id.* (internal quotation marks omitted).

3       In its opposition, the government makes two arguments related to commonality: (1) Plaintiffs

4   cannot show widespread actual injury, *see Lewis v. Casey*, 518 U.S. 343, 348-49 (1996) ("agree[ing]

5   that the success of respondents' systemic challenge was dependent on their ability to show

6   widespread actual injury, and . . . the court's failure to identify anything more than isolated instances

7   of actual injury renders its finding of a systemic *Bounds* violation invalid"); and (2) there is no

8   common or overriding policy that governs the Yuba, Elk Grove and Richmond facilities – rather

9   there are various practices at the three different facilities.

10      As to the first argument, the government asserts that "those detainees within the proposed

11  class who are ineligible to seek relief from removal or who are awaiting removal proceedings cannot

12  [even] evidence the 'actual injury' required to contest their conditions of confinement." Opp'n at

13  11. But this argument misses the point. Even those ineligible for relief from removal may still wish

14  to get the advice of counsel as there may be other avenues for relief. As for those detainees awaiting

15  removal proceedings, that is precisely when there is a need for adequate telephone access to get the

16  assistance of an attorney or others in order to contest removal or, at least, to see whether there is a

17  basis to contest removal. Moreover, this alleged injury is clearly widespread and not "isolated

18  instances" as in *Lewis*.

19      As for the second argument, Plaintiffs fairly point out that the government has admitted to at

20  least one significant common practice in all of the three facilities. More specifically, in its answer,

21  the government admits that "the telephone systems generally available to detainees at the Yuba,

22  Sacramento and Contra Costa facilities require a live person to answer and accept any call; this

23  feature is deemed necessary to prevent detainees, including criminal inmates not in ICE custody but

24  housed at the same facilities, from calling any crime victims or leaving threatening messages." Ans.

25  ¶ 43.

26      More fundamentally, the overarching claim is that ICE detainees in these facilities are denied

27  effective access to telephones and that this impedes communications with counsel, family, and

28  others necessary to protect and vindicate their legal rights. The fact that the precise practices among

United States District Court
For the Northern District of California

the three facilities may vary does not negate the application of a constitutional floor equally

applicable to all facilities.  In this regard, the constitutional standard Plaintiffs seek to impose here is

structurally similar to the application of ICE's National Detention Standards, which the government

admits applies to all three facilities.  *See* Compl. ¶ 41; Ans. ¶ 46.  As Plaintiffs argue, the nature of

the overarching constitutional standard Plaintiffs seek to apply here to various conditions found in

particular facilities is no different than cases in which a class-based challenge is brought against

systemic prison conditions.  *See, e.g.*, *Williams v. City of Philadelphia*, 270 F.R.D. 208, 222 (E.D.

Pa. 2010) (granting Rule 23(b)(2) class certification to claim bought by inmates contesting the

conditions of confinement in the Philadelphia Prison System); *cf. Walters*, 145 F.3d at 1047

(certifying a Rule 23(b)(2) class where plaintiffs alleged that forms used by INS on a nationwide

basis did not adequately advise them of their rights; noting that, "[w]hile the government correctly

observes that numerous individual administrative proceedings may flow from the district court's

decision, it fails to acknowledge that the district court's decision eliminates the need for individual

litigation regarding the constitutionality of INS's official forms and procedures").[4]

4.    Typicality: Claims or Defenses of Representatives Parties Are Typical of Claims or
Defenses of the Class

"To demonstrate typicality, Plaintiffs must show that the named parties' claims are typical of

the class.  The test of typicality is whether other members have the same or similar injury, whether

the action is based on conduct which is not unique to the named plaintiffs, and whether other class

members have been injured by the same course of conduct.  Typicality refers to the nature of the

claim or defense of the class representative, and not to the specific facts from which it arose or the

relief sought."  *Ellis*, 657 F.3d at 984 (internal quotation marks omitted).

[4] The commonality identified above is sufficient to support a class covering all three facilities.  However, the Court notes that, even if there were differences among the three facilities (*e.g.*, at the Richmond facility, a detainee cannot purchase a calling card or phone credit), such that there were significant concerns about commonality, the government has failed to explain why, at the very least, there could not be certification of subclasses.  *See Staton v. Boeing Co.*, 327 F.3d 938, 956 (9th Cir. 2003) ("conclud[ing] that the district court was within its discretion to find the commonality requirement of Rule 23(a)(1) met in this case" but adding that "[t]he district court in all likelihood could . . . have declined to certify the overall class in favor of certifying discrete sub-classes, so as to assure commonality").  No party, however, has argued for subclasses herein.

