ROBERT P. VARIAN (SBN 107459)
CHARLES J. HA (*pro hac vice*)
DAVID KEENAN (*pro hac vice*)
JUDY KWAN (SBN 273930)
ALEXIS YEE-GARCIA (SBN 277204)
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
Telephone:  (415) 773-5700
Facsimile:  (415) 773-5759
Email:  rvarian@orrick.com

JULIA HARUMI MASS (SBN 189649)
ANGÉLICA SALCEDA (SBN 296152)
MICHAEL T. RISHER (SBN 191627)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437
Email: jmass@aclunc.org

*Attorneys for Plaintiffs*

[Additional Counsel appear on signature page]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| AUDLEY BARRINGTON LYON, JR., et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br>Defendants. | Case No.:  13-cv-05878-EMC<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY ADJUDICATION**<br><br>Date:  February 11, 2016<br>Time:  1:30 p.m.<br>Courtroom:  5<br>Judge:  Hon. Edward M. Chen<br><br>**[PUBLIC REDACTED VERSION]** |

AMERICAN CIVIL LIBERTIES UNION
NATIONAL PRISON PROJECT
CARL TAKEI (SBN 256229)
915 15th Street N.W., 7th Floor
Washington, DC 20005
Telephone: (202) 393-4930
Facsimile: (202) 393-4931
Email: ctakei@aclu.org

VAN DER HOUT, BRIGAGLIANO, & NIGHTINGALE, LLP
MARC VAN DER HOUT (SBN 80778)
MEGAN SALLOMI (SBN 300580)
180 Sutter Street, Suite 500
San Francisco, CA 94104
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
Email: Msal@vblaw.com

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on February 11, 2016, at 1:30 p.m. or as soon thereafter as they may be heard in Courtroom 5 on the 17th Floor at 450 Golden Gate Avenue, San Francisco, California, Plaintiffs will and hereby do move the Honorable Edward M. Chen under Rule 56 of the Federal Rules of Civil Procedure for summary adjudication ("the Motion").

Through this motion, Plaintiffs seek a declaration from the Court that (1) Defendants have violated and continue to violate Plaintiff class members' constitutional and statutory rights to access to counsel and to full and fair immigration proceedings through the denial of necessary and adequate telephone access and (2) that injunctive relief is necessary to remedy these ongoing violations.

The Motion is made on the following grounds:

- That Defendants' provision of limited and restricted telephone access to class members violates Plaintiffs' rights under the Immigration and Nationality Act;
- That Defendants' provision of limited and restricted telephone access to class members violates Plaintiffs' rights under the Due Process Clause of the Fifth Amendment to the United States Constitution; and
- That Defendants' provision of limited and restricted telephone access to class members violates Plaintiffs' rights under the Petition Clause of the First Amendment to the United States Constitution.

This Motion is based upon this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the concurrently filed declarations, all pleadings and other documents on file with this Court, and any other evidence or argument that may be presented before or at the time of the hearing on this Motion.

Dated: December 17, 2015     By:     _/s/ Julia Harumi Mass_____

JULIA HARUMI MASS (SBN 189649)
ANGÉLICA SALCEDA (SBN 296152)
MICHAEL T. RISHER (SBN 191627)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
OF NORTHERN CALIFORNIA

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................ 1

II.  STATEMENT OF FACTS .................................................................................. 2

   A.   The Certified Class Consists of Individuals Detained for Immigration
      Proceedings ................................................................................................ 2

   B.   Meaningful Telephone Access Is Critical to Plaintiffs' Ability to Obtain
      and Communicate with Counsel or Represent Themselves ....................... 3

   C.   Defendants' Denial and Restriction of Telephone Access Prevents
      Plaintiffs from Critical Contact with the Outside World .......................... 5

      1.   Housing Unit Calls Are Prohibitively Expensive at RCCC, Yuba
         and Contra Costa ............................................................................. 6

      2.   Technical Barriers Prevent Detainees from Reaching Government
         Offices and Others for Information or Support ................................ 7

      3.   The Talton "Free Call Platform" Does Not Meet Plaintiffs' Needs
         for Direct, Free, Private Legal Calls ............................................. 10

      4.   Restraints on Plaintiffs' Liberty Further Prevent Telephone Access ........ 11

      5.   ICE Provides Insufficient Access to Private Calling Options .................. 12

         a.   RCCC Provides No Private Calling Option ................................. 13

         b.   Yuba's Phone Room Is Not Private, Phones Require
            Positive Acceptance, and Access Is Unreasonably Limited ........ 13

         c.   Contra Costa Phone Rooms Are Available at Deputy
            Discretion, Detainees Cannot Schedule Calls, and Calls Are
            Limited to Attorneys, Courts, and Law Enforcement
            Agencies .................................................................................... 15

         d.   Mesa Verde Does Not Allow Critical Legal Calls to Non-
            Attorneys ................................................................................... 15

      6.   The Facilities Lack Effective and Private Messaging Systems ................ 17

      7.   Defendants Fail to Provide Notice of Available Options ........................ 17

   D.   ICE's Own Detention Standards Require Reasonable and Equitable
      Telephone Access at All Four Facilities ................................................... 18

III. STANDARD ...................................................................................................... 21

IV.  ARGUMENT ..................................................................................................... 21

   A.   Non-Citizens Have Significant Due Process Rights in Removal
      Proceedings .............................................................................................. 22

      1.   The Right to Counsel Requires That Immigration Respondents
         Have a Reasonable Opportunity to Secure Counsel ........................ 22

      2.   The Right to a Full and Fair Hearing Necessarily Includes the Right
         to Gather Evidence ......................................................................... 23

   B.   Defendants' Denial of Telephone Access Violates Plaintiffs' Rights Under
      the INA ..................................................................................................... 25

   C.   Defendants' Denial of Telephone Access Violates Plaintiffs' Due Process
      Rights ....................................................................................................... 27

1. Defendants' Restriction of Plaintiffs' Communication with the Outside World Violates Their Rights to Procedural Due Process ............ 27

a. Plaintiffs' Interests Are Extremely Weighty................................. 29

b. Defendants' Failure to Provide Reasonable Telephone Access Creates a High Risk of Erroneous Deprivation of Rights ................................................................................................ 30

(1) Defendants' Telephone Systems Restrict Access to Counsel.............................................................................. 31

(2) Defendants' Telephone Systems Restrict Access to Government Agencies and Other Third Parties Plaintiffs Need to Reach.................................................... 32

c. The Government's Interests Are Consistent with Accommodating Plaintiffs' Rights................................................. 34

(1) The Administrative Burden on ICE Is Minimal Because the Agency's Own Detention Standards Aspire to Most of the Access Sought Here ....................... 35

(2) The Government Can Achieve Its Purposes and Effectuate Due Process Through Modest, Non-Burdensome Additional Safeguards................................. 39

(3) Defendants Can Claim No Interest in Maintaining Current Conditions.............................................................. 41

(4) Expense Is Not a Significant Barrier................................ 42

2. Denial of Reasonable Telephone Access Violates Plaintiffs' Substantive Due Process Rights................................................................. 44

D. Denial of Reasonable Telephone Access Violates Plaintiffs' First Amendment Right to Petition the Government..................................... 46

E. Summary Judgment for Plaintiffs Is Appropriate Despite Defendants' Actions in Response to Litigation and Differences Between the Facilities .......... 47

V. CONCLUSION ............................................................................................ 48

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Agyeman v. INS,*
    296 F.3d 871 (9th Cir. 2002) ..............................................................................24

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ..........................................................................................21

*Baires v. INS,*
    856 F.2d 89 (9th Cir. 1988) .........................................................................24, 30

*Bell v. City of Boise,*
    709 F.3d 890 (9th Cir. 2013) ..............................................................................48

*Berger v. United States,*
    295 U.S. 78 (1935) ............................................................................................34

*Biwot v. Gonzales,*
    403 F.3d 1094 (9th Cir. 2005) .........................................................22, 23, 30, 31

*Bridges v. Wixon,*
    326 U.S. 135 (1945) ..........................................................................................29

*California First Amendment Coalition v. Woodford,*
    299 F.3d 868 (9th Cir. 2002) ..............................................................................47

*Casas-Castrillon v. Dep't of Homeland Sec.,*
    535 F.3d 942 (9th Cir. 2008) ..............................................................................30

*Castro-O'Ryan v. INS,*
    847 F.2d 1307 (9th Cir. 1987) ............................................................................22

*Cobb v. Aytch,*
    643 F.2d 946 (3d Cir. 1981) .........................................................................44, 45

*Colmenar v. INS,*
    210 F.3d 967 (9th Cir. 2000) ........................................................................27, 27

*Dela Cruz v. Napolitano,*
    764 F. Supp. 1197 (S.D. Cal. 2011) ....................................................................33

*Demore v. Kim,*
    538 U.S. 510 (2003) .....................................................................................30, 46

*Denius v. Dunlap,*
    209 F.3d 944 (7th Cir. 2000) ..............................................................................46

*Dent v. Holder,*
    627 F. 3d 365 (9th Cir. 2010)............................................................................24

*Franco-Gonzalez v. Holder,*
    Case No. CV 10-02211 DMG (DTBx), 2013 U.S. Dist. LEXIS 186258 (C.D.
    Cal. April 23, 2013) .................................................................................3, 22

*Faretta v. California,*
    422 U.S. 806 (1975)...................................................................................26

*Foucha v. Louisiana,*
    504 U.S. 71 (1992)....................................................................................29

*Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000)...................................................................................48

*Gideon v. Wainwright,*
    372 U.S. 335 (1963)...................................................................................22

*Griffin v. Illinois,*
    351 U.S. 12 (1956)....................................................................................40

*Ibarra–Flores v. Gonzales,*
    439 F.3d 614 (9th Cir. 2006).........................................................................24

*Jayne v. Bosenko,*
    2014 U.S. Dist. LEXIS 84431 (E.D. Cal. June 19, 2014)..........................................37

*Johnson ex rel. Johnson v. Brelje,*
    701 F.2d 1201 (7th Cir. 1983).......................................................................26

*Johnson-El v. Schoemehl,*
    878 F.2d 1043 (8th Cir. 1989)...................................................................26, 32

*Jones v. Blanas,*
    393 F.3d 918 (9th Cir. 2004).................................................................34, 41, 44

*Keenan v. Hall,*
    83 F.3d 1083 (9th Cir. 1996).........................................................................47

*Klopfer v. North Carolina,*
    386 U.S. 213 (1967)...................................................................................44

*Landon v. Plasencia,*
    459 U.S. 21 (1982)....................................................................................27

*Lassiter v. Dep't of Soc. Servs.,*
    452 U.S. 18 (1981)....................................................................................34

Notice of Motions and Motions to Supplement
Complaint and Modify Class Certification and     - iv -     Case No. 13-cv-05878 EMC
Case Management Orders

*Lee v. Holder,*
    599 F.3d 973 (9th Cir. 2010)...................................................................33

*Mathews v. Eldridge,*
    424 U.S. 319 (1976)................................................................... *passim*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)...................................................................21

*Maust v. Headley,*
    959 F.2d 644 (7th Cir. 1992)...................................................26

*Meza v. Holder,*
    544 Fed. Appx. 716 (9th Cir. 2013)........................................24

*Milton v. Morris,*
    767 F.2d 1443 (9th Cir. 1985).............................................25, 26

*MLB v. SLJ,*
    519 U.S. 102 (1996)...................................................................40

*Montes-Lopez v. Holder,*
    694 F.3d 1085 (9th Cir. 2012)............................................22, 25

*Mothershed v. Justices of Supreme Court,*
    410 F.3d 602 (9th Cir. 2005), *as amended on denial of reh'g* 20015 U.S. Dist.
    LEXIS 14804 (9th Cir. July 21, 2005)....................................46

*Nhoc Dahn v. Demore,*
    59 F. Supp. 2d 994 (N.D. Cal. 1999) ......................................34

*Orantes-Hernandez v. Meese,*
    685 F. Supp. 1488 (C.D. Cal. 1988).......................................28

*Oshodi v. Holder,*
    729 F.3d 883 (9th Cir. 2013)...................................................21

*Padilla-Agustin v. INS,*
    21 F.3d 970, 974 (9th Cir. 1994).............................................29

*Palko v. Connecticut,*
    302 U.S. 319 (1937)...................................................................45

*Parsons v. Ryan,*
    754 F.3d 657 (9th Cir. 2014), *reh'g en banc denied,* 784 F.3d 571 (9th Cir.
    2015) .........................................................................................48

*Perez-Funez v. District Director, INS,*
    619 F. Supp. 656 (C.D. Cal. 1985).........................................28

*Public Citizen v. U.S. Dep't of Justice,*
    491 U.S. 440 (1989)..................................................................................................27

*Rendon v. Holder,*
    603 F.3d 1104 (9th Cir. 2010)................................................................................24

*Reno v. Flores,*
    507 U.S. 292 (1993)............................................................................................27, 29

*Rios-Berrios v. INS,*
    776 F.2d 859, 862 (9th Cir. 1985)..........................................................................23

*Rufo v. Inmates of Suffolk County Jail,*
    502 U.S. 367, 112 S. Ct. 748, 116 L. Ed. 2d 867 (1992)........................................35

*Sanchez Sosa v. Holder,*
    373 F. App'x 719 (9th Cir. 2010)............................................................................24

*School Dist. No. 1J, Multnomah County, Or. v. ACandS, Inc.,*
    5 F.3d 1255 (9th Cir. 1993)....................................................................................20

*Sell v. United States,*
    539 U.S. 166 (2003)................................................................................................34

*Shakur v. Selsky,*
    391 F.3d 106 (2d Cir. 2004)....................................................................................47

*Silva v. Di Vittorio,*
    658 F.3d 1090 (9th Cir. 2011)................................................................................46

*Singh v. Holder,*
    405 F. App'x 193 (9th Cir. 2010)............................................................................24

*Strandberg v. City of Helena,*
    791 F.2d 744 (9th Cir. 1986), *opinion amended on denial of reh'g,* 135 F.3d
    1318 (9th Cir. 1998)................................................................................................47

*Strickland v. Washington,*
    466 U.S. 668 (1984)................................................................................................25

*Tawadrus v. Ashcroft,*
    364 F.3d 1099 (9th Cir. 2004)................................................................................21

*Torres-Chavez v. Holder,*
    567 F.3d 1096 (9th Cir. 2009)................................................................................25

*United States. v. Salerno,*
    481 U.S. 739 (1987)................................................................................................45

Notice of Motions and Motions to Supplement
Complaint and Modify Class Certification and     - vi -     Case No. 13-cv-05878 EMC
Case Management Orders

*Vasquez v. Rackauckas,*
    734 F.3d 1025 (9th Cir. 2013)...............................................................................43

*Wong Yang Sung v. McGrath,*
    339 U.S. 33 (1950)..................................................................................................29

*Youngberg v. Romeo,*
    457 U.S. 307 (1982)...............................................................................................44

*Zadvydas v. Davis,*
    533 U.S. 678 (2001)...............................................................................................45

*Zavala v. Ridge,*
    310 F. Supp. 1071 (N.D. Cal. 2004) ...............................................................45, 46

**State Cases**

*In re Grimes,*
    208 Cal. App. 3d 1175 (1989)...............................................................................26

*People v. Jenkins,*
    22 Cal. 4th 900 (2000) ..........................................................................................26

**Federal Statutes**

8 U.S.C. § 1225(b) ...........................................................................................................3

8 U.S.C. § 1226(a) ......................................................................................................2, 30

8 U.S.C § 1226(c) ............................................................................................................2

8 U.S.C. § 1229a ............................................................................................................22

8 U.S.C. § 1229(b)(4)(A) .....................................................................................3, 25, 27

8 U.S.C. § 1229a(b)(4)(B) .............................................................................................25

8 U.S.C. § 1231 ................................................................................................................3

8 U.S.C. § 1231(a)(3) .....................................................................................................30

8 U.S.C. § 1362 ..........................................................................................................3, 21

**State Statutes**

Immigration and Nationality Act ............................................................................. *passim*

**Rules**

Fed. R. Civ. P. 56(a)......................................................................................................21

Notice of Motions and Motions to Supplement
Complaint and Modify Class Certification and      - vii -      Case No. 13-cv-05878 EMC
Case Management Orders

**Regulations**

8 C.F.R. § 208.30(d)(4)...........................................................................................................23

8 C.F.R. § 208.31.................................................................................................................23

8 C.F.R. § 1003.16(b) ...................................................................................................21, 22

8 C.F.R. § 1240.1.................................................................................................................35

8 C.F.R. § 1240.1(c)............................................................................................................21

**Constitutional Provisions**

First Amendment........................................................................................................2, 46, 47

Fifth Amendment ...............................................................................................2, 21, 22, 25

Sixth Amendment ................................................................................................... *passim*

Eighth Amendment...............................................................................................................45

Notice of Motions and Motions to Supplement
Complaint and Modify Class Certification and          - viii -          Case No. 13-cv-05878 EMC
Case Management Orders

## I.    **INTRODUCTION**

This case seeks to vindicate Plaintiffs' rights to a full and fair hearing, including access to counsel, in immigration proceedings. These rights, guaranteed by statute and the Due Process Clause of the U.S. Constitution, exist to protect Plaintiffs from being improperly removed from their adopted country, and thus from being separated from families and communities, denied the opportunity to live and work in this land of freedom, and for many, being forced to return to home countries where they will confront persecution, violence, and even death.