19

1    In its opposition, the government argues that Plaintiffs cannot establish typicality "[f]or the

2   same reasons that Plaintiffs cannot satisfy the adequacy and commonality prerequisites."  Opp'n at

3   13.  For the reasons discussed above, the government's typicality argument also fails.

4   D.    Rule 23(b)(2)

5    As noted above, for certification under Rule 23(b)(2), the party seeking certification must

6   show that "the party opposing the class has acted or refused to act on grounds that apply *generally* to

7   the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting

8   the class as a whole."  Fed. R. Civ. P. 23(b)(2) (emphasis added).  Claims for individualized relief

9   do not satisfy Rule 23(b)(2).  *See Wal-Mart*, 131 S. Ct. at 2557.

> The key to the (b)(2) class is "the indivisible nature of the injunctive
> or declaratory remedy warranted – the notion that the conduct is such
> that it can be enjoined or declared unlawful only as to all of the class
> members or as to none of them."  In other words, Rule 23(b)(2)
> applies only when a single injunction or declaratory judgment would
> provide relief to each members of the class.  It does not authorize class
> certification when each individual class member would be entitled to a
> *different* injunction or declaratory judgment against the defendant.

15   *Id.*

16    In its opposition, the government largely rehashes its commonality argument with respect to

17   the (b)(2) requirement – *i.e.*, "Plaintiffs do not challenge a single policy applying to all facilities, but

18   rather various practices amongst the facilities."  Opp'n at 13-14.  But, as indicated above, the

19   government's characterization is not accurate.  Plaintiffs are not asking for any individualized relief

20   for each class member.  Rather, they are asking for systemic changes consistent with a single

21   overarching constitutional standard that will be applicable to all class members in all these facilities.

22   That each facility may have to change its current policies in varying ways in order to comply does

23   not negate the singular nature of the injunction sought.  As noted above, it is telling that prison

24   condition cases are often certified under Rule 23(b)(2) where a prison policy or procedure is

25   challenged.  *See Riker v. Gibbons*, No. 3:08-CV-00115-LRH-RAM, 2009 U.S. Dist. LEXIS 35449,

26   at *17-18 & n.7 (D. Nev. Mar. 31, 2009) (finding certification appropriate under Rule 23(b)(2)

27   where plaintiffs "challenge[d] [Ely State Prison's] medical system, which they allege subjects all of

28   them to a significant risk of injury and unnecessary infliction of pain"; adding that "[o]ther courts

have also certified classes under Rule 23(b)(2) when prisoners challenge the constitutionality of prison conditions"); *Williams*, 270 F.R.D. at 222 (noting that "[n]umerous courts have held that Rule 23(b)(2) is an appropriate vehicle in actions challenging prison conditions"). The instant case is, for all practical purposes, materially indistinguishable from such prison condition cases.

### III.  CONCLUSION

For the foregoing reasons, the Court grants Plaintiffs' motion for class certification. The following class is certified pursuant to Rule 23(b)(2): "All current and future immigration detainees who are or will be held by ICE in Contra Costa, Sacramento, and Yuba Counties."

Because a 23(b)(2) class is being certified, notice to the class is not required but may be appropriate depending on the circumstances. *See* Fed. R. Civ. P. 23(c)(2) (providing that, "[f]or any class certified under Rule 23(b)(1) or (b)(2), the court may direct appropriate notice to the class"). If Plaintiffs believe that notice is appropriate, then they should immediately inform Defendants, and the parties should meet and confer (either in person or by telephone) to determine whether they can reach agreement as to whether notice should be given and, if so, what the terms of that notice should be and how the notice should be distributed to the class.

A case management conference ("CMC") shall be held on May 22, 2014, at 9:00 a.m. The parties shall file a joint CMC statement one week prior to the conference.

This order disposes of Docket No. 14.


IT IS SO ORDERED.


Dated:  April 16, 2014

_____
EDWARD M. CHEN
United States District Judge