Courts have recognized that Plaintiffs' statutory and constitutional rights to present evidence in their immigration proceedings and to access counsel in support of their cases require, for their realization, conditions that allow immigrants to gather evidence and communicate with counsel. Unlike criminal defendants, most immigrants in removal proceedings are not entitled to court-appointed counsel.  Given the labyrinthine nature of immigration law, it is no surprise that detained immigrants represented by counsel are three times more likely to obtain affirmative relief and four times more likely to have their cases dismissed than their unrepresented counterparts.  Plaintiffs must navigate this complex maze on their own or with retained counsel, an endeavor that requires access to documents, witnesses, financial support, and assistance from government and private parties, as well as meaningful opportunities to consult with legal experts in private settings.  The record in this case establishes that Defendant U.S. Immigration and Customs Enforcement ("ICE") imposes restrictions on communication that make this impossible for many class members.

ICE serves as both Plaintiffs' jailor and their prosecutor.  Plaintiffs are held in remote locations, far from the immigration court and the attorneys who appear before it.  Their attempts to seek legal help or information for their cases are plagued by exorbitant telephone rates and fees, technical and language barriers that prevent Plaintiffs from connecting with their intended call recipients, physical limitations on movement that restrict when Plaintiffs can use telephones, inadequate privacy, inability to receive incoming calls, ineffective messaging systems, and a lack of notice and instruction of the options available. As a result, Plaintiffs, including many who have submitted testimony in support of this motion, seek continuances prolonging their detention while

they struggle to obtain counsel and gather evidence. Their inability to contact witnesses and others with needed information prevents them from presenting evidence to the immigration court and other immigration agencies that could provide them relief from removal.

There is no genuine dispute of material fact that these obstacles exist and that they restrict Plaintiffs' right to consult with and be represented by counsel and their right to gather and present evidence in their immigration cases. Defendants cannot credibly assert an interest in maintaining their current restrictions on Plaintiffs because ICE's own detention standards require most of what Plaintiffs seek to safeguard their rights. Accordingly, Plaintiffs seek summary adjudication of liability on their statutory and constitutional claims under the Immigration and Nationality Act, the Fifth Amendment, and the First Amendment to fully realize their promised rights to consult with and retain counsel and to gather and present evidence and petition the government for immigration benefits related to life-changing immigration proceedings.

## II.   STATEMENT OF FACTS[1]

### A.   The Certified Class Consists of Individuals Detained for Immigration Proceedings.

This action is brought on behalf of a class of adult immigration detainees who are or will be held by ICE in Contra Costa County, Kern County, Sacramento County, or Yuba County. Dkt. Nos. 98, 86. Plaintiffs are held in four facilities in the named counties: Yuba County Jail ("Yuba"), Rio Cosumnes Correctional Center ("RCCC"), West County Detention Facility ("Contra Costa"), and the Mesa Verde Detention Facility ("Mesa Verde") (collectively "Facilities").[2] In Contra Costa, Yuba, and RCCC, ICE detainees are housed with county prisoners.[3] Mesa Verde was opened in March 2015 by GEO Group Inc. and exclusively holds

---

[1] Numbered references to "Ex. __" refer to exhibits attached to the Declaration of Charles Ha. Lettered references to "Ex. __" refer to exhibits attached to the Declaration of Melanie Phillips.
[2] Ex. J [Lyon-RCCC-000158 – 181 RCCC IGSA]; Ex. 15 [Lyon-Yuba-5874-5899 Yuba IGSA]; and Ex. H [Lyon-CoCo-000266 – 276 WCDF IGSA].
[3] Ex. 33 Gil Dep. 41:1-13; Ex. 32 Butler Dep. 23:24-24:1, 41:22-42:14; Ex. 35 Bonthron Dep. 72:10-22.

ICE detainees.[4]  Contra Costa is the only Facility within 21 miles of the San Francisco

Immigration Court where Plaintiffs' cases are venued.  RCCC, Yuba, and Mesa Verde are 83

miles, 123 miles, and 282 miles away, respectively.  Dkt No. 100 (Ans. First Am. Compl.) at ¶33.

Plaintiffs are detained pending Defendants' efforts to remove them from the United States

through a civil adjudication process governed by the Immigration and Nationality Act ("INA").

Many members of the Plaintiff class are in custody pending removal hearings in the San

Francisco Immigration Court and are held pursuant to 8 U.S.C §§ 1226(a) and (c).[5]  Others who

may be detained after having presented themselves at the border as asylum-seekers remain

detained following issuance of a removal order, or have been arrested and detained based on a

prior removal order.[6]  *See* 8 U.S.C. §§ 1225(b), 1231.

### B.    Meaningful Telephone Access Is Critical to Plaintiffs' Ability to Obtain and Communicate with Counsel or Represent Themselves.

Although access to counsel is guaranteed by statute and widely acknowledged to strongly

correlate with better outcomes in removal proceedings, detained immigrants—including

Plaintiffs—are rarely represented by counsel.[7]  Finding and retaining counsel is extremely

---

[4] *See* Ex. 40 Murray Dep. 15:8-15, 37:2-9; Ex. 14 [Exh. 307] (Intergovernmental Service Agreement Between the United States Department of Homeland Security U.S. Immigration and Customs Enforcement Office of Enforcement and Removal Operations and City of McFarland, CA).

[5] *See* Ex. 41 Astorga-Cervantes Depo. at 28:8-29:24; Ex. P Lyon Dep. 10:8-23; Ex. R V.V. Dep. 23:12-21; Prasad Decl. ¶ 6.

[6] *See* Prasad Decl. ¶ 6; S.A. Decl. ¶ 1 (asylum); I.P. Decl. ¶ 4-7 (prior removal order).

[7] *See* Prasad Decl. ¶ 7; Realmuto Decl. ¶ 18-21; *see also* Berg. Decl. Ex. A [Berg Report] at 16 (14% of detained immigrants in national study were represented by counsel) *citing A National Study of Access to Counsel in Immigration Court*, Eagly, I. and Shafer, S. (Dec. 2015, 164 U.Penn.L.Rev. 1); *id.* at 17 *citing* Northern California Collaborative for Immigrant Justice, Access to Justice for Immigrant Families and Communities: Study of Legal Representation of Detained Immigrants in Northern California (Oct. 2014) (roughly 2/3 of detained immigrants in removal proceedings before the San Francisco Immigration Court had no legal representation at any point in their removal proceedings).

Although non-citizens facing removal charges have a statutory right to be represented by an attorney of their choice, it must be at "no expense to the Government." 8 U.S.C. §§ 1362, 1229a(b)(4)(A).  Thus, with limited exceptions, Plaintiff class members must retain private counsel or represent themselves in their hearings.  *See Franco-Gonzalez v. Holder*, Case No. CV 10-02211 DMG (DTBx), 2013 U.S. Dist. LEXIS 186258 (C.D. Cal. April 23, 2013) (requiring appointment of counsel for mentally incompetent detained immigrants).

difficult for detained immigrants, and limitations on telephone access in the Facilities contribute

significantly to that difficulty.[8]

Whether they represent themselves or have assistance from counsel, Plaintiffs need

adequate access to telephones in order to contact the outside world to obtain evidence or support

for their cases.  Even Plaintiffs who have counsel may need to contact members of their

communities, where a cold call from an attorney would raise confusion and mistrust.[9]  Plaintiffs

may also need to contact individuals in their home countries whom attorneys cannot reach due to

cost, availability, and language barriers.[10]

For *pro se* immigration detainees, the need is even greater.  For example, Plaintiffs

seeking asylum and other forms of protection from persecution require evidence of danger in their

home countries based on membership in a particular social group, such as police reports, medical

records, and letters from family and other contacts in their home country.[11]  Plaintiffs seeking

cancellation of removal need to show, *inter alia*, ties to the community (*e.g.*, marriage and birth

certificates, children's school records), employment history, payment of income taxes,

rehabilitation, and hardship to family if removed (*e.g.*, medical conditions and educational

needs).[12]  Plaintiffs seeking release on bond also need to show ties to the community, a likelihood

of winning their immigration cases, and evidence of rehabilitation or sources of support, such as

acceptance into a rehabilitation program.[13]  Plaintiffs seeking a U-visa (available to victims of

crime) from U.S. Citizenship and Immigration Services must obtain and submit a certification

from a law enforcement agency of their willingness to assist in a criminal investigation or

---

[8] Prasad Decl. ¶ 7; Realmuto Decl. ¶ 13-17; Ex. P Lyon Dep. 111:5-14 (private phone access
would have allowed him to access a wider pool of attorneys); Lee Decl. ¶ 9 (Lee generally only
accepts detained clients if there's a family member willing to assist, but this is often inadequate);
Vincent Decl. ¶4 (Vincent's firm will only accept detained clients if there is a family member
willing to assist because of restrictions on detainee phone access, but this is often inadequate);
M.G. Decl. ¶ 14-15; Y.A. Decl. ¶ 17-18; B.M. Decl. at ¶ 10-11.
[9] Prasad Decl. ¶ 8.
[10] Ex. R V.V. Dep. 61:11-63:1 (testifying to difficulty and expense of collecting evidence
from Thailand with limited telephone access); B.M. Decl. ¶ 20; S.A. Decl. at ¶¶ 11-12.
[11] Realmuto Decl. ¶ 28.
[12] *Id.*
[13] *Id.* ¶ 26.

prosecution, as well as other supportive evidence such as medical, police, and court records, psychological evaluations, and letters from witnesses regarding harm to the victim.[14]

Although many of Plaintiffs' witnesses have spent months in detention, the average length of detention for Plaintiff Class members was 36 days from June 2014 to May 2015, and 59% of class members had detention stays of less than three weeks.[15]  Thus, Plaintiffs have highly time-sensitive needs to consult with counsel, collect evidence, and evaluate the strength of their claims to avoid either prolonged detention or rapid deportation.

## C.    Defendants' Denial and Restriction of Telephone Access Prevents Plaintiffs from Critical Contact with the Outside World.

The Facilities where ICE detains Plaintiffs share certain telephone system features as well as having differences that impact telephone access for Plaintiffs in particular ways.  All Plaintiffs have at least some access to telephones in or near the common areas of their housing units (referred to herein as "Housing Unit Phones").[16]  At the time this litigation was filed, Plaintiffs were largely limited to using Housing Unit Phones.[17]  Following the filing of the Complaint, ICE began offering access to telephones in rooms outside the housing units at Yuba, Contra Costa, and Mesa Verde (referred to herein as "Phone Rooms").[18]  But the Phone Room options (alone or in

[14] Prasad Decl. ¶¶ 16-18.

[15] Levy Decl., Ex. A [Levy Report] at 7-8. These detention stays are consistent with ICE's nationwide and local detention statistics. *See* Ex. I Lyon_ICE_000873 and https://www.ice.gov/doclib/foia/reports/ero-facts-and-statistics.pdf.

[16] Housing Unit Phones are usually within the dayroom or common area of a housing unit and available to detainees whenever they are at liberty to leave their bunks (in dorm-style units and congregate celled units) or leave their cells (in single or double celled housing units). *See* Berg Decl., Ex. A [Berg Report] at 6-11; Ex. 33 Gil Dep. 41:14-43:23 (stating that Ex. 4 (Gil Dep. Ex. 195 YCS00000046_0002) is an accurate depiction of the location of the telephones at the Yuba facility);Ex. 32 Butler Dep. 63:7-64:25; Ex. 35 Bonthron Dep. 59:1-60:24.

[17] Contra Costa provided only Housing Unit Phones to detainees; Yuba provided detainees occasional access to desk phones in the jail's booking area.  Ex. 33 Gil Dep. 21:9-22:1; Ex. 21 [Resp. to ROG No. 18] ("ICE Detainees at Yuba were permitted to make legal calls and emergency calls from at least the booking area of Yuba."); Ex. 37 Grant Dep. 28:16-29:3.

[18] Ex. 33 Gil Dep. 24:7-24 (stating that a new room with two phones was added in the last one to two years for the purpose of offering free legal calls); Ex. 35 Bonthron Dep. 195:20-25 (phone room created in response to litigation at the request of ICE);  Ex. 40 Murray Dep. 37:2-9 (facility began accepting detainees on March 20, 2015); Ex. 11[Ex. 296] at 4 (Mesa Verde telephone access policy "allowing detainees to call from one of the four private attorney rooms").

combination with the Housing Unit Phones) are not sufficient in any of the Facilities to meet the needs of most immigration detainees to seek representation, communicate with counsel, and gather evidence and information needed for their immigration cases.

Factors that undermine Plaintiffs' ability to communicate with counsel and others from whom they need to gather information, evidence, or legal support include: (1) extremely high rates and fees for paid calls from Housing Unit Phones; (2) technical barriers and payment restrictions on Housing Unit Phones; (3) reliance on a severely limited ICE-specific "free call platform" to meet Plaintiffs' legal communication needs; (4) liberty restrictions impacting hours of telephone access; (5) lack of privacy; (6) inability to receive incoming calls or timely messages; and (7) failure to provide notice of calling options for Plaintiffs with limited English or Spanish language skills.  These are discussed in turn below.

> ### 1.    Housing Unit Calls Are Prohibitively Expensive at RCCC, Yuba and Contra Costa.

At RCCC, Yuba, and Contra Costa, housing unit phone calls require an initiation fee of █████ (or █████ for collect), █████, and █████, respectively.[19]  Per minute rates range from █████, and there are additional fees for various transactions, such as a █████ charge to add █████ to a prepaid collect account.[20]  By contrast, Mesa Verde housing phones have no initiation fee and cost $0.10 per minute for both interstate and intrastate calls.[21]  High initiation fees at RCCC, Yuba, and Contra Costa drive up expense, especially when combined with technical features such as automatic cutoffs and "security"-driven dropped calls.  *See infra* at 9.[22]  As a result, Plaintiffs must limit calls to attorneys and others involved in gathering necessary

---

[19] *See* Ex. B [ICS000432 (Philbin Dep. Ex. 169)]; Ex. 43 [YCS00000020_0002].

[20] *See* Ex. T [CCCSO001124]; Ex. U [CCCSO000753].

[21] *See* Ex. 38 Andrews Dep. 46:4-5, Ex. 44 [Ex. 282].

[22] As explained by Plaintiffs' expert Don Wood, these high rates and fees stem from a widely-recognized market failure in the inmate calling services market, characterized by a disconnect between the entity making the purchasing decision for phone services (facility managers) and the individuals who must pay for the service (prisoners), resulting in excessive telephone rates that are not justified by the actual cost of providing the services.  Wood Decl., Ex. A [Wood Report] at ¶¶ 20-28.  Although the Federal Communications Commission ("FCC") voted in October 2015 to, *inter alia*, impose lower caps on per-minute rates, prohibit initiation fees, and limit fees for adding funds to prepaid accounts, this order is not yet in effect.  *Id.* at ¶¶ 29-41.

documents and information in connection with their cases, and cut short conversations in furtherance of their immigration defenses and applications for relief.[23]  Some plaintiffs who are indigent are unable to make calls at all.[24]

**2.  Technical Barriers Prevent Detainees from Reaching Government Offices and Others for Information or Support.**

There are a number of technical features of Housing Unit Phones that prevent Plaintiffs from reaching government offices and private individuals to obtain case-related information or support.

*Positive Acceptance Requirement:* All Housing Unit Phones have an outgoing message that identifies the caller as an "inmate" calling from a particular jail or facility (except Mesa Verde, which uses the term "detainee") and prompts the recipient to affirmatively accept the call by pressing a numbered key on his or her telephone, without which the call will not connect.[25] This makes it impossible for Plaintiffs to navigate automated telephone systems to dial an extension, choose a language or service option, or leave a voicemail message.[26]  In addition, detainees may not be able to reach a call recipient who is a friend, coworker, or supportive

---

[23] *See* Ex. 41 Astorga-Cervantes Depo. 92:15-19; Ex. R V.V. Dep. 87:5-21 (limited direct communication with her attorney due to cost); Prasad Decl. ¶¶ 10-11; R.K. Decl. ¶¶ 16, 43.

[24] *See* Ex. 36 Neria-Garcia Dep. 71:22-72:6; Ex. 41 Astorga-Cervantes Depo. 14:24-15:4, 67:18-20, 68:19-23; R.K. Decl. ¶ 44; Lee Decl. ¶ 5.

[25] *See* Ex. 37 Grant Dep. 48:15-49:3, 46:5-14 (calls from housing unit phones will not connect unless a live person answers the phone); Ex. 32 Butler Dep. 117:17-118:20 (call recipient receives the message "phone call from a Sacramento County inmate" and presses a button to accept the call and have it connected); Ex. 35 Bonthron Dep. 167:8-21; Ex. 39 Harvey Dep. 57:20-23; Ex. 286 (recipient of a call must "press one or star to accept" the call or "press (2)" to deny call); Ex. 36 Neria-Garcia Dep. 169:16-24 (testifying the outgoing message would identify her as an "inmate…detained…at Contra Costa Jail"), 42:8-20 (testifying that the "recording says …jail" at Yuba).

[26] *See* Ex. 36 Neria-Garcia Dep. 117:12-18 (difficulty navigating voicemail trees), 169:4-11 (cannot dial an extension from housing unit phones at Mesa Verde, Yuba County, and Contra Costa); Ex. Q Shugall Dep. 119:24-121:16 (Mesa Verde detainee unable to gather critical evidence from police department because police had automated phone system); H.S. Decl. ¶ 14 (could not leave voicemail or dial extension); J.H. Decl. ¶¶ 9, 12 (unable to reach an attorney because of outgoing message identifying the call coming from a jail at RCCC and unable to reach county offices because of outgoing message identifying the call coming from the detention facility at Mesa Verde); O.A. Decl. ¶ 15 (could not leave voice message); K.M. Decl. ¶ 13 (could not leave message).

community member, such as a church pastor or employer, because the call recipient declines to accept a call from an unidentified "inmate" in a county jail.[27] The inability to leave messages for intended call recipients denies Plaintiffs a feature of telephone communication that is ubiquitous outside of incarceration and is generally necessary for most individuals seeking to connect with a witness or government official for purposes of a legal case.[28]

*Billing and Payment Limitations:* At Contra Costa, Housing Unit Phone calls must be paid for by the call recipient.[29] Thus, any call recipient must be willing and able to *pay* for the call, even if the detainee would have been able to afford it.[30] This restriction, as well as the positive acceptance requirement, has altogether precluded detainees at Contra Costa from communicating with certain entities, including government offices, to gather critical information and documentation in support of their applications for relief from removal because such offices have automated telephone systems and therefore cannot provide the necessary positive acceptance or agree to pay for the call.[31] Call recipients who wish to accept calls from Contra Costa must have a credit card, a requirement that prevented Mr. Lyon from speaking to his wife as she

---

[27] *See* Ex. 36 Neria-Garcia Dep. 57:9-18; I.P. Decl. ¶ 44 (employer or church unlikely to accept a call from an "inmate.").

[28] Y.A. Decl. ¶ 18; Ex. 36 Neria-Garcia Dep. 134:6-13; Ex. 41 Astorga-Cervantes Depo. 69:8-15; I.P. Decl. ¶ 39.

[29] Ex. 35 Bonthron Dep. 165:20-25, 168:21-169:7 (no options to call individuals who were unwilling or unable to pay for the detainee's calls); Ex. 21 [Resp. to RFA No. 12] (admitting that detainees at Contra Costa cannot purchase a calling card to make outgoing telephone calls from the Housing Unit Telephones).

[30] Ex. 35 Bonthron Dep. 168:21-169:7; Ex. 21 [Resp. to RFA No. 13] (admitting that the only methods to pay for outgoing calls from the Housing Unit Telephones at WCDF are through the call recipient's acceptance of the charges at the time of the call, or through a prepaid account paid for by the call recipient).

[31] Lyon Decl. ISO Class Cert. at ¶ 8 (the police department or victim services unit would need to either establish a prepaid account or enter credit card information to take a collect call); Ex. R V.V. Dep. 39:20-40:12 (credit in the prepaid account linked only to one phone number and attorney did not have a prepaid account); R.K. Decl. ¶¶ 17, 19, 20. At Yuba and RCCC, phone credit can only be purchased when the commissary service is open. Ex. 33 Gil Dep. 71:11-18, 72:3-5; *see* Ex. 32 Butler Dep. 49:9-20. This limitation, in addition to financial limitations faced by many Plaintiffs, can exacerbate Plaintiffs' difficulty communicating with attorneys and witnesses in a timely manner. *See, e.g.* I.P. Decl. at ¶ 41 (on two occasions Plaintiff learned he had court hearings the next day but could not contact his attorney because he had no telephone credit).

attempted to support his efforts to find counsel and obtain a U-visa certification.[32]

**_Language Barriers and Limits on Three-Way Calling:_** The outgoing message and prompt system also creates a particular barrier for Plaintiffs seeking to connect with individuals who do not understand English, such as family and government offices outside the United States.[33]  In addition, all of the Facilities' Housing Unit Phone systems are set up to disconnect if a detainee attempts to make a three-way call.[34]  But three-way calling can be one of the only ways to overcome the barriers presented by the outgoing message and prompt system that families at home do not understand.[35]  Three-way calling can also be one of the few ways for an attorney to communicate with a detainee where the attorney and client do not share a common language and need a family member or professional interpreter to facilitate their communication.[36]

**_Time Limits and Dropped Calls:_** Finally, serviceability problems and automatic time limits intersect with the high initiation fees assessed at RCCC, Yuba, and Contra Costa to gouge detainees and their call recipients.  Many detainees complain that their calls frequently drop for no reason, requiring them to pay a new initiation fee to reconnect.[37]  Moreover, both Yuba and

---

[32] _See_ Ex. 37 Grant Dep. 55:24-56:12; Ex. 30 Garzon Dep. 120:24-121:7 (upon receiving call from detainee, automated message required recipient to set up account to continue the call, but does not provide sufficient time to do so before disconnecting); Ex. P Lyon Dep. 74:2-75:7.

[33] Y.A. Decl. ¶ 11 (Togo family members did not understand the English instructions); S.A. Decl. ¶¶ 11, 14 (outgoing message made it difficult to connect with family in Somalia and a non-profit organization in Kenya); F.L. Decl. ¶ 28 (relatives that did not speak English well did not understand how to follow the prompts to accept a call).

[34] _See e.g._ Ex. 34 Gonzalez Dep. 132:2-133:3 (calling platform detects and terminates three-way calls), 135:18-137:4 (three-way calls are automatically dropped but still charged to detainee); _see also_ Ex. 31 Philbin Dep. 85:6-11 (same), 87:6-18 (call waiting and calls put on hold may also be dropped if software misinterprets actions as attempting a three-way call); Ex. 35 Bonthron Dep. 221:7-17; Ex. E [Bonthron Dep. Ex. 235] (███████████████████████████████████████████████████).

[35] S.A. Decl. ¶ 11; B.M. Decl. ¶ 11.

[36] Ex. Q Shugall Dep. 96:23-97:11 (three-way calls necessary for interpreter).

[37] _See_ Ex. 36 Neria-Garcia Dep. 132:3-11, 167:21-168:18; O.A. Decl. ¶ 11; Ex. 41 Astorga-Cervantes Depo. 92:22-24, 65:23-24 (phones turned off arbitrarily, "from time to time"); Ex. Q Shugall Dep. 70:22-71:12 (dropped calls from detainee at RCCC); K.M. Decl. ¶ 7 (detainee had to pay a new connection fee to continue conversation when call disconnected after a few minutes); F.L. Decl. ¶ 26; M.G. Decl. ¶ 21; Ex. 33 Gil Dep. 50:25-51:7, 64:4-13 (acknowledging that detainees complain about calls dropping "a lot"); Ex. 35 Bonthron Dep. 221:7-17; Ex. E [Bonthron Dep. Ex. 235] (inmate telephone instructions on eight ways to avoid dropped calls); _see also_ CCCSO000749.  According to Expert Don Wood, security settings on inmate calling

RCCC Housing Unit phone calls automatically disconnect after 20 minutes (increased from the 15-minute cutoff that was in place at the time this case was filed).[38] This automatic cut off is disruptive to legal calls and imposes substantial additional expense.[39]

### 3. The Talton "Free Call Platform" Does Not Meet Plaintiffs' Needs for Direct, Free, Private Legal Calls.

Until this case was filed, the Facilities (excluding Mesa Verde, which was not yet operating) provided the same telephone service to immigration detainees as they provided to their other wards (county prisoners serving criminal sentences or held in pretrial detention), with one exception: access to the Talton Free Call Platform, which allows direct calls to a limited set of speed-dial numbers.[40] However, the Free Call Platform is entirely insufficient to effectuate the rights of immigration detainees. It does not permit calls to local government offices, local courts, or the many private parties Plaintiffs need to contact to obtain information relevant to their immigration cases (such as police reports, school records, medical records, employment records, tax records, etc.).[41]

---

systems are set to drop calls after certain periods of silence, a setting that can be adjusted to allow for longer periods of silence to minimize dropped calls. Wood Decl., Ex. A [Wood Report] at ¶ 54.

[38] Ex. 17 [YCS00000028_0007] (showing calls are limited to 15-minutes); Ex. 32 Butler Dep. 81:15-20 (20-minute call length policy); Ex. 27 Vaughn Dep. 61:19-62:5, 115:23-116:9, 157:21-158:2, 174:25-175:19, 180:7-21, 184:11-20; Ex. 29 McDaniel Dep. 96:24-97:6; Ex. 28 Meyer Dep. 78:8-11. Some of the services also limit the monthly calls to a particular number. *See* Ex. 31 Philbin Dep. 191:15-192:1*; see* also Ex. B [Philbin Dep. Ex. 169], at ICS000432 (████████ ████████).

[39] Vincent Decl. ¶ 6 (limiting detainee calls to 15 minutes renders attorney's ability to draft necessary declarations infeasible); Lee Decl. ¶¶ 6-7 (15-minute limit on calls makes lengthy discussions more expensive and unnecessarily prolongs the discussion).

[40] *See e.g.* Ex. 37 Grant Dep. 122:3-15; Ex 32 Butler Dep. 85:15-19 ("When we contracted with ICE, they were aware of the facility and where the phones were and those kinds of things. That hasn't changed."). In addition to being used for paid calls, Housing Unit Phones connect to a "free call platform," provided by Talton Communications pursuant to a contract with ICE. *See* Ex. 34 Gonzalez Dep. 23:9-25 (ICE contracts require a free call platform).

[41] The Talton Free Call Platform allows detainees to make free calls to foreign consulates, federal government offices connected with immigration enforcement and the immigration court system, and a limited number of legal services providers. *See* Ex. 38 Andrews Dep. 82:9-14; Ex. 8 [Andrews Dep. Ex. 287]; M.G. Decl. ¶ 29 (needs to contact local police department for U-Visa); Prasad Decl. ¶¶ 16-18; Realmuto Decl. ¶¶ 26-31 (detailing kinds of evidence needed).

Plaintiffs are rarely successful in obtaining or even consulting with counsel through the Free Call Platform.[42] Indeed, the Free Call Platform speed-dial numbers do not even include all of the offices on Defendants' free legal services list, as contemplated by Defendants' detention standards.[43] The few legal services numbers that are listed are frequently inaccurate or out of date.[44] Even in the rare instances in which Plaintiffs can reach assistance through the Free Call Platform, their calls must be placed in a noisy, crowded setting within earshot of Facility personnel and other detainees. Like paid calls from Yuba and RCCC, calls from the Free Call Platform at Yuba, RCCC, and Contra Costa are cut short after 15 minutes.[45]

With the exception of this limited Free Call Platform, Defendants have not made accommodations for indigent Plaintiffs seeking to use Housing Unit Phones.[46]

### 4.  Restraints on Plaintiffs' Liberty Further Prevent Telephone Access.

Defendants unreasonably limit the hours of the day that many Plaintiffs can access Housing Unit Phones. At RCCC, detainees housed in the "CBF" and "SBF" units were limited to, at most, a few hours a day to use the available telephones.[47] Similarly, at Yuba, detainees held

[42] See Ex. P Lyon Dep. 69:2-9 (he was unable to call his attorney "[b]ecause she is not on the free phone list"); I.P. Decl. ¶ 29 (detainee was never able to connect to an attorney using this system); O.A. Decl. ¶ 16 (tried calling attorneys at the ACLU using the Free Call Platform but the calls never connected).

[43] Cf. Ex. 8 [Ex. 287] (Free Call Platform list from May 20, 2015), and Ex. 288 (free legal services list from April 2015). Defendants' 2008 and 2011 Performance Based National Detention Standards specify "legal service providers or organizations listed on the ICE/DRO free legal service provider list) to be available through "direct or free calls." 2008 Performance Based National Detention Standards ("2008 PBNDS") (Ex. 1); 2011 Performance Based National Detention Standards ("2011 PBNDS") (Ex. 2).

[44] See Ex. Q Shugall Dep. 9:6-25, 105:24-107:9 (problems with being added to Free Call Platform took months to correct, clients were unable to reach her due to inaccurate list); Takei Decl. ¶¶ 25, 39, 46 (listing and attaching examples from October 2015 inspection); I.P. Decl. ¶¶30-31.

[45] Prasad Decl. ¶11; Ex. 37 Grant Dep. 77:4-8; M.G. Decl. ¶ 33; Ex. 17 [YCS00000028_0007 (Yuba Handbook stating that "calls are limited to 15 minutes").

[46] See Ex. 37 Grant Dep. 92:10-23; Ex. 39 Harvey Dep. 61:19-62:3 (testifying that the only accommodation available to indigent detainees is an emergency call), 71:17-20 (testifying that indigent detainees are not treated differently than other detainees for purposes of accessing phones).

[47] CBF and SBF are two housing units at RCCC. See Takei Decl. ¶¶ 26-28; Ex. 32 Butler Dep. 63:7-64:25 (although not sure of exact hours of dayroom time, concludes detainees in CBF have "several hours" to use Housing Unit Phones depending on population); M.G. Decl. ¶¶ 6, 17-

in certain units have only a few hours per day of telephone access.[48]

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████[49]

### 5.      ICE Provides Insufficient Access to Private Calling Options.

Another important barrier to Plaintiffs' ability to seek and consult with counsel and to gather information and evidence for their immigration cases is the lack of privacy when using Housing Unit Phones. Housing Unit Phones are in open areas of the housing pods or dormitories █████████████████████████████████████████.[50] In addition, outgoing calls from Housing Unit Phones are generally recorded or monitored for security purposes and include a message informing the parties to the call that the calls are not private.[51]

In response to the instant case, Yuba and Contra Costa have increased telephone access outside the housing units.[52] Additionally, Mesa Verde—which was activated during the course of this litigation—has a system for providing free, direct and private calls to attorneys.[53] While an

19 (required to stay in cell 23 hours a day at CBF but later transferred to dorm with 11 other detainees).

[48] *See* Ex. 33 Gil Dep. 54:25-56:2 (detainees in administrative segregation can access the phones for only one hour per day, sometimes less); 60:14-19 (detainees in E pod can access phones for four hours per day); Ex. 18 [YCS00000029_0005-6] (free-time schedule for E pod listed as identical to the schedule for D and F pods); Ex. 36 Neria-Garcia Dep. 59:4-17 (phone access limited to one hour, sometimes outside of business hours).

[49] Ex. 35 Bonthron Dep. 37:17-39:3 (housing unit phone access limited to free-time), 59:24-60:11 (describing free-time hours), 133:19-134:16; Ex. C [Bonthron Dep. Ex. 230] at 4 (████ ████████████████████████); Ex. 30 Garzon Dep. 129:10-24 (time restrictions on phone access for RCCC detainee limited ability to call attorney).

[50] *See* Ex. O Trinidad Dep. 87:23-88:9, 92:8-14, 93:12-1, 213:22-214:15; Ex. N Fishburn Dep. 73:17-74:8; Ex. 33 Gil Dep. 41:14-43:23 (stating that Ex. 4 (Gil Dep. Ex. 195 YCS00000046_0002) is an accurate depiction of the location of the telephones at the Yuba facility and showing the phones in open areas); Ex. 32 Butler Dep. 69:15-25, 71:25-72:9 (in KBF, phones are located on the wall of the dormitory-style housing unit and are approximately five to six feet apart from each other); Takei Decl. ¶¶ 8-24, 26-37, 40, 42, 50-53 (photographs of housing units from expert inspection).

[51] *See* Ex. 36 Neria-Garcia Dep. 77:2-10; Ex. R V.V. Dep. 123:5-17; M.G. Decl. ¶ 13; O.A. Decl. ¶ 13; K.M. Decl. ¶ 11; R.K. Decl. ¶ 27; Ex. 37 Grant Dep. 48:18-22 ("The outgoing message that they would hear, I believe that both the inmate as well as the recipient would hear it's being identified as a phone call from a detention facility, and then that the call could be recorded or monitored.").

[52] Ex. 33 Gil Dep. 24:7-24; Ex. 35 Bonthron Dep. 195:20-25.

[53] Ex. 38 Andrews Dep. 71:12-72:15 (explaining the process to request a free, direct and private phone call).

improvement, these alternative phone options are not sufficient to realize rights guaranteed to immigrants in their proceedings—access to counsel and a full and fair hearing.

### a. RCCC Provides No Private Calling Option.

As Lieutenant Mike Butler explained in his deposition, RCCC provides *no* private calling options for detainees, and Defendants were aware of this limitation when they agreed to use RCCC as an immigration detention facility for the Plaintiff Class.[54] The only non-housing unit telephone access detainees can request is through an inmate request (commonly referred to as a "kite") to visit the library.[55] The library deputy has a telephone that is free to detainees and does not have an outgoing message requiring positive acceptance, but it is close to where the deputy sits and is within earshot of groups of detainees who are brought together to the library.[56] Moreover, detainees sometimes wait weeks before their kites are answered, and they are not given advance notice of when their library call opportunity will take place, so they cannot schedule calls with attorneys or others to take place through the library phone.[57]

### b. Yuba's Phone Room Is Not Private, Phones Require Positive Acceptance, and Access Is Unreasonably Limited.

In about October 2014, Yuba installed two telephones in a room for Plaintiffs' legal calls.[58] Demand for the Phone Room at Yuba has been great, and the Facility's ability to meet that demand has fallen short.[59] As conceded by Defendants, detainees have been limited to one 20-minute legal call per week, and Yuba takes about one week to process each request.[60]

---

[54] Ex. 32 Butler Dep. 85:11-25 (testifying that there is not absolute privacy for telephone calls due to the design of the RCCC facility, and that ICE was aware of the facility design at the time of contracting); *see also* Ex. 22 [Resp. to RFA No. 198].

[55] Ex. 32 Butler Dep. 37:13-38:1, 67:23-68:7, 134:13-16.

[56] Takei Decl. ¶ 38 (photo of library phone); M.G. Decl. ¶ 24 (deputy just foot or two away from phone); H.S. Decl. ¶ 20; Ex. 32 Butler Dep. 86:5-87:11 (ICE privacy standards not enforced at RCCC).

[57] M.G. Decl. ¶¶ 23-24; H.S. Decl. ¶ 20; I.P. Decl. ¶ 24.

[58] Ex. 33 Gil Dep. 24:25-26:2 (describing the new phone room and its location).

[59] Ex. 33 Gil Dep. 83:12-21 (it would take one to two weeks between requesting to use the phone room and actually using the phone room); E.L. Decl. ¶ 14-15; O.A. Decl. ¶¶ 19-20; K.M. Decl. ¶ 15; F.L. Decl. ¶ 37; Neria-Garcia Decl. ¶ 20; Ex. 36 Neria-Garcia Dep. 79:16-24.

[60] Ex. 19 ("Detainees' shall be limited to one free legal phone call per week, 20 minutes in duration."); Ex. 22 [Resp. to RFA No. 134] (admitting that Yuba generally permits detainees one

Moreover, calls from Yuba's Phone Room are not private because it accommodates two detainees at a time.[61] Detainees are not given advance notice of when they will be granted access to the room and therefore cannot schedule their legal calls.[62] Attorneys' efforts to schedule calls are also often unsuccessful.[63] The Phone Room at Yuba does not even overcome one of the greatest problems with the Housing Unit Phones—the positive acceptance requirement. Call recipients from the Yuba Phone Room begin the call by hearing an announcement that they are receiving a free call from an "inmate" at the Yuba County jail and are given the option to affirmatively accept the call.[64] Finally, use of the Phone Room at Yuba is limited to calls to attorneys.[65] Detainees cannot make calls to local agencies, potential witnesses or sponsors for their cases, or to family members who are acting as legal runners to help them gather evidence.[66]

---

20-minute call per week from Phone Rooms); *id.* [Resp. to RFA No. 188] (admitting that there have been occasions when an ICE Detainee at Yuba has waited one week or more after submitting a request to use the Phone Room phones before they were permitted to use those phones); Ex. N Fishburn Dep. 63:24-64:4, 86:9-89:11, 93:19-98:8, 105:17-106:6, 110:16-20; Ex. 28 Meyer Dep. 51:24-52:16, 119:25-120:5, 121:5-14, 122:9-19; Ex. O Trinidad Dep. 176:20-23; Ex. 33 Gil Dep. 26:19-27:20 (most calls from the phone room are limited to 20 minutes), 83:12-21 (one to two week wait to use phone room).

[61] *See* Ex. 19 ("[u]nder normal conditions both telephones will be utilized simultaneously"); Ex. 36 Neria-Garcia Dep. 59:24-60:11; O.A. Decl. ¶ 24; K.M. Decl. ¶ 20; E.L. Decl. ¶¶ 16-17.

[62] K.M. Decl. ¶ 15; O.A. Decl. ¶ 21.

[63] Prasad Decl. ¶ 13; Vincent Supp. Decl. ¶ 5.

[64] *See* E.L. Decl. ¶ 19 (recipient must listen to a message that says the call is from "Yuba County Jail"); K.M. Decl. ¶ 16 (recipient must listen to a message that says the call is from "Yuba County Jail" and must press "0" to accept the call). If the call recipient does not accept the call, the call does not connect. *See* Ex. 36 Neria-Garcia Dep. 54:9-20; O.A. Decl. ¶ 26 (call did not connect because attorney's office has an automated system that requires caller to dial extension. While Gil testified that the phones at Yuba are "regular phones," Ex. 33 Gil Dep. 25:12-15, Plaintiffs' expert tested the phones and found "they are subject to the same technical limitations as the Housing Unit Phones, including the inability to navigate phone trees and leave voicemail messages. Additionally, each call from these phones is preceded by an announcement stating that the call is from an inmate at Yuba County Jail and instructing the recipient to affirmatively accept or reject the call." Berg Decl., Ex. A [Berg Report] at 13-14.

[65] *See* Ex. 36 Neria-Garcia Dep. 59:24-60:11; Ex. 19 [YCS000000037] ("[f]or the purpose of this procedure, a legal phone call shall be interpreted as a phone call made directly to a legal representative").

[66] O.A. Decl. ¶ 23; K.M. Decl. ¶ 14 (private phone is limited to attorney calls).

**c.** **Contra Costa Phone Rooms Are Available at Deputy Discretion, Detainees Cannot Schedule Calls, and Calls Are Limited to Attorneys, Courts, and Law Enforcement Agencies.**

In response to this litigation, Contra Costa created free, direct, private calling options for Plaintiffs' legal calls. There is one phone in an attorney visiting room in Building 7A that serves roughly 119 male Plaintiff class members and another phone in the attorney visiting room in Building 8B that serves roughly 35 female Plaintiff class members.[67] But access to the Phone Rooms at Contra Costa is granted at the discretion of individual deputies, and many Plaintiffs have been denied access outside of free-time hours.[68]

Until October 2015, detainees were informed that phones were limited to calls to attorneys.[69] ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████."[70] In addition, ██████████████████████████████████████████████████.[71] There is no schedule to sign up for calls, and availability depends on both Plaintiff demand and whether the room is being used for other purposes, such as attorney visits.[72] Detainees therefore cannot plan to call a specific office at a specific time.

**d.** **Mesa Verde Does Not Allow Critical Legal Calls to Non-Attorneys.**

Mesa Verde—unlike the other Facilities—has assigned a single staff member, Program Director Catherine Harvey, the responsibility of vetting detainee requests and scheduling legal

---

[67] Ex. 35 Bonthron Dep. 70:25-71:5, 72:19-22.

[68] *Id.* at 184:1-185:24 (access subject to deputy's ability to accommodate request given many other responsibilities); *see also* Ex. 36 Neria-Garcia Dep. 61:7-62:1; 155:2-16; 156:7-17 ("In Contra Costa . . . we were only allowed to use the phone during our free-time, which was one hour per day"); Ex. R V.V. Dep. 92:15-93:14 (deputies deny access to immigration phones); Ex. P Lyon Dep. 48:14-49:2 (testifying that detainees not allowed to use the phone "unless it's free-time, but it depends on the deputy, he can let you use it").

[69] *See* Ex. 36 Neria-Garcia Dep. 59:24-60:11, 149:6-23; Ex. 35 Bonthron Dep. 123:5-124:4.

[70] Ex. A [CCCSO001068]; *see* Ex. 35 Bonthron Dep. 180:7-181:18.

[71] Ex. A [CCCSO001068].

[72] Ex. 35 Bonthron Dep. 184:25-185:24, 191:8-13, 193:14-17; *see* Ex. 36 Neria-Garcia Dep. 62:14-64:7; Prasad Decl., ¶ 14.

telephone calls for Plaintiffs.[73]  In some ways, Mesa Verde's model is a vast improvement. However, ICE prevents Plaintiffs at Mesa Verde from obtaining evidence and assistance by allowing direct, private calls only to attorneys and persons specifically approved by attorneys or ICE.[74]

From the beginning of its operation, Mesa Verde limited legal calls to attorneys who had already filed a form indicating that they represented the caller in his or her immigration proceedings.[75]  Posted instructions on how to request a private legal call state:

> Detainees must submit a detainee request (KITE) to the shift supervisor with the phone number of the Law Office of the attorney representing the detainee.  The provided number will be verified by onsite staff as well as Talton Communications in order to validate the number.  Additionally, the attorney will be asked to provide their bar card number for verification.  Once approved as a legal representative, the number will be placed as unmonitored.[76]

Even though some exceptions have been made to allow for consultation with attorneys who have not been formally retained, Mesa Verde's practice has been to limit direct and private legal calls to attorneys.[77]  The Facility has also refused to allow legal calls to offices where no specific attorney name was provided.[78]  This makes it impossible for *pro se* Plaintiff class members to gather the information, evidence, and support they need to fully effectuate their rights under the INA.[79]

---

[73] Ex. 11 [Depo Ex. 296]; Ex. 39 Harvey Dep. 31:18-32:7, 72:18-73:7, 91:16-25, 92:9-19.

[74] *See* Ex. 16 [Mesa 000228]; Ex. 39 Harvey Dep. 38:24-39:6 (all people approved for legal call or attorney visit have been attorneys, cleared by an attorney, or cleared by ICE); Ex. 40 Murray Dep. 91:5-14 (understanding of a legal call is to lawyers, courts, consulates, and "those types of things."); Ex. 11 [Ex. 296].

[75] Ex. 12 [Exhibit 297] (email from Leslie Ungeman); Ex. 39 Harvey Dep. 80:12-15 (thought that a G-28 form was required on file for an attorney).

[76] Ex. 16 [Mesa 000228].

[77] Ex. 39 Harvey Dep. 36:12-19 (G-28 not required for consultations).  *But see* Ex. 40 Murray Dep. 91:5-14 (limited to attorneys). *See also* Y.A. Decl. ¶ 16.

[78] *See* Ex. 39 Harvey Dep. 70:15-21; Ex. 13 [Ex. 306] ("You also need to provide a specific attorney's name from the Public Defender's Office.").

[79] *See* J.H. Decl. ¶¶ 12-14; (working on vacating criminal conviction but no response to kite requesting call to public defender's office); S.A. Decl. ¶ 14 (requested but never received a free phone call to Human Rights Watch to gather information for his asylum case).

### 6.    The Facilities Lack Effective and Private Messaging Systems.

Because communication is a two-way street, Defendants' failure to provide an effective and private messaging system for Plaintiffs to hear back from attorneys and others from whom they seek information and assistance is a significant barrier to Plaintiffs' ability to seek counsel and gather evidence for their cases. At each Facility, attorneys attempt to obtain information or schedule a time to speak with clients by calling or sending an email message, but delays in delivery render the system useless for urgent matters.[80] Defendants have a much more efficient system for delivering messages at Mesa Verde though it is not confidential.[81]

### 7.    Defendants Fail to Provide Notice of Available Options.

Moreover, Defendants fail to advise and instruct Plaintiffs regarding the communications options that they claim exist. The Housing Unit Phones at each Facility—including the Talton Free Call Platform—are extremely difficult to navigate.[82] Instructions are provided only in English and Spanish.[83] Staff, including ICE agents who visit the facility, do not understand how the systems function and do not provide assistance to Plaintiffs who complain that they cannot use the telephones.[84] Instead, Defendants regularly suggest that Plaintiffs seek assistance *from*

---

[80] *See* Vincent Supp. Decl. ¶¶ 11-12 (unable to include information in urgent filing because unable to get message to client at Contra Costa in time for same-day return call); Ex. R V.V. Dep. 10:12-11:4, 107:19-108:17 (delayed delivery of legal messages); M.G. Decl. ¶¶ 31-32 (received messages to call ACLU attorney two and four days after they were sent through RCCC email messaging system); Ex. Q Shugall Dep. 75:4-21 (attorney could not request private phone call with clients in detention facilities until recently, after filing on this action), 78:16-79:1 (generally takes 2-3 weeks to get call scheduled with detainee at Yuba).

[81] Ex. 38 Andrews Dep. 84:1-14 (messages delivered three times a day); Ex. 39 Harvey Dep. 57:2-5.

[82] Berg Decl., Ex. A [Berg Report] at 7 (Contra Costa), 8 (RCCC), 10 (Yuba), 10 (Mesa Verde); S.A. Decl. ¶ 5; H.S. Decl. ¶ 10; I.P. Decl. ¶ 46.

[83] Ex. 21 [Resp. to RFA No. 101] (admitting that instructions to use the FREE CALL PLATFORM are posted in the FACILITIES only in English and Spanish); *id.* [Resp. to RFA No. 104] (admitting that the FACILITIES provide facility-specific detainee handbooks to the ICE DETAINEES only in English and Spanish).

[84] Ex. 28 Meyer Dep. 155:5-11; Ex. 29 McDaniel Dep. 88:5-19; Berg Decl., Ex. A [Berg Report] at 11 ("In all four facilities, facility staff and ICE officials do not consider it their job to assist detainees with how to use the phone system and access the free call platform. In my interviews with detainees, they consistently stated that no member of the staff helped them with these issues. Staff testimony was generally consistent with these reports."); S.A. Decl. ¶ 15 (never received assistance from GEO or ICE officers on how to use the phones).

1     *each other.*[85]

2        Access to Phone Rooms at Yuba ███████████████████████

3 ██████████████████████████████████████████████████.[86] Even detainees who

4 were housed in those facilities when the new options came on line received no notice of them;

5 they learned of their existence only through word of mouth.[87] The same is true for the library

6 phone option at RCCC.[88]

7        Plaintiffs who do not speak or read English or Spanish struggle even more to learn what

8 communication options are available.[89] Despite the availability of an interpreter line provided by

9 the Department of Homeland Security, none of the Facilities provide oral instructions regarding

10 the telephone options available to detainees in languages other than English or Spanish.[90]

11     **D.**     **ICE's Own Detention Standards Require Reasonable and Equitable**
          **Telephone Access at All Four Facilities.**

12        Three of the facilities—RCCC, Yuba, and Contra Costa—are inspected for compliance

13 with ICE's 2000 National Detention Standards ("2000 NDS"), while Mesa Verde has contracted

14 to meet the newer 2011 Performance Based National Detention Standards ("2011 PBNDS").[91]

15 Both sets of detention standards require facilities to provide "reasonable and equitable access" to

16 telephones, including access to free and direct calls with privacy for legal calls, and they direct

17

18

19

20      [85] M.G. Decl. ¶ 10 (ICE agent said "get one of your buddies to help you"); Ex. 29 McDaniel
21 Dep. 90:4-17, 124:5-125:6; Prasad Decl. ¶ 10.
     [86] Ex. D [Bonthron Dep. Ex. 234] (detainee handbook) at CCSO000782 ("Access to
22 telephones"); Ex. 17 [YCS00000028_0007]; Ex. K [Lyon-RCCC-002500-2534] (RCCC Inmate
and Detainee Handbook) at 10.
23      [87] *See e.g.* Ex. P Lyon Dep. 111:5-112:19; Ex. 35 Bonthron Dep. 219:25-220:18.
     [88] I.P. Decl. ¶ 23; H.S. Decl. ¶ 20.
24      [89] Y.A. Decl. ¶ 6 (French speaker given an English handbook); B.M. Decl. ¶¶4-5.
     [90] Ex. 21 [RFA responses 101 and 104]; Ex. 6 [Exhibit 283]; Ex. 38 Andrews Dep. 59:8-17
25 (use of the interpreter at Mesa Verde does not include going over the information in the handbook
26 in the detainee's language). *See also,* Ex. 35 Bonthrom Dep. at 218:19-220:5; 221:11-25; Ex. 33
Gil Dep. 79:16-23.
27      [91] Ex. 33 Gil. Dep. 23:15-23, 85:7-21; Ex. 3 [Depo. Ex. 68, 2000 NDS]; Ex. J [Lyon-RCCC-
000163] at 6; Ex. 32 Butler Dep. 23:14-19; Ex. 35 Bonthron Dep. 232:25-233:8; Ex. 40 Murray
28 Dep. 68:13-21; Ex. 14 [Ex. 307].

facilities not to unduly limit a detainee's efforts to obtain legal representation.[92]  As Plaintiffs

explain, neither of the applicable detention standards is sufficient to effectuate Plaintiffs' rights

and Defendants fail to meet their own detention standards at each of the Facilities.

ICE's Office of Detention Oversight ("ODO") has interpreted a number of practices

challenged in this case to violate ICE's 2000 NDS or raise serious compliance questions.[93]

Moreover, the detailed telephone access provisions of the 2011 PBNDS, which ICE

developed as part of an "ongoing detention reform initiative" to conform to evolving best

practices and civil detention principles,[94] require many of the outcomes Plaintiffs seek in this

litigation:

***Reasonable Costs and Broad Range of Payment Options:*** Telephone services must be

"reasonably priced" and "based on rates and surcharges comparable to those charged to the

general public.  Any variations shall reflect actual costs associated with the provision of services

in the detention setting."[95]  Additionally, the 2011 PBNDS require that detention facilities offer

"the broadest range of calling options, including but not limited to, international calling, calling

cards and collect telephone calls."

***Providing Free, Direct, and Private Calls:***  The 2011 PBNDS require that facilities

permit detainees to make "direct or free calls" to a variety of offices, including: (1) federal and

---

[92] 2000 NDS, Telephone Access, §§ I, III(E) and (J); 2011 PBNDS 5.6 §§ I, V(E) and (F); *see also* Ex. 27 Vaughn Dep. 75:21-76:5 (the 2000 NDS and 2011 PBNDS are "very similar. They're more similar than dissimilar.").

[93] *See, e.g.*, Ex. 25 Dozoretz Dep. 24:19-25:13 (ODO provides internal but independent oversight of ICE detention facilities), 121:21-123:6 (telephones in open-bay housing units and in multi-person cells would not provide privacy that would satisfy ICE detention standards for legal calls), 123:10-124:5 (a telephone in an office or booking area is not private if there is an officer or anyone else in the room who can overhear the call), 144:21-148:3 (failing to provide legal calls from a private area within 24 hours of detainee request would be considered out of compliance with ICE detention standards, and providing access to a housing unit phone is not an adequate substitute), 155:5-159:18 (15-minute automatic cutoff is per se noncompliant, and 20-minute cutoff must be specifically justified), 169:9-19 (systems that prevent detainees from being able to leave voicemails for attorneys  would "be of great concern to us," and could be found non-compliant depending on what alternative calling options were available), 175:20-176:21 (same); Berg Decl., Ex. A [Berg Report] at 21-22.

[94] Ex. 24 Landy Dep. 43:10-44:4.

[95] 2011 PBNDS 5.6 § V(A)(2) at 360-61.  *See* Ex. 24 Landy Dep. 148:5-16.

state courts where the detainee is or may become involved in a legal proceeding; (2) legal representatives, to obtain legal representation, or for consultation when subject to expedited removal; (3) legal service providers or organizations listed on the ICE/ERO free legal service provider list; (4) federal, state, or local government offices to obtain documents relevant to his/her immigration case.

The 2011 PBNDS also recognize Plaintiffs' need for private legal calls. "[E]ach facility shall ensure privacy by providing a reasonable number of telephones on which detainees can make such calls without being overheard by staff or other detainees."[96] Moreover, free and direct calls (including calls to legal representatives that require privacy) "shall be easily accessible," and "[a]ccess shall be granted within 24 hours of the request, and ordinarily within eight facility established 'waking hours.'"[97]

***Allowing Incoming Legal Calls and Messages***: The 2011 PBNDS acknowledge the need for two-way communication by including a provision on incoming calls: "The facility shall take and deliver telephone messages to detainees as promptly as possible." 2011 PBNDS, p. 366.

***Providing Adequate Notice of Telephone Access Opportunities:*** The 2011 PBNDS require that facilities provide telephone access rules in writing to each detainee and that "[t]ranslation and interpretation services shall be provided as needed." 2011 PBNDS p. 362. The "expected outcome" includes that "applicable content and procedures . . . shall be communicated to the detainee in a language or manner the detainee can understand" and that "[o]ral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate." 2011 PBNDS p. 360.

---

[96] *Id.* at 364. The PBNDS's reference to "privacy panels," is misleading. Privacy panels cannot satisfy detainees' right to confer in private with counsel unless they actually achieve privacy. The privacy panels in Mesa Verde and Contra Costa do not. Ex. O Trinidad Dep. 87:23-88:9, 92:1-14, 94:11-17, 96:17-20; Ex. 25 Dozoretz Dep. 114:10-115:22 (NDS language regarding privacy panels usually refers to a bank of phones in a separate room from the housing unit), 121:21-122:9 (telephones inside an open-bay housing unit, that are not separated from the rest of the unit, have "no privacy" and would not comply with 2000 NDS requirements).

[97] *Id.* at 363. The same requirement exists in the 2000 NDS. Ex. 3 [NDS] Component E.

## III. STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also id.* at 249-50 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (citations omitted)). When "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted); *see also School Dist. No. 1J , Multnomah Cty., Or. v. ACandS, Inc.,* 5 F.3d 1255, 1264 (9th Cir. 1993) (evidence that "no reasonable juror could rely upon" creates no genuine issue of fact).

## IV. ARGUMENT

"It is well established that the Fifth Amendment guarantees non-citizens due process in removal proceedings." *Oshodi v. Holder*, 729 F.3d 883, 889 (9th Cir. 2013). The right of individuals in removal proceedings to receive a "full and fair hearing" is also set forth in the INA. 8 U.S.C. 1229a(b)(4); *see also Colmenar v. INS*, 210 F.3d 967 (9th Cir. 2000). "A vital hallmark of a full and fair hearing is the opportunity to present evidence and testimony on one's behalf." *Oshodi*, 729 F.3d at 889. *See also* 8 C.F.R. § 1240.1(c) ("The immigration judge shall receive and consider material and relevant evidence . . . ."). Non-citizens facing removal charges have a right to retained counsel by statute and as a matter of due process. *See Tawadrus v. Ashcroft*, 364 F.3d 1099, 1103 (9th Cir. 2004) (right to counsel stems from guarantee of due process); 8 U.S.C. §§ 1362, 1229a(b)(4)(A); 8 C.F.R. § 1003.16(b).

Here, Plaintiffs' rights to present evidence or access counsel are illusory. As a practical matter, they can neither gather the evidence they have a right to present nor consult with counsel because Defendants hold them in jails or jail-like conditions without reasonable telephone or other access to the outside world. Defendants' policies and practices violate their statutory and constitutional rights to due process, including access to counsel.

The Ninth Circuit has used the rights of criminal defendants under the Sixth Amendment to guide its interpretation of 8 U.S.C. § 1229a. *Montes-Lopez v. Holder*, 694 F.3d 1085, 1092-93 (9th Cir. 2012). Therefore, the well-established guarantees to telephone access for pretrial criminal detainees inform Plaintiffs' statutory rights here. Application of the *Mathews v. Eldridge* balancing test to Plaintiffs' claims under the Fifth Amendment yields the same result— that meaningful telephone or other access to counsel and evidence is required to achieve procedural due process for detained immigrants facing removal proceedings. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Finally, Defendants' conduct in denying and restricting Plaintiffs' access to counsel and other means of preparing their cases and seeking release from detention violates Plaintiffs' substantive due process rights under the Fifth Amendment.

A. **Non-Citizens Have Significant Due Process Rights in Removal Proceedings.**

1. **The Right to Counsel Requires That Immigration Respondents Have a Reasonable Opportunity to Secure Counsel.**

Unlike criminal defendants, most respondents in removal proceedings have not been held to have a right to appointed counsel.[98] Nevertheless, courts recognize the difficulty *pro se* respondents have navigating the complexity of immigration law, and they take seriously the statutory and due process rights of respondents to be represented "by an attorney or other representative of his or her choice." *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005) (quoting 8 C.F.R. § 1003.16(b)); *see Castro-O'Ryan v. INS*, 847 F.2d 1307, 1312 (9th Cir. 1987) ("With only a small degree of hyperbole, the immigration laws have been termed second only to the Internal Revenue Code in complexity. . . . A lawyer is often the only person who could thread the labyrinth") (internal citation omitted).[99]

---

[98] *See Franco-Gonzalez v. Holder*, Case No. CV 10-02211 DMG (DTBx), 2013 U.S. Dist. LEXIS 186258 (C.D. Cal. April 23, 2013) (requiring appointment of counsel for mentally incompetent detained immigrants facing removal proceedings). Whether appointed counsel may be required to meet the due process needs of all detained immigrants, *compare Gideon v. Wainwright*, 372 U.S. 335 (1963), remains an open question, and one the Court need not address to resolve Plaintiffs' claims in this case.

[99] The statutory right to counsel is so critical that its violation is considered *per se* prejudicial. *Montes-Lopez v. Holder*, 694 F.3d 1085 1093-94 (9th Cir. 2012) (to prevail on petition for review

To give meaning to immigrants' statutory and constitutional rights to counsel in their removal proceedings, immigration judges "must provide [respondents] with reasonable time to locate counsel and permit counsel to prepare for the hearing." *Biwot*, 403 F.3d at 1098-99. In *Biwot*, the Ninth Circuit acknowledged the difficulty inherent in obtaining counsel for even educated, English-speaking immigration detainees.

> With telephone tag, tight schedules, and impending deadlines, trying to secure an attorney [in three business days] would be difficult enough for an ordinary party. That Biwot was an incarcerated immigrant compounded those circumstances and made obtaining an attorney all but impossible in such a short interval.

*Id.* at 1099-1100 (denial of additional two-week continuance was "tantamount to denial of counsel," and an abuse of discretion); *accord Rios-Berrios v. INS*, 776 F.2d 859, 862 (9th Cir. 1985) (denial of continuance for detained respondent with limited education who spoke only Spanish, was unfamiliar with the United States, and was far from "his only friend in the country" was an abuse of discretion).

Plaintiffs' rights to counsel and to gather and present evidence are not limited to proceedings in immigration court. For example, Plaintiffs who are in custody pursuant to expedited or administrative removal proceedings may be deported without access to an immigration court hearing, but they first have a right to consult with and be represented by counsel and to present evidence to an asylum officer to establish a credible or reasonable fear of persecution. 8 C.F.R. §§ 208.30(d)(4), 208.31.

## 2. **The Right to a Full and Fair Hearing Necessarily Includes the Right to Gather Evidence.**

Like the right to counsel, the statutory and constitutional right to a fair hearing, including the right to present evidence in one's removal hearing, requires that individuals be afforded a reasonable opportunity to prepare their cases.[100] Accordingly, the right to a full and fair hearing

---

of a removal order, respondent who shows he was denied the statutory right to be represented by counsel in immigration hearing need not also show he was prejudiced by absence of attorney).

[100] A full and fair hearing requires that immigration judges affirmatively elicit possibly relevant evidence to "fully develop the record" from *pro se* immigrants because they "often lack the legal knowledge to navigate their way successfully through the morass of immigration law,

in immigration court extends beyond the courtroom walls to a respondent's practical ability to

present evidence.  For example, the Ninth Circuit has directed that continuances be granted as

needed to allow immigration respondents to gather and prepare evidence in support of their cases.

*Rendon v. Holder*, 603 F.3d 1104, 1110-11 (9th Cir. 2010) (denial of continuance violated due

process where respondent needed time to obtain additional evidence of respondent's son's

medical and educational needs and the lack of opportunities to meet those needs in country of

origin); *Baires v. INS*, 856 F.2d 89, 92 (9th Cir. 1988) (denial of continuance violated right to

present evidence).[101]

Similarly, the right to present evidence has been held to require ICE to provide access to

evidence in its possession that is relevant to an immigration respondent's potential claims for

relief.  In *Dent v. Holder*, an immigration respondent asserted he was a naturalized U.S. citizen

based on childhood adoption by a U.S. citizen parent, but was ordered deported because he was

not able to produce his adoptive mother's birth certificate.  627 F.3d 365, 369-70 (9th Cir. 2010).

At the time of the removal order and unknown to Dent or the IJ, ICE possessed documents related

to Dent's naturalization application in Dent's A-file.  *Id.* The Ninth Circuit held that the

government's failure to make those records available to Dent denied him due process of law.  *Id.*

at 374-75.  *See also Ibarra–Flores v. Gonzales*, 439 F.3d 614, 621 (9th Cir. 2006) (IJ violated due

process by refusing to order the Immigration and Naturalization Service to produce a form, the

existence or nonexistence of which was relevant to his defense); *Singh v. Holder*, 405 F. App'x

193 (9th Cir. 2010) (government's failure to provide documents in its possession and IJ's refusal

to grant continuance for purpose of forensic evaluation violated right to fair hearing).

---

and because their failure to do so successfully might result in their expulsion from this country."
*Agyeman v. INS*, 296 F.3d 871, 877 (9th Cir. 2002).

[101] It has also been held an abuse of discretion for an IJ to deny continuances to immigration
respondents seeking time to pursue applications for visas—such as the "U-visa" available to
victims of crime who assist in a law enforcement investigation—even though adjudication of the
visa application is not within the IJ's jurisdiction.  *See Meza v. Holder*, 544 F. App'x 716 (9th
Cir. 2013) (BIA cannot deny motion to reopen based USCIS's sole authority to grant U-visa);
*Sanchez Sosa v. Holder*, 373 F. App'x 719 (9th Cir. 2010) (IJ abused discretion in failing to grant
continuance so respondent could pursue a U-visa).

**B.** **Defendants' Denial of Telephone Access Violates Plaintiffs' Rights Under the INA.**

As illustrated by the foregoing discussion, a necessary condition of the statutory right to present evidence under 8 U.S.C. § 1229a(b)(4)(B) is the ability to obtain evidence. Similarly, the statutory right to consult with or retain counsel under 8 U.S.C. § 1229a(b)(4)(A) requires that individuals who are subject to removal charges have time to contact potential counsel.

Federal courts have not yet considered what these rights may require regarding an immigration respondent's ability to communicate with attorneys and collect evidence while in custody. But Plaintiffs' statutory rights have significant corollaries to the rights of criminal defendants guaranteed by the Sixth Amendment, which thereby inform the scope of immigrants' statutory rights. *Montes-Lopez v. Holder*, 694 F.3d at 1092-93; *see also Torres-Chavez v. Holder*, 567 F.3d 1096, 1100 (9th Cir. 2009) (analysis of ineffective assistance claim under the INA begins "within the Sixth Amendment framework established by *Strickland*") (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). In the present context as well, the rights of *pro se* criminal defendants should inform the scope of telephone access (or other communication) required to effectuate the statutory rights of Plaintiffs, many of whom are forced to proceed without counsel due to limited financial resources.

In *Milton v. Morris*, a criminal defendant who had chosen to represent himself and was convicted of robbery and attempted murder appealed the conviction, claiming a denial of due process. 767 F.2d 1443 (9th Cir. 1985). Milton claimed that the jail where he was held failed to provide him current law books, telephone access, or access to the legal runner appointed by the court to assist in the service of subpoenas, precluding him from contacting an expert witness or procuring an investigator, and generally preventing him from preparing his defense. 767 F.2d at 1444-45. The Ninth Circuit agreed and reversed the judgment of the district court, declaring:

> The defendant in this case had no means to prepare a defense. *When he was denied communication with the outside world, he was denied due process.*

767 F.2d at 1447 (emphasis added).[102] Thus, "it is certainly true that a defendant who is representing himself or herself may not be placed in a position of presenting a defense without access to a telephone, law library, runner, investigator, advisory counsel, or any other means of developing a defense . . . ." *People v. Jenkins*, 22 Cal. 4th 900, 1040 (2000).

Courts have also recognized the constitutional rights of pretrial criminal detainees—who, unlike Plaintiffs, are entitled to court-appointed attorneys and do not need telephone access for the purpose of *retaining* counsel—to contact counsel by telephone. *See In re Grimes*, 208 Cal. App. 3d 1175 (1989) (ordering installation of free telephone line connecting jail with public defender's office); *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1052 (8th Cir. 1989) (limiting pretrial criminal detainees to two non-private calls per week would be "patently inadequate" to satisfy Sixth Amendment right to counsel); *Johnson ex rel. Johnson v. Brelje*, 701 F.2d 1201, 1207-08 (7th Cir. 1983), *abrogated on other grounds by Maust v. Headley*, 959 F.2d 644, 648 (7th Cir. 1992) (detention facility for criminal defendants unfit to stand trial violated plaintiffs' right to be represented by counsel where calls were limited to two ten-minute calls a week with no incoming calls permitted).

In this case, Plaintiffs have largely been limited to non-private telephones with extremely high rates and fees and significant technical barriers to reaching outside agencies and individuals they need to contact to gather evidence and legal advice. *See supra* 6-10. While criminal defendants have access to appointed counsel in the county of their pretrial detention, as well as toll-free telephone access to public defender's offices, Plaintiffs are detained in remote locations and must retain counsel or represent themselves without assistance. While *pro se* criminal defendants have access to a wide array of tools, such as legal runners, investigators, and unlimited telephone access, Plaintiffs' efforts to contact witnesses and government agencies are thwarted by exorbitant phone rates and technical barriers. Applying the logic of court cases examining the Sixth Amendment rights of criminal defendants to telephone access, among other critical tools for

---

[102] Although the *Milton* court cited denial of due process as the basis for reversing Milton's conviction, it also noted that *Faretta v. California*, 422 U.S. 806 (1975), which addressed the right to self-representation under the Sixth Amendment "controls this case." *See Milton*, 767 F.2d at 1446.

obtaining legal advice, gathering evidence, and preparing for their hearings, it is clear that

Defendants' provision of extremely limited means of communication with counsel and others

violates Plaintiffs' rights to a full and fair hearing and to representation "by counsel of the alien's

choosing." 8 U.S.C. § 1229a(b)(4)(A).

### C.    Defendants' Denial of Telephone Access Violates Plaintiffs' Due Process Rights.

The Ninth Circuit has characterized procedural rights under the INA as a codification of

constitutional due process requirements, and the Court can avoid deciding constitutional

questions presented in this case by granting relief under those statutory provisions. *Colmenar v.*

*INS*, 210 F.3d 967, 971 (9th Cir. 2000).[103]  Alternatively, the Court can apply the familiar

constitutional doctrines governing procedural and substantive due process to grant summary

judgment to the Plaintiffs.

### 1.    Defendants' Restriction of Plaintiffs' Communication with the Outside World Violates Their Rights to Procedural Due Process.

It is well established that the Fifth Amendment entitles non-citizens to due process in

removal proceedings. *Reno v. Flores*, 507 U.S. 292, 306 (1993).  Courts apply the *Mathews v.*

*Eldridge* balancing test to determine the constitutional sufficiency of due process protections in

immigration cases. *Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (applying *Mathews* balancing

test to procedures in exclusion proceeding).  Under this test, courts must consider the interest at

stake for the individual, the risk of an erroneous deprivation through existing procedures as well

as the probable value of additional safeguards, and the interest of the government in using current

procedures rather than additional or different procedures. *Id.*, citing *Mathews v. Eldridge*, 424

U.S. 319, 334-35 (1975).

In two cases challenging immigration enforcement practices that coerced asylum seekers

---

[103] *See Public Citizen v. U.S. Dep't of Justice,* 491 U.S. 440, 466 (1989) ("It has long been an axiom of statutory interpretation that where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.") (citation and internal quotation marks omitted).

to waive their rights to a hearing and accept voluntary departure, federal courts applied the *Mathews* balancing test and imposed injunctions that specifically included telephone access as a remedy. In *Perez-Funez v. District Director, INS*, 619 F. Supp. 656 (C.D. Cal. 1985), plaintiffs challenged procedures for securing voluntary departure agreements from unaccompanied minors seeking entry into the United States. The court ordered additional safeguards to protect the minors' interests in being informed of their rights and possible legal claims in removal proceedings prior to accepting voluntary departure. Those safeguards included meaningful telephone access. *Id.* at 665, n. 19 ("class members should be given the fullest opportunity to obtain advice necessary to make an informed decision, and not merely the right to make and complete a single phone call.").

In *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488 (C.D. Cal. 1988), the court issued a permanent injunction enjoining immigration authorities from coercing Salvadoran detainees into signing voluntary departure agreements. In its findings, the court noted that defendants had violated plaintiffs' "rights to effective representation of counsel by unduly restricting attorney and paralegal visitation, failing to provide private telephone and visitation facilities, and in some cases failing to provide adequate telephone access." *Id.* at 1511. The injunction required immigration authorities to, *inter alia*, "provide class members with access to telephones during processing," provide accurate legal services lists, "assign an officer with a published phone number . . . to provide information on Salvadorans detained in the region," and "ensure the privacy of attorney-client communications." *Id.* at 1512-13.

The facts presented here are similar to those at issue in *Perez-Funez* and *Orantes-Hernandez.* But Plaintiffs' needs to consult with counsel and reach government agencies and potentially supportive witnesses are even more complex and comprehensive—they require not only information related to possible asylum claims prior to deciding whether to accept voluntary departure, but access to a wide range of legal services and sources of evidence and support to fight deportation on a number of possible grounds. The *Mathews v. Eldridge* balancing test applied in *Perez-Funez* and *Orantes-Hernandez* should be applied here with commensurate results: the strong interests of non-citizens in avoiding deportation, including through this

country's laws providing asylum from persecution, should be furthered through practical measures to allow meaningful access to counsel and to the persons and information Plaintiffs need to pursue their legal claims and defenses.

Plaintiffs' liberty interests are among the most weighty: avoiding removal from their adopted country and seeking release from detention. *Mathews*, 424 U.S. at 334-35. Defendants' detention practices block Plaintiffs from communicating with counsel and obtaining evidence for their cases, creating a high likelihood of erroneous deprivation of Plaintiffs' liberty interests. *Id.* Finally, Defendants' own interests are not adverse to Plaintiffs. *Id.* Defendants have promulgated detention standards that, if followed, would impose nearly all the administrative burden that would follow from Plaintiffs' own proposed safeguards. Any remaining burdens are minimal compared to the risk of erroneously depriving Plaintiffs of the serious liberty interests at stake. Accordingly, Defendants' practices violate Plaintiffs' due process rights.

### a. Plaintiffs' Interests Are Extremely Weighty.

The liberty interests involved in deportations proceedings have long been understood to rank "among the most substantial." *Padilla-Agustin v. INS*, 21 F.3d 970, 974 (9th Cir. 1994).

> Though deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom. That deportation is a penalty—at times a most serious one—cannot be doubted. Meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness.

*Bridges v. Wixon*, 326 U.S. 135, 154 (1945); *see also Wong Yang Sung v. McGrath*, 339 U.S. 33, 50 (1950) (deportation hearing involves "issues basic to human liberty and happiness and, in the present upheavals in lands to which aliens may be returned, perhaps to life itself").

In addition to substantial interests in the outcomes of their immigration proceedings, Plaintiffs have a liberty interest in avoiding prolonged detention. "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Reno*, 507 U.S. at, 315 (O'Connor, J., concurring) (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)) (core liberty interest implicated by confinement in custodial institution even if conditions of confinement are liberal). There are at least two ways Defendants' denial of reasonable telephone access implicates Plaintiffs' liberty interests in freedom from

confinement.  First, it limits Plaintiffs' ability to seek release from detention while their cases are pending.[104]  Second, it forces Plaintiffs to seek repeated continuances (and thus remain detained longer) as they struggle to contact potential counsel and obtain evidence.

**b.** **Defendants' Failure to Provide Reasonable Telephone Access Creates a High Risk of Erroneous Deprivation of Rights.**

The Ninth Circuit recognizes that due process may require granting an immigration respondent additional time to obtain counsel or gather and prepare evidence in support of his or her claims and defenses.  *Baires v. INS*, 856 F.3d at 92-93.  In reviewing an IJ's denial of a continuance, the Ninth Circuit considers, *inter alia*, "the realistic time necessary to obtain counsel . . . [and] any barriers that frustrated a petitioner's efforts to obtain counsel, such as being incarcerated or an inability to speak English."  *Biwot*, 403 F.3d at 1099.  But continuances alone do not provide Plaintiffs a reasonable opportunity to obtain the support needed for their cases.  By detaining Plaintiffs without reasonable telephone access, ICE—which is both the prosecuting agency *and* the custodian of respondents in removal proceedings—effectively denies Plaintiffs a means of accessing the counsel and evidence needed to present their cases. Because Plaintiffs must choose between prolonging their detention as they struggle to overcome obstacles in preparing their cases or moving forward with their removal proceedings without the assistance and evidence they would otherwise seek, the risk of erroneous deprivation of their liberty interests caused is near certain.[105]

---

[104] There are several potential means for immigrants to seek release from detention. *See e.g.* 8 U.S.C. § 1226(a) (ICE has authority to detain or release pending removal proceedings); 8 U.S.C. § 1231(a)(3) (opportunity to seek release 90 days after removal order); *Demore v. Kim*, 538 U.S. 510, 514 (2003) (referencing hearing to challenge inclusion in mandatory detention category); *Casas-Castrillon v. Dep't of Homeland Sec.*, 535 F.3d 942, 952 (9th Cir. 2008) (establishing right to bond hearing pending review of final removal order.

[105] Plaintiffs' interests in seeking and communicating with counsel and others to access fair and timely immigration proceedings have been recognized by the UN High Commissioner for Refugees. Guidelines issued by UNHCR instruct that that persons in detention "must be given access to asylum procedures, and *detention should not constitute an obstacle to an asylum-seeker's possibilities to pursue their asylum application.*" UN High Commissioner for Refugees, Guidelines on the Applicable Criteria and Standards relating to the Detention of Asylum-Seekers and Alternatives to Detention, Guideline 7(vi) (2012) (emphasis added). Procedures for seeking asylum must be "realistic and effective, including that timeframes for lodging supporting materials are appropriate for someone in detention, and access to legal and linguistic assistance

**(1)** **Defendants' Telephone Systems Restrict Access to Counsel.**

The limited scope of telephone access at the Facilities as set forth in Plaintiffs' Statement of Facts above is beyond reasonable dispute. Plaintiff class members' and attorney witnesses' testimony and declarations in this case detail the many ways in which Defendants' telephone systems restrict and prevent communications with counsel. Housing Unit Phones are prohibitively expensive, cut off after 20 minutes in two of the facilities, require positive acceptance and/or for the call recipient to pay for the call, and offer no privacy.[106] *See supra* at 6-10. Limits on physical access to phones at RCCC, Yuba, and Contra Costa compound the problems by limiting the hours Plaintiffs can make calls. *See supra* at 11. The Talton Free Call Platform—with its inaccuracies and limited coverage—is insufficient to meet Plaintiffs' needs to contact counsel. *See supra* 11-12. Phone Room access is offered only once a week at Yuba, but Plaintiffs cannot contact offices with automated answering systems, and RCCC offers no Phone Rooms at all. *See supra* at 12-16. The lack of effective messaging systems means Plaintiffs in all of the facilities (except Mesa Verde) cannot even play "phone tag" with potential representatives. *Biwot*, 403 F.3d at 1099 (factors such as "telephone tag, tight schedules, and impending deadlines" impact efforts to secure an attorney). *See supra* at 17.

Many Plaintiffs are unable to contact and retain counsel on their own from within the Facilities and rely on the assistance of family and friends.[107] Obstacles to contacting potential counsel also require Plaintiffs to request continuances in their immigration cases, prolonging their detention.[108] In addition, the limitations of Defendants' telephone systems interfere with

---

should be made available." *Id.*

[106] It is undisputed that at the time this case was filed, there were 15-minute limits on the Housing Unit Phones at RCCC and Yuba and that those limits were increased to 20 minutes in response to litigation. Ex. 27 Vaughn Dep. 115:23-116:9.

[107] Ex. 36 Neria-Garcia Dep. 25:23-28:4; I.P. Decl. ¶¶ 34-35; M.G. Decl. ¶¶ 14-16; S.A. Decl. ¶18; K.M. Decl. ¶13. Given that 59% of class members were in detention for under three weeks, the sample of Plaintiffs that Class Counsel were able to connect with to provide declarations is over representative of detainees who persisted in their efforts to obtain representation and seek relief from deportation. *See* Levy Decl., Ex. A [Levy Report] at ¶ 6, Tables 1, 2.

[108] R.K. Decl. ¶ 21; H.S. Decl. ¶ 7; M.G. Decl. ¶ 16.

Plaintiffs' ability to communicate effectively with counsel.  Plaintiffs are unable to speak

confidentially to retained counsel or seek consultations with potential counsel or advisors because

Housing Unit Phones are in noisy, crowded settings and conversations can be overheard by other

detainees and facility staff.[109]  *See Johnson-El v. Schoemehl*, 878 F.2d 1043, 1052 (8th Cir. 1989)

("Forcing prisoners . . . to yell over the phone obviously compromises the consultation. Detainees

might be hesitant to disclose names and information relevant to the attorney's investigation and

necessary to the advice sought").  Failures in facility messaging systems, technical barriers, and

high costs and delays in accessing Phone Rooms also interfere with attorney-client

communications necessary to prepare legal documents.[110]

  Defendants' restriction and denial of telephone access have delayed Plaintiffs in obtaining

representation and harmed the effectiveness of their counsel, to the detriment of their liberty

interests in avoiding deportation and unnecessarily prolonged detention.

  **(2)**  **Defendants' Telephone Systems Restrict Access to Government Agencies and Other Third Parties Plaintiffs Need to Reach.**

  Many immigration attorneys who represent detained immigrants are aware of the

challenges their potential clients have in communicating by telephone and take steps to staff their

office telephones with individuals who know to accept calls from the Facilities.[111]  But

government offices and third parties from whom Plaintiffs may seek information necessary to

their cases are not so accommodating.[112]

---

[109] Ex. 30 Garzon Dep. 93:1-25 (attorney had difficulty preparing for bond hearing for Yuba detainee because of lack of privacy for phone calls and lack of funds to make calls); Prasad Decl. ¶ 11; H.S. Decl ¶ 15-16; I.P. Decl. ¶¶ 16-18, 37.

[110] *See* Ex. 36 Neria-Garcia Dep. 91:25-92:17 (testifying to delays in obtaining an attorney call which was needed to determine if evidence had been gathered for a removal hearing); Prasad Decl. ¶ 11; Vincent Decl. ¶ 3 (inability to schedule calls or receive calls from attorneys interferes with ability to effectively receive legal advice); Vincent Supp. Decl. ¶¶ 4, 11-12; M.G. Decl. ¶ 31-33 (delays in messaging systems and 15 minute limit on the Free Call Platform were obstacles to completing a declaration).

[111] *See* Ex. Q Shugall Dep. 38:13-40:22, 119:24-121:16; Ex. 30 Garzon Dep. 34:1-24.

[112] *See* Ex. Q Shugall Dep. 82:7-24 (virtually impossible for detainee to obtain all necessary evidence because of limited access to phones), 119:24-121:16 (detainee unable to gather critical evidence from police department in support of case because police had automated phone system that prevented calls from being connected).

The combination of technical barriers on Housing Unit Phones and the Facilities' policies of restricting phones to attorney calls effectively prevents Plaintiffs from reaching such offices while in ICE custody. Plaintiff Audley Lyon was unable to contact the police to seek certification of his assistance with a criminal investigation on his own from Contra Costa and was only able to pursue a U-visa once he obtained pro bono counsel.[113] Several Plaintiff witnesses have been unable to contact witnesses to provide testimony or letters in support of their applications for release on bond.[114] J.H. was unable to obtain a police report to support his claim for relief under the Convention Against Torture and has been unable to secure advice or assistance in obtaining post-conviction relief, extinguishing an important option for avoiding deportation to the Philippines, where he fears persecution.[115]

Defendants' telephone system presents nearly insurmountable challenges for Plaintiffs who need to reach non-English speaking relatives. Y.A. was granted a $5,000 bond by ICE but was unable to contact his family in Togo to have them send money to pay for his release on bond or documents he needed to seek a lower bond amount.[116] This was due to language barriers and their inability to understand the telephone systems' voice prompts. *Id.* Restrictive features of Defendants' telephone system (and Defendants' failure to provide alternative resources to assist Plaintiffs who are isolated in detention) have directly resulted in Y.A.'s continued detention.[117]

---

[113] Ex. P Lyon Dep. 111:5-14. Inability to access law enforcement agencies for a U-visa certification impacts both whether a class member is ultimately deported and his or her eligibility for release on bond. *See Lee v. Holder*, 599 F.3d 973, 976, n.2 (9th Cir. 2010) (certification from law enforcement as to helpfulness in investigation of crime sufficient to show prima facie eligibility for U-visa).

[114] *See e.g.* Y.A. Decl. ¶ 10-12 (could not contact individuals to receive documents for bond hearing); Ex. 36 Neria-Garcia Dep. 77:11-78:9; R.K. Decl. ¶¶ 19-20 (could not contact county offices for rehabilitation programs to support application for release on bond). In addition, one's likelihood of prevailing on the merits is a factor for determining flight risk in bond hearings, making evidence like law enforcement certifications required for U-visa applications critical to Plaintiffs' efforts to seek release from detention. b*See Dela Cruz v. Napolitano*, 764 F. Supp. 1197, 1204 (S.D. Cal. 2011).

[115] J.H. Decl. ¶¶ 8-14; *see also* B.M. Decl. ¶¶ 19-20, 24 (could not contact family and friends to gather proof of identity to support application for asylum).

[116] Y.A. Decl. ¶¶ 9-11.

[117] *See also* S.A. Decl. ¶¶ 12, 14 (unable to reach human rights organizations in Somalia for evidence to support asylum claim).

The harms to Plaintiffs' liberty interests from the limitations imposed by Defendants' telephone systems are real and palpable. They are not merely risks; they are reality.

### c. The Government's Interests Are Consistent with Accommodating Plaintiffs' Rights and Any Administrative Burdens Are Significantly Less Weighty than Plaintiffs' Liberty Interests.

The third prong of the *Mathews* balancing test is "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. As government actors, Defendants' first and primary goal should be facilitating Plaintiffs' rights to a full and fair hearing and access to counsel. *See Sell v. United States*, 539 U.S. 166, 180 (2003) (the government has a "constitutionally essential interest in assuring that the defendant's trial is a fair one"); *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 28 (1981) (noting the government's interest in "accurate and just results" in the right to counsel context). Similarly, the government has an interest in avoiding unnecessary delays in Plaintiffs' cases and the prolonged detention that results. *Jones v. Blanas*, 393 F.3d 918, 928 (9th Cir. 2004) (recognizing public policy interest in prompt resolution of legal claims); *Nhoc Dahn v. Demore*, 59 F. Supp. 2d 994, 1005 (N.D. Cal. 1999) (reasoning the government has an interest in limiting unauthorized detentions).

Unlike most custodial agencies, ICE has prosecutorial powers that grant the agency discretion to release Plaintiffs on bond or on various forms of supervision, or to terminate or defer removal proceedings. This prosecutorial role heightens the governmental interest in affording due process to those whom ICE chooses to detain. *See Berger v. United States*, 295 U.S. 78, 88 (1935) (U.S. Attorney is the representative "of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest . . . is not that it shall win a case, but that justice shall be done"). Because ICE has failed to exercise its custodial and prosecutorial powers in ways that serve this interest, strong oversight is needed by the Court to ensure that conditions of detention nevertheless give Plaintiffs a meaningful opportunity to

seek relief under this nation's immigration laws.[118]

To the extent the agency has countervailing interests, these are heavily outweighed by the combination of Plaintiffs' and the Government's own interest in fair process. Based on the course of the litigation, Plaintiffs anticipate the asserted interests would be minimizing administrative burdens (including burdens related to institutional security) and minimizing expense.

**(1)**   **The Administrative Burden on ICE Is Minimal Because the Agency's Own Detention Standards Aspire to Most of the Access Sought Here.**

Defendants cannot credibly claim they have an interest in avoiding any administrative burdens related to safeguards that are already contemplated by ICE's own detention standards.[119] Indeed, the 2011 PBNDS are already in place at Mesa Verde, and Defendants have therefore already undertaken to fulfill them for a portion of the Plaintiff class.[120] Moreover, ICE's policy is to "seek to implement PBNDS 2011 whenever a contracting opportunities [sic] arise."[121] ICE admits the only reason why these standards were not adopted at RCCC and Yuba is a fear of paying more money to its detention contractors.[122] But as discussed *infra*, "[f]inancial cost alone is not a controlling weight" under *Mathews*, 424 US. at 348, and generally does not "justify the creation or perpetuation of constitutional violations," *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S.

---

[118] Unlike criminal court, where judges can order *pro per* privileges as needed for particular defendants who exercise their Sixth Amendment right to forego appointed counsel and represent themselves, immigration judges have no such authority. *See* 8 C.F.R. § 1240.1 (describing authority of immigration judges in removal proceedings).

[119] The 2011 PBNDS were the outcome of a substantial collaboration process within ICE and other DHS components. Ex. 24 Landy Dep. 146:2-14. Nationwide, they have been adopted at every facility that holds an ICE-only population and some additional number of facilities that hold a mixed ICE/criminal justice population. *Id.* at 53:15-54:12.

[120] As detailed below, neither the 2011 PBNDS nor the practices at Mesa Verde fully meet Plaintiffs' needs.

[121] Ex. 24 Landy Dep. 87:8-13.

[122] Ex. 27 Vaughn Dep. 131:11-25 (RCCC "felt that they could meet" the 2008 or 2011 PBNDS, but ICE chose not to require 2011 PBNDS compliance because "it would have caused an increase, a possible increase in the bed rate or additional funding from ICE to bring the areas that were not currently in compliance, up to those Standards . . . ."), 142:22-143:20 (ICE reached out to Yuba regarding 2011 PBNDS compliance, but did not pursue it further because Yuba requested higher per diem rates).

367, 392 (1992) (denying modification to consent decree regarding unconstitutional jail conditions).

Moreover, as explained here, the safeguards outlined in the 2011 PBNDS that are sought by Plaintiffs do not conflict with legitimate government interests.

***Reasonable Costs and Broad Range of Payment Options:*** Defendants can assert no legitimate interest in maintaining the high call-initiation charges and per-minute rates at RCCC, Yuba, and Contra Costa. The high prices of those calls are entirely unrelated to the cost of providing calling services to Plaintiffs and, instead, exist to subsidize commission payments from the telephone companies to the counties.[123] The fact that Talton Communications is able to provide ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ and while still making a profit also shows that prohibitive pricing for housing unit calls at RCCC, Yuba, and Contra Costa is unrelated to the actual cost of telephone services.[124] Indeed, the Federal Communications Commission recently issued an order to address the market failure that has led to overcharging Plaintiffs and others housed in jails across the country.[125]

***Providing Free, Direct, and Private Calls:*** Under both the 2000 NDS and 2011 PBNDS, free and direct calls (including calls to legal representatives that require privacy) "shall be easily accessible," and "[a]ccess shall be granted within 24 hours of the request, and ordinarily within eight facility established 'waking hours.'"[126] None of the Facilities meet this standard, and Mesa Verde is the only facility that even has a telephone coordinator who schedules Plaintiff legal calls

---

[123] *See* Wood Decl., Ex. A [Wood Report] at ¶¶ 20-27; Ex. B [ICS000399, 427] (▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆); Ex. G [GLOBAL_0002288-94] (▆▆▆▆▆▆▆▆▆▆); Ex. F [GLOBAL_0002281-87] (▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆).
[124] *See* Ex. S Talton Dep. 210:15-212:23 (▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆); Exhibit 264 (Mesa Verde rate sheet).
[125] Based on the FCC order, each of the Facilities in this case should impose a rate cap of $0.16/minute for debit/prepaid calls and eventually reach the same rate for collect calls, as well as eliminate initiation and other ancillary fees. *See* Wood Decl., Ex. A [Wood Report] at ¶¶ 36-37; Ex. 33 Gil Dep. 39:15-24 (stating that the Yuba facility houses approximately 180 ICE detainees and 210 county inmates); Ex. 38 Andrews Dep. 100:17-22 (max is 400, count on day of deposition was 380).
[126] PBNDS 2011 § V(E)(2) at 363; NDS Component E.

in relatively short order.[127]  The fact that Mesa Verde has been able to staff this level of

coordination undercuts any argument ICE may make that the burden of providing such staffing

weighs more heavily than the risk to Plaintiffs' interests of not doing so.  Moreover, ICE has no

legitimate interest in violating its own standards.

The 2011 PBNDS require that facilities permit detainees to make "direct or free calls" to a

variety of offices—not just attorneys, but also "federal, state or local government offices to obtain

documents relevant to his/her immigration case," other named government entities, legal service

providers, and (in emergencies and cases of "compelling need") family members or others.[128]

Though Plaintiffs do not concede this list is adequate,[129] it goes far beyond what Defendants

currently provide.[130]  There are a number of ways Defendants could facilitate such calls, whether

by adding more numbers to the Talton Free Call Platform, augmenting existing County pro bono

call platforms similar to the Talton platform,[131] or making Phone Rooms available to call these

categories of offices.  Particularly given Defendants' demonstrated ability to staff Phone Rooms

at Mesa Verde, the additional effort required to allow access to government offices does not

outweigh Plaintiffs' weighty interests.

Defendants may claim security concerns limit their ability to provide unmonitored calls to

---

[127] At Yuba and RCCC, detainees are afforded only one private legal call per week, or none at all. At Mesa Verde, Ms. Harvey testified that she picks up requests every morning, vets the numbers being called, and schedules detainees for calls using existing escort staff. Ex. 39 Harvey Dep. 92: 11-19, 93:6-14 (morning pick up), 94:9-21 (vets number and schedules).

[128] PBNDS 2011 § V(E) at 363.

[129] Specifically, it fails to provide private, direct calling access to businesses and personal contacts for information, evidence, or as potential witnesses or sponsors in their cases.

[130] See supra n. 41, 70 (Housing Unit Phones do not allow calls to government offices, Phone Rooms limited to attorney calls).

[131] Each of the County facilities have ████████████████████████████████████████████████████████████████████████████. See Ex. D [Bonthron Dep. Ex. 234] (detainee handbook) at CCSO000782 ("Access to telephones"); Ex. 17 [YCS00000028_0007]; Ex. K [Lyon-RCCC-002500-2534] (RCCC Inmate and Detainee Handbook) at 10.; Ex. 37 Grant Dep. 79:12-80:12; Ex. 31 Philbin Depo Tr. 53:10-20; Ex. 34 Gonzalez Depo Tr. 284:22-285:1.  See also, Jayne v. Bosenko, 2014 U.S. Dist. LEXIS 84431, at *24 (E.D. Cal. June 19, 2014) (describing GTL system for designating certain numbers for free, direct, unmonitored calls).  Frequently called numbers such as federal, state or local government offices, including law enforcement and victims' services agencies, as well as immigration attorneys who frequently represent detained immigrants in the Facilities could be added to those platforms.

non-attorneys.  However, Mike Vaughn, the Assistant Field Office Director based in ICE's San Francisco Field Office, has indicated that Plaintiffs can "make unmonitored, unrestricted calls to any entity" from ICE field offices.[132]  If Plaintiffs are permitted to make unmonitored, unrestricted phone calls from the ICE field office, there is no security reason why they should not also be able to do so from inside the detention facility.  Given the significant need for Plaintiffs to make private legal calls to non-attorneys (and the nature of the class, which includes many individuals with non-serious or no criminal history), any legitimate security concerns can and should be addressed on an individualized basis by limiting telephone access to certain numbers for certain detainees based on actual conduct.[133]

In addition, because an automatic 15-minute cutoff is *per se* noncompliant with both the 2000 NDS and 2011 PBNDS[134], Defendants can have no basis for maintaining such a cutoff for Free Call Platform calls.[135]

***Allowing Incoming Legal Calls and Messages:*** Staff at Mesa Verde is able to deliver messages three times a day.  It is thus administratively feasible to implement a fast, reliable incoming message system that would allow lawyers and others to return calls to Plaintiffs regarding their legal cases without the days-long delay experienced by Plaintiffs at RCCC and Contra Costa.[136]  This strongly undermines any claim by Defendants that it has an interest in avoiding similar message-delivery standards for the entire class, especially given the impact that delayed messages has on Plaintiffs' access to counsel.  The 2011 PBNDS also encourage "the use of new technologies."  Given increasing reliance on technologies such as email, text messaging, and web-based communications over traditional telephone communications, as well as the

---

[132] Ex. 27 Vaughn Dep. 62:22-64:3, 73:13-74:2.

[133] Jails can "block" numbers from receiving calls where there are security concerns and create individualized "allowed call" lists for detainees.  *See* Ex. 42 [YCS000000007].  Another practical solution to security concerns would be to allow monitoring of non-attorney calls with a clear policy and practice prohibiting use of any information gathered through Plaintiffs' legal calls for purposes unrelated to institutional security.

[134] Ex. 25 Dozoretz Dep. 157:3-5.

[135] *See* Ex. 37 Grant Dep. 77:4-8; M.G. Decl. ¶ 33; Prasad Decl. ¶ 11.

[136] Ex. 39 Harvey Dep. 55:19-56:5, 56:19-57:1; Exhibit 289 (copies of messages); Ex. 38 Andrews Dep. 84:1-15 (messages delivered three-times a day), 85:6-14 (message delivery within scope of what Mesa Verde can provide and does not require additional staff).

practical need for Plaintiffs to be able to send and receive messages both domestically and internationally, Defendants have an interest in providing alternative forms of communication to Plaintiffs. Incoming voicemail, as described by Plaintiffs' expert, Don Wood, is but one example.[137]

***Providing Adequate Notice of Telephone Access Opportunities:*** One of the greatest challenges Plaintiffs face is understanding how Defendants' telephone systems work and how to access Phone Rooms. This is particularly true for Plaintiffs who do not read or understand English and Spanish, as all written materials are provided in only those two languages. But there can be no legitimate governmental interest in failing to orient Plaintiffs to the settings where they are held in custody.[138] The Department of Homeland Security has a telephone-based interpretation service that Mesa Verde uses to conduct its intake of new detainees.[139] It would be a minimal additional administrative burden for Defendants to provide an explanation of available telephone access opportunities and instructions on how to pay for and use telephones in the facility as part of their facility orientations. This is needed for all Plaintiffs, as even literate English and Spanish speakers have not received effective notice of or assistance with telephone access.[140] For Plaintiffs who speak languages other than English or Spanish, the DHS language services line is an easy and available resource.

> **(2)** **The Government Can Achieve Its Purposes and Effectuate Due Process Through Modest, Non-Burdensome Additional Safeguards.**

Implementing the remaining additional safeguards not addressed by the 2011 PBNDS would not impose a significant administrative burden on ICE.

***Using Available Technology to Modify Phone Restrictions:*** In third-party depositions, representatives of the inmate telephone service providers for Yuba, Contra Costa, and RCCC explained that technical features such as the positive acceptance requirement and limits on three-

---

[137] Wood Decl., Ex. A [Wood Report] at ¶¶ 58-59.
[138] *See* PBNDS 2011 p. 362, 360.
[139] Ex. 38 Andrews Dep. 54:10-22; Ex. 6 [Andrews Dep. Ex. 283].
[140] *See* M.G. Decl. ¶ 33, Prasad Decl. ¶ 11; O.A. Decl. ¶ 18 (no postings or notices about access to the private phone).

way calling are introduced at the request of the jails and are not required features of their systems.[141]  Calling toll-free numbers is prohibited even though GEO deponents with knowledge of the Mesa Verde telephone policy were unaware of the reason for the prohibition, and such calls can be enabled through existing technology.[142]

The Contra Costa limitation that housing unit calls must be paid for by the call recipient is not required by inmate calling services technology, and any purported security justification is rebutted by the fact that the other three facilities allow debit systems or calling cards.[143]  Use of debit account payment systems also means that funds can be added to indigent Plaintiff debit accounts to provide greater Housing Unit phone access to indigent Plaintiffs.[144]

***Accommodating Indigent Plaintiffs:***  Except for the Free Call Platform—and, in response to litigation, Phone Rooms—Defendants offer no accommodations for indigent detainees unless there is a family emergency or other unusual need.  But indigent Plaintiffs share the same rights to contact counsel and others to prepare their immigration cases.  Limiting indigent detainees to the "same telephone access" as other detainees in a system where the majority of telephone access is through a paid system fails to address how their rights are compromised by the combination of being indigent and being in custody.  Courts have recognized that denying access to judicial processes based on ability to pay violates the Constitution in criminal and 'quasi criminal' cases.  *See Griffin v. Illinois*, 351 U.S. 12, 23 (1956) (state cannot condition ability to appeal criminal conviction on purchase of a full transcript) (Frankfurter J., concurring); *MLB v. SLJ*, 519 U.S. 102, 112 (1996).

---

[141] *See* Ex. 34 Gonzalez Dep. 213:7-214:16 (GTL does not have some sort of menu of features that are listed to clients), 219:1-221:9 (services chosen are typically outlined in the RFP put out by the counties), 224:22-226:19 (describing the RFP and bid process), 263:16-265:7 (changing duration of call time at various facilities within Contra Costa County only took a matter of days at Contra Costa's request); Ex. 31 Philbin Dep. 43:23-44:9 (provision of services offered varies depending on what is requested in counties' RFPs), 49:17-50:7 (technical configurations may be changed by phone companies, as quickly as a matter of days or less, depending on requests); *see also* Wood Decl., Ex. A [Wood Report] at ¶¶ 50-53 (positive acceptance) and 54-55 (three-way calling).

[142] Ex. 40 Murray Dep. 95:3-19; Wood Decl., Ex. A [Wood Report] at ¶ 56.

[143] Wood Decl., Ex. A [Wood Report] at ¶¶ 63-64.

[144] *Id.*

Two simple policy changes could provide indigent Plaintiffs with equitable telephone access for legal calls: (1) Provide indigent detainees with additional access to Phone Rooms, which are already free; and (2) Since Phone Rooms are a limited resource, provide indigent detainees with equitable, no-cost access to Housing Unit Phones for short calls, for example to plan and schedule longer consultations on the Phone Rooms.[145] These steps—which are not currently being taken in any systematic way—would be a negligible burden on Defendants.[146]

***Ending Unnecessary Physical Restrictions That Block Access to Telephones:*** Treatment of Plaintiffs reveals that Yuba and RCCC have both housed Plaintiffs in unnecessarily restrictive conditions, impacting their ability to make calls. M.G. was held in total isolation with one hour of "dayroom time" a day for months before he was transferred to a 12-man tank with constant access to a housing room phone.[147] Similarly, Nancy Neria-Garcia was held in isolation with one hour a day of "hallway time" when she could use the Housing Unit Phone for some of her time at Yuba, but she was also housed in larger dorms at Yuba, Contra Costa, and Mesa Verde.[148] The severe restriction of liberty at Contra Costa also interferes with telephone access and is without apparent security justification. Despite the civil nature of their detention, Plaintiffs are confined to their cells for 21 hours a day.[149] *See Jones*, 393 F.3d at 934 (limited out-of-cell time and related restrictions raised presumption of punitive conditions).

### (3) Defendants Can Claim No Interest in Maintaining Current Conditions.

ICE's shocking, ongoing disregard for enforcement of its own telephone access standards creates doubt about whether its current practices are even intentional, let alone serve identifiable

---

[145] In the three facilities that offer debit-based payment on the housing phones, ICE can simply instruct their detention contractors to add phone credit to indigent detainees' accounts or provide them with a calling card. *See* Wood Decl., Ex. A [Wood Report] at ¶ 18 (describing process for adding funds to debit accounts).

[146] *See* Ex. 37 Grant Dep. 92:10-23; *see also* Ex. 39 Harvey Dep. 61:17-62:3, 71:17-20.

[147] M.G. Decl. ¶¶ 6, 17-19.

[148] *See* Ex. 36 Neria-Garcia Dep. 59:8-12, 113:25-115:4; Neria-Garcia Decl. ¶ 17.

[149] Ex. 35 Bonthron Dep. 59:5-14 (detainees expected to remain in their cells except during free-time), 59:24-60:11 (listing free-time hours when detainees can access the housing unit phones); Berg Decl., Ex. A [Berg Report] at 7 ("Detainees receive severely limited out-of-cell time in a manner that appears inconsistent with the nature of the population").

government interests. Several witnesses with responsibility for enforcing ICE detention standards at the Facilities lacked knowledge of the standards and could not remember being trained on them. One ICE employee tasked with checking RCCC regularly for, among other things, compliance with ICE's telephone standards was unable to identify the standards when presented with them in his deposition.[150]

In the face of a formal report citing telephone access deficiencies at RCCC during the course of this litigation, ICE did nothing. ███████████████████████████████████

████████████████████████████████████████████████████████████[151]

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████[152]

As a correctional agency, one of ICE's basic duties is to create a functional system of inspection and monitoring.[153] Its failure to do so is "profoundly dysfunctional" as a matter of correctional management.[154] Because such dysfunction serves no government interest, the Court's calculation of administrative burden should be discounted accordingly.

### (4)     Expense Is Not a Significant Barrier.

If ICE required the contractors who operate the Facilities to implement the safeguards already required in the 2011 PBNDS telephone access provisions, as well as the additional safeguards described in Section (2) above, there may be some expense to ICE. However, Defendants bear the burden of identifying any legitimate governmental expense and showing it is substantial enough to outweigh Plaintiffs' and their own interest in procedural fairness. *See*

---

[150] *See* Ex. 28 Meyer Dep. 48:9-14 (could not recall receiving training on ICE detention standards); Ex. O Trinidad Dep. 55:12-14, 58:20-22, 61:12-62:5 (████████████████████████████

████████████████████████████████████████████████████████████

███████████████), 113:8-13; Ex. 29 McDaniel Dep. 24:24-25:6, 26:3-13 (never received training on ICE telephone access standards and did not recognize the standards when they were shown to him in his deposition), 82:3-83:2.
[151] Ex. L [Jan. 29, 2015 ODO inspection of RCCC] at Lyon-RCCC-003117 – 003118.
[152] Ex. M [ERO Inspection G-324A Worksheet] at Lyon-RCCC-003219 – 003221.
[153] *See* Berg Decl., Ex. A [Berg Report] at 26-27.
[154] *Id.* at 20.

*Vasquez v. Rackauckas*, 734 F.3d 1025, 1052-53 (9th Cir. 2013) (government "has not established any governmental interest" in support of challenged procedures because it offered no evidence of cost or burden). Moreover, "[f]inancial cost alone is not a controlling weight in determining whether due process requires a particular procedural safeguard prior to some administrative decision." *Mathews*, 424 U.S. at 348.

Nor should all expenses associated with implementing the proposed safeguards be treated as legitimate interests under the *Mathews* analysis. Defendants concede that "ICE has no interest in receiving revenues from detainees in the form of telephone calls . . . [b]ecause ICE operates using appropriated funds and is not supposed to be subsidizing its services with the funds from detainees."[155] By extension, ICE can have no interest in indirectly benefiting from detention contractors subsidizing their services with commissions funded by high telephone rates and fees unconnected to the actual costs of phone service. The Facilities, who are being paid to house Plaintiffs, must accept the administrative costs of effectuating Plaintiffs' constitutional rights as a condition of doing business with the federal government.

Finally, any costs must be balanced against the likely savings resulting from the decreased detention times. As Michael Berg explained, a national study recently found that for detained immigrants who sought counsel, almost 51% of all court adjudication time was incurred due to time requested to find an attorney.[156] Both this national study and a study of cases in the San Francisco immigration court further concluded that detained immigrants who obtain counsel have significantly higher success rates at both bond hearings and removal hearings.[157] By reducing the amount of time consumed in the search for counsel and increasing the number of immigrants who successfully advocate for affordable bonds, Plaintiffs' requested safeguards can reduce average detention times and thereby reduce ICE's overall detention expenditures.

Plaintiffs' well-established rights to access counsel and prepare and present evidence in removal proceedings are necessary to protect the most weighty of liberty interests: freedom from

---

[155] *See* Ex. 24 Landy Dep. 163:3-13.
[156] Berg Decl., Ex. A [Berg Report] at 26 (citing Ingrid V. Eagly & Steven Shafter, *A National Study of Access to Counsel in Immigration Court*, 164 U. PENN. L. REV. 1 (2015)).
[157] *Id.* at 17.

confinement and the right to remain in this country of freedom. Telephone access and other means of communicating with the outside world is essential to Plaintiffs' ability to exercise these rights, and Defendants' ongoing denial of such access has deprived and, unless enjoined, will continue to deprive Plaintiffs of those liberty interests. By comparison, ICE's interests in maintaining the status quo is minimal at best.  Accordingly, the *Mathews* test should be resolved in favor of Plaintiffs.

> ## 2.  Denial of Reasonable Telephone Access Violates Plaintiffs' Substantive Due Process Rights.

Defendants' isolation of Plaintiffs in remote locations far from the San Francisco Immigration Court, without the means to communicate effectively with the outside world, also violates substantive due process protections in two ways.

First, being housed in conditions essentially identical to county prisoners who are awaiting criminal trials and serving criminal sentences at Yuba, RCCC, and Contra Costa, leads to a presumption that the conditions are unconstitutionally punitive.  *See Jones*, 393 F.3d at 934 (9th Cir. 2004) ("With respect to an individual confined awaiting adjudication under civil process, a presumption of punitive conditions arises where the individual is detained under conditions identical to, similar to, or more restrictive than those under which pretrial criminal detainees are held…").  As a matter of substantive due process, civil detainees are entitled to "more considerate" treatment than prisoners held on criminal charges. *Id*. (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982)).  Defendants may claim that the availability of the Talton Free Call Platform and, at some Facilities, private or semi-private phones, makes the conditions different enough to avoid this presumption. But in truth, these accommodations fall far short of what pretrial criminal defendants and sentenced county prisoners receive.  County prisoners housed with Plaintiffs at Contra Costa, Yuba, and RCCC are held in the county of their criminal proceedings, within minutes of their court-appointed public defenders.[158]  In contrast, Plaintiffs

---

[158] Pretrial incarceration in remote locations has been held to interfere with the Sixth Amendment right to a speedy trial, which in turn is grounded in the principles of reducing the period of time an individual is incarcerated without having been found guilty. *Cobb v. Aytch*, 643 F.2d 946, 958 (3d Cir. 1981) (citing *Klopfer v. North Carolina*, 386 U.S. 213, 223-26 (1967)).

held at Yuba, RCCC, and Mesa Verde are located far from the immigration court and facts and witnesses relevant to Plaintiffs' cases. County prisoners have free, direct telephone lines to the county public defenders and, if they are appearing *pro se*, access to court-appointed runners and investigators as well as enhanced telephone access within the Facilities.[159]  Compared to a comparably situated county inmate, Plaintiffs' conditions of confinement related to access to legal resources are seriously deficient.[160]

Second, Defendants' restrictions and denial of telephone access prolong Plaintiffs' detention without any compelling justification.  *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (detention violates due process unless ordered in criminal proceeding or in narrow circumstances where special justification outweighs "individual's constitutionally protected interest in avoiding physical restraint") (citations omitted).  As shown by Plaintiffs' depositions and declarations in this case, the deficiencies in Plaintiffs' access to counsel and evidence result in prolonged detention for those who attempt to resist the removal charges against them.[161]  In *Zavala v. Ridge*, this district court granted a petition for writ of habeas corpus to an immigration detainee whom the government sought to retain in custody pending an automatic stay of the IJ's decision granting bail redetermination.  310 F. Supp. 2d 1071 (N.D. Cal. 2004).  The court noted that "[s]ubstantive due process protections from arbitrary confinement apply to aliens, notwithstanding their residency status."  310 F. Supp. 2dat 1076, citing *Zadvydas*, 533 U.S. at 693.  Detention of civil immigration detainees violates substantive due process without a "special justification" of

---

[159] Ex. 37 Grant Dep. 30:25-31:21; Ex. 17 [YCS00000028_0007]; Ex. K [Lyon-RCCC-002500-2534] (RCCC Inmate and Detainee Handbook) at 10.

[160] In *Cobb*, the Third Circuit explained that the Sixth Amendment right to a speedy trial together with the right to counsel and the Eighth Amendment bail clause "create [a] federally protected interest in reducing pretrial incarceration and minimizing interference with a pretrial detainee's liberty. *Id.* n. 7.

[161] *See* Prasad Decl. ¶ 12 (regularly sees detainees at RCCC denied bond or discretionary relief that they may have received if they had been able to contact family to obtain evidence); Y.A. Decl. ¶¶ 9-12 (unable to contact family in Togo to pay for release on $5,000 bond).

To the extent Defendants' denial of telephone and other access to the outside world drives some Plaintiffs to give up on the possibility of fighting removal and stipulate to a removal order or take voluntary departure these conditions also "interfere with rights implicit in the concept of ordered liberty." *United States. v. Salerno*, 481 U.S. 739, 746 (1987) (quoting *Palko v. Connecticut*, 302 U.S. 319, 325-326 (1937)). *See* I.P. Decl. ¶¶ 47-48 (other detainees give up).

compelling interest that outweighs the detainees' interest in liberty. *Id.* While it has been established that ICE has a compelling interest in holding certain immigration respondents in custody pending their removal proceedings, Defendants cannot show that the *prolonged* detention that results from denying Plaintiffs' reasonable access to telephones or other means to communicate with the outside world is justified by a compelling interest. *Cf. Demore*, 538 U.S. at 518 (upholding mandatory detention for individuals with aggravated felony histories based on special justification of government's "near-total inability to remove deportable criminal aliens" and assumption that detention would be brief).

### D. Denial of Reasonable Telephone Access Violates Plaintiffs' First Amendment Right to Petition the Government.

Plaintiffs are also entitled to summary judgment on their First Amendment claim for the right to petition the government for redress of grievances. This claim focuses on efforts to obtain governmental records, benefits, or actions (including, for example, U-visa certifications, vital records, medical records, court records, and police records), as well as efforts to hire and consult attorneys, who would assist Plaintiffs in terminating removal proceedings or extinguishing ICE's basis for seeking their removal. As set forth *supra*, Defendants' restrictions on Plaintiffs' telephone access prevent them from contacting government offices and similar record keepers for these purposes.

"Under the First Amendment, a prisoner has . . . a right to petition the government for a redress of his grievances." *Silva v. Di Vittorio*, 658 F.3d 1090, 1101-02 (9th Cir. 2011). The right to petition the government encompasses the right to hire and consult attorneys for this purpose. *Mothershed v. Justices of Supreme Court*, 410 F.3d 602, 611 (9th Cir. 2005), *as amended on denial of reh'g*, 2005 U.S. App. LEXIS 14804 (9th Cir. July 21, 2005) (the "right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition.") (quoting *Denius v. Dunlap*, 209 F.3d 944, 953 (7th Cir. 2000)). Additionally, the Ninth Circuit has held that "[p]risoners have a First Amendment right to

telephone access, subject to reasonable security limitations." *Keenan v. Hall*, 83 F.3d 1083, 1092 (9th Cir. 1996) *opinion amended on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998) (quoting *Strandberg v. City of Helena*, 791 F.2d 744, 747 (9th Cir. 1986)).

No reasonable security limitations justify the denial of Plaintiffs' ability to directly telephone government agencies or other recordkeepers to request production of records or other actions needed for their applications for immigration benefits, or to communicate with attorneys regarding such matters. As set forth *supra*, ICE's detention standards require facilities to permit detainees to make direct or free calls to legal representatives and to federal, state, and local offices for their immigration cases, even though the Facilities do not fully provide this access.[162] *See Shakur v. Selsky*, 391 F.3d 106, 116 (2d Cir. 2004) ("a failure to abide by established procedures or standards can evince an improper [governmental] objective"). Defendants have failed to produce any evidence that allowing Plaintiffs to make calls to attorneys or to obtain government certifications or other records needed for their applications for immigration benefits, whether through the Talton Free Call Platform or the Phone Rooms in the Facilities, would pose anything other than a wholly imaginary security risk. *See California First Amendment Coalition v. Woodford*, 299 F.3d 868, 882 (9th Cir. 2002) ("Although prison officials may pass regulations in anticipation of security problems, they must at a minimum supply some evidence that such potential problems are real, not imagined.") (internal citations omitted). Accordingly, the First Amendment claim should be resolved in favor of Plaintiffs.

E.   **Defendants' Actions in Response to Litigation Are Insufficient; Class-Wide Relief Is Necessary and Appropriate.**

During the course of this litigation, Defendants and the Facilities have made changes to telephone access provided Plaintiffs—an implicit acknowledgement that conditions at the time

---

[162] 2011 PBNDS § V(E), at 363; 2000 NDS Telephone Access Component E.

the Complaint was filed violated Plaintiffs' critical rights in removal proceedings. As set forth above, the undisputed facts related to Defendants' *current* restrictions and denial of telephone access to Plaintiffs warrant a finding of summary adjudication on liability in favor of Plaintiffs because the changes Defendants have undertaken are inadequate to effectuate Plaintiffs' statutory and constitutional rights. Moreover, because Defendants' practices have been in flux during the course of litigation and Defendants have not demonstrated that the restrictions on telephone access that existed when the Complaint was filed cannot reasonably be expected to recur, summary adjudication should be based on facts as they existed when the Complaint was filed. *See Bell v. City of Boise*, 709 F.3d 890, 898 (9th Cir. 2013) (mootness based on voluntary cessation subject to stringent standard, including demonstration that "challenged conduct cannot reasonably be expected to start up again") (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).

Finally, injunctive relief to remedy a systemic denial of safeguards that create a risk of erroneous deprivation of liberty is appropriate even where conditions vary for members of the plaintiff class and not all members of the plaintiff class are prejudiced by the lack of safeguards. *See Parsons v. Ryan*, 754 F.3d 657, 679 (9th Cir. 2014), *reh'g en banc denied*, 784 F.3d 571 (9th Cir. 2015) (in class action challenging prison medical care, "every single ADC inmate faces a substantial risk of serious harm if ADC policies and practices provide constitutionally deficient care for treatment of medical, dental, and mental health needs"). For this reason, Plaintiffs seek relief that sets minimum standards for Defendants at all Facilities, without regard to whether some of the Facilities have begun to meet some of those standards during the course of litigation.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for summary adjudication.

Dated: December 17, 2015      By:   */s/ Julia Harumi Mass*
                                    JULIA HARUMI MASS (SBN 189649)
                                    ANGÉLICA SALCEDA (SBN 296152)
                                    MICHAEL T. RISHER (SBN 191627)

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
OF NORTHERN CALIFORNIA

By:     _/s/ Robert P. Varian_____
      ROBERT P. VARIAN (SBN 107459)
      CHARLES J. HA (WA Bar No. 34430 (*pro hac vice*))
      DAVID KEENAN (WA Bar No. 41359 (*pro hac vice*))
      JUDY KWAN (SBN 273930)
      ALEXIS YEE-GARCIA (SBN 277204)
      ORRICK, HERRINGTON & SUTCLIFFE, LLP

By:     _/s/ Carl Takei_____
      CARL TAKEI (SBN 256229)
      AMERICAN CIVIL LIBERTIES UNION
      NATIONAL PRISON PROJECT

By:     _/s/ Megan Sallomi_____
      MEGAN SALLOMI (SBN 300580)
      VAN DER HOUT, BRIGAGLIANO, &
      NIGHTINGALE, LLP

*Attorneys for Plaintiffs*

## CERTIFICATION OF CONCURRENCE FROM OTHER PARTIES

I, Robert P. Varian, am the ECF user whose ID and password are being used to file this Motion for Summary Adjudication. In compliance with General Order 45, X.B., I hereby certify that Julia Mass, Carl Takei and Megan Sallomi have concurred in the filing of this document and has authorized the use of her electronic signature.

Dated:   December 17, 2015      By:     _/s/ Robert P. Varian_____
                                  ROBERT P. VARIAN (SBN 107459)
                                  ORRICK, HERRINGTON & SUTCLIFFE, LLP