UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

<table>
<tr><td>

AUDLEY BARRINGTON LYON, et al.,

          Plaintiffs,

v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,

          Defendants.

</td><td>

Case No.  13-cv-05878-EMC

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Docket Nos. 120, 139

</td></tr>
</table>

## I.    INTRODUCTION

The instant action is brought on behalf of a certified class of adult immigration detainees who are or will be held by Defendant United States Immigration and Customs Enforcement (ICE) in Contra Costa County, Kern County, Sacramento County, or Yuba County.  Docket No. 99 (First Supplemental Complaint) (Compl.) at ¶ 90.

The Immigration and Nationality Act (INA) grants the Attorney General the discretionary authority, transferred to the Department of Homeland Security (DHS), to detain any alien in removal proceedings pending a final order.  8 U.S.C. § 1226(a).  At issue are conditions at four detention facilities used to hold adult immigration detainees: Yuba County Jail (Yuba), Rio Cosumnes Correctional Center (RCCC) in Sacramento County, West County Detention Facility (Contra Costa), and Mesa Verde Detention Facility (Mesa Verde) in Bakersfield County (collectively, Facilities).  *See* FAC at ¶¶ 31-32.  Plaintiffs' cases are venued at the San Francisco Immigration Court; thus, Contra Costa, RCCC, Yuba, and Mesa Verde are respectively 21, 83, 123, and 282 driving miles from San Francisco.  *See* Docket No. 100 (Answer) at ¶ 33.  Because of this distance, Plaintiffs allege that in-person visits are "impractical at best," making telephone

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

access "critical to Plaintiffs' ability to locate, retain, and seek advice from legal counsel" and "essential to gather the evidence and government documents necessary to defend[] against removal charges, locate witnesses, and do other things necessary to represent themselves in complex legal proceedings."[1]  FAC at ¶ 3.

However, because of restrictions on telephone access, Plaintiffs contend that they are unable to retain or communicate with counsel, or to gather evidence to be presented in removal proceedings or that is otherwise necessary for relief.  *Id.* at ¶ 6.  Plaintiffs specifically allege the following limitations: (1) high rates and fees for paid calls from Housing Unit Phones; (2) technical barriers and payment restrictions on Housing Unit Phones, such as a "positive acceptance" requirement where the individual being called must accept the call; (3) inadequacies of the free call or pro bono platforms; (4) limits on hours of telephone access; (5) lack of privacy; (6) inability to receive incoming calls or timely messages; and (7) failure to provide notice of calling options for detainees with limited English or Spanish language skills.  Plaintiffs Mot. at 6. As a result of these alleged restrictions, Plaintiffs who would be eligible for relief are deported or unnecessarily detained as they seek continuances in order to find counsel and gather evidence. Compl. at ¶¶ 5, 6.

Based on these allegations, Plaintiffs bring three claims for relief: (1) the right to representation of counsel, (2) the right to a full and fair hearing, and (3) the right to petition the government for redress of grievances.  *Id.* at ¶¶ 100-112.  The Court certified a class of "all current and future immigration detainees who are or will be held by ICE in Contra Costa, Sacramento, and Yuba Counties" in April 2014 under Federal Rule of Civil Procedure 12(b)(2), and expanded the class definition to include detainees who are or will be held in Bakersfield County.  *See* Docket

---

[1] For example, detainees seeking asylum or withholding or deferral of removal under the United Nations Convention Against Torture often must gather evidence of their identity, conditions in their home country, and other evidence corroborating their claim.  *See* Docket No. 120-19 (Realmuto Dec.) at ¶ 28.  Similarly, detainees seeking cancellation of removal need to establish residency and physical presence, the absence of disqualifying criminal convictions, good moral character, and/or hardship to a qualifying relative.  *Id.*  Finally, detainees who seek a U-visa must obtain a government-issued form certifying that the individual was a victim of a crime and that the individual was helpful to law enforcement.  *See* Docket No. 120-22 (Prasad Dec.) at ¶ 16.

1 Nos. 31, 98.

2      The parties' cross-motions for summary judgment came on for hearing before the Court on

3 February 11, 2016.  *See* Docket Nos. 120 (Plaintiffs Mot.), 139 (Defendants Mot.).  For the

4 reasons set forth below, the Court **GRANTS** in part and **DENIES** in part Defendants' motion for

5 summary judgment, and **DENIES** Plaintiffs' motion for summary judgment.

<h2 style="text-align:center">II.    <u>BACKGROUND</u>[2]</h2>

7 A.    <u>Undisputed Facts</u>

8      The Court finds that the following facts are not in dispute.

9     1.    <u>General Matters</u>

10         1.    Many of the detainees were arrested for a crime or are being held by the

11 ICE after serving time for their crimes.  *See* Docket No. 139-2 (Shinners Dec.), Exh. 1 (Vaughn

12 Dep.) at 175:25-176:4.

13         2.    Of the individuals held between December 10, 2012 through August 31,

14 2014, 10.54% were classified low risk, 20.5% were medium-low risk, 35.7% were medium-high

15 risk, and 33.27% were high risk.[3]  Shinners Dec., Exh. 32.

16         3.    Each of the Facilities provide access to telephones in or near the common

17 areas of their housing units (Housing Unit Phones).  *See* Docket No. 119-5, Exh. A (Berg Report)

18 at 6-11.

19         4.    Since this action was filed, ICE also began offering access to telephones

20 outside of the housing units at Yuba, Contra Costa, and Mesa Verde.  *Id.* at 12-15.

21         5.    Detainees at all four facilities also have access to a "Free Call Platform" or

22 "Pro Bono Platform" from the Housing Unit Phones and some Phone Rooms, which allows free

23 direct calls to a pre-programmed set of speed dial numbers.  *See* Shinners Dec., Exh. 6 (Landy

---

[2] Defendants make a number of evidentiary objections to the declarations submitted by Plaintiffs in support of their motion for summary judgment.  Docket No. 139-1.  Many of these objections have merit, and the Court will sustain the objections.  However, the objected to statements have no impact on the Court's ruling on the cross-motions for summary judgment.

[3] Risk takes into account factors such as flight risk, protective custody factors (*i.e.*, age), and the seriousness or violent nature of criminal convictions.  Vaughn Dep. at 199:5-19.

United States District Court

For the Northern District of California

Dep.) at 159:16-20.

6.    Detainees may also request to be transported to the ICE Field Office to make telephone calls.[4]  *See* Shinners Dec., Exh. 31 (Butler Dep.) at 87:13-22.  Detainees at all facilities also have access to legal mail and attorney visits, although there is some evidence that these services are inadequate substitutes for telephone access due to the delay in responses and distance between the Facilities and where attorneys are located.  *See* Docket No. 120-17 (Supp. Vincent Dec.) at ¶ 11.

2.    <u>Contra Costa</u>

7.    Contra Costa is an open, campus-style facility.  Shinners Dec., Exh. 20 (Bonthron Dep.) at 45:19.  Because of this open layout, Contra Costa only houses detainees who fall into certain security classifications, and does not house any ICE detainees classified as high risk, have accumulated a significant number of disciplinary incident reports, have medical or mental health needs, or have been violent against other inmates or staff.  *Id.* at 45:18-46:14; 118:18-22.

8.    Housing Unit Phones are located in dayrooms on each tier of the housing units.  Berg Report at 6.  They are typically set up in pairs facing each other, and are often located only a few feet from the door of the nearest cell.  *Id.*  The Housing Unit Phones are also located within auditory range of the common-area tables and televisions.  *Id.*; *see also* Docket No. 124-5 (Takei Dec.) at DSC00452, 484, 504, 535.  All Housing Unit Phone calls are monitored and recorded.  Berg Report at 7.

9.    In order to use the Housing Unit Phone, detainees must pay an initiation fee of $2.60-$3.00, and per-minute rates ranging from $.05-$.025.  Docket No. 119-10 (Phillips Dec.), Exh T.

---

[4] This process requires being shackled, and is considered insufficient to comply with ICE detention standards that require telephone access within the detention facility.  *See* Docket No. 144-1 (Yee-Garcia Dec.), Exh. 49 (Meyer Dep.) at 132:2-14 (testifying that transportation requires shackles on the hands and a chain around the waist); Exh. 50 (Dozoretz Dep.) at 124:16-126:1 (explaining that detention standards are facility-specific, and that if the facility lacks accessible phones which provide privacy for detainees to discuss legal matters, it will be cited as deficient).

10.     Housing Unit Phone calls must be paid for by the recipient.  Ha Dec., Exh. 35 (Bonthron Dep.) at 165:20-25.  Thus, detainees can only call individuals or offices that agree to accept collect calls or have a prepaid account.  Berg Report at 7.

11.     Housing Unit Phones have a positive acceptance requirement; the phone plays an outgoing message identifying the caller as an "inmate" calling from Contra Costa jail, before prompting the call recipient to affirmatively accept the call by pressing a numbered key on his or her phone.  *See* Ha Dec., Exh. 36 (Neria-Garcia Dep.) at 169:22-24; Ha Dec., Exh. 35 (Bonthron Dep.) at 167:8-21.

12.     The positive acceptance requirement makes it impossible for detainees to navigate automated telephone systems to dial an extension or leave a voicemail message.  Ha Dec., Exh. 35 (Bonthron Dep.) at 167:22-168:4 (explaining that calls which go to voice mail or offices that use a phone tree system will not connect); Berg Report at 7-8, 10.

13.     Detainees are not permitted to make three-way calls.[5]  Ha Dec., Exh. 31 (Philbin Dep.) at 85:9-11 ("Q: So is it your understanding that all facilities do not allow three-way calls? A: That is my understanding."); Phillips Dec., Exh. D (Contra Costa Detainee Handbook) at 14.

14.     Detainees are only permitted to use the Housing Unit Phones during designated free time hours. Ha Dec., Exh. 35 (Bonthron Dep.) at 38:1-13.  Free time hours are limited to Monday through Wednesday and Friday between 3:30 p.m. and 5:00 p.m. and 6:30 p.m. to 9:00 p.m., Thursday between 6:30 p.m. and 9:00 p.m., and Saturday and Sunday between 10:30 a.m. and 11:30 a.m., 1:30 p.m. to 2:50 p.m., 3:30 p.m. to 5:00 p.m., to 6:45 p.m. and 10:00 p.m. Ha Dec., Exh. 35 (Bonthron Dep.) at 60:1-8.

15.     From the Housing Unit Phones, detainees can access the Talton Free Call Platform, which allows direct calls to a limited set of speed-dial numbers, made up primarily of federal government offices connected with immigration, the immigration court system, foreign

---

[5] Three-way calls are used by attorneys to communicate with detainees who do not share a common language by including an interpreter.  *See* Phillips Dec., Exh. Q (Shugall Dep.) at 96:23-97:11.

United States District Court
For the Northern District of California

consulates, and several free legal services providers.  Berg Report at 6; *see also* Takei Dec. at

DSC00434, 555.  The free call numbers do not include local government offices or local courts.

*See* Takei Dec. at DSC00434, 555.  The free legal service providers also do not include all offices

on Defendants' free legal services list.  *Compare id.* with Ha Dec., Exh. 9.

16.     The Talton Free Call Platform has a 15-minute automatic cutoff.  Contra

Costa officials were unable to explain why there is a cutoff.  Ha Dec., Exh. 37 (Grant Dep.) at

77:4-18 (stating that she does not know why there is an automatic cutoff and when compared with

other telephone calls, "there's no comparison" and "[i]t doesn't make any sense to me.").

17.     In addition to the Housing Unit Phones, Contra Costa has -- following the

filing of this suit -- added phone rooms, from which detainees are permitted to make private and

free calls to case-related contacts.  Ha Dec., Exh. 37 (Grant Dep.) at 64:9-15.

18.     Contra Costa maintains a dedicated e-mail address for attorney e-mail

messages, while anyone may send e-mail messages through its SmartMail service.  Shinners Dec.,

Exh. 23 at 5; Grant Dep. at 88:15-89:9.

19.     Information about the dedicated attorney e-mail system is posted on the

housing units to advise detainees that the system is available.  Shinners Dec., Exh. 20 (Bonthron

Dep.) at 208:14-18.

20.     The attorney e-mail system is not confidential; two copies of the e-mail are

printed out, with one being logged and the other hand-delivered to the detainee.  *Id.* at 208:7-12;

Supp. Vincent Dec. at ¶ 10.[6]

3.     RCCC

21.     RCCC houses only male detainees in dormitory-style housing units that

contain phones the detainees can access at any time.[7]  Shinners Dec., Exh. 31 (Butler Dep.) at

---

[6] It is unclear how quickly messages are passed onto the detainees; one attorney stated that she would message her clients to call her, but would not receive a call back for several days.  Supp. Vincent Dec. at ¶ 10.  However, she was unsure if the waiting period was due to phone availability, a delay in clients receiving messages, or both.  *Id.*

[7] For detainees held in administrative segregation, there is a dispute over how many hours a day these detainees would have access to phones.  *See* Ha Dec., Exh. 32 (Butler Dep.) at 63:22-64:25 (stating that they have access "several hours a day"); Docket No. 120-8 (M.G. Dec.) at ¶ 6 (stating

United States District Court
For the Northern District of California

1  32:12-14, 41:2.

2          22.    The Housing Unit Phones are located within auditory range of the

3  stairwells, and below a television which is kept at a loud volume.  Berg Report at 7-8; *see also*

4  Takei Dec. at DSC00329, 290.

5          23.    All Housing Unit Phone calls are monitored and recorded.  Berg Report at

6  8.

7          24.    In order to use the Housing Unit Phones, detainees must pay an initiation

8  fee of $1.75 to $2.40, and per-minute rates ranging from $.175-$.50.  Phillips Dec., Exh. B at 52.

9  Phone calls are limited to 20 minutes.  Ha Dec., Exh. 32 (Butler Dep.) at 81:17-18.

10          25.    Like Housing Unit Phones at Contra Costa, Housing Unit Phones at RCCC

11  have a positive acceptance requirement, with the phone playing an outgoing message identifying

12  the caller as a "Sacramento County inmate."  Ha Dec., Exh. 32 (Butler Dep.) at 118:3.  The

13  recipient must then accept the call.  Ha Dec., Exh. 32 (Butler Dep.) at 118:15-16.

14          26.    Detainees are not permitted to make three-way calls.  Ha Dec., Exh. 31

15  (Philbin Dep.) at 85:9-11.

16          27.    From the Housing Unit Phones, detainees can access the Talton Free Call

17  Platform.  Berg Report at 6; *see also* Takei Dec. at DSC00356.  The free call numbers do not

18  include local government offices or local courts, and do not include all offices on Defendants' free

19  legal services list.  *Compare id.* with Ha Dec., Exh. 9.

20          28.    The instructions for using the Talton Free Call Platform are confusing and

21  incorrect.  Berg Report at 8.

22          29.    Unlike the other Facilities, RCCC does not offer a dedicated phone room

23  for private calls.  Instead, RCCC permits detainees to make phone calls from a private phone in

24  the law library.  Shinners Dec., Exh. 31 (Butler Dep.) at 37:16-38:1.

25          30.    The library phone is free, has no time limit and does not require positive

26

27  _____

that while in restricted housing, he was only let out of his cell one hour a day, during which he had
28  access to showers and telephone calls).

1    acceptance.  *See* Shinners Dec., Exh. 31 (Butler Dep.) at 81:18-20.

2        31.    Like Contra Costa, there is an e-mail system for people to communicate

3    with a detainee.  Shinners Dec., Exh. 31 (Butler Dep.) at 92:4-10.  Each day, the e-mail is pulled

4    off the server and delivered by the night shift to the deputies to be passed out to the detainees.

5    Shinners Dec., Exh. 31 (Butler Dep.) at 92:11-15.  The night shift and deputies are permitted to

6    read these messages.  Shinners Dec., Exh. 31 (Butler Dep.) at 92:16-23.

7        4.    <u>Yuba</u>

8        32.    Yuba provides a mix of housing styles; depending on the housing style,

9    detainees have varying degrees of access to the housing unit phones.  Shinners Dec., Exh. 27 (Gil

10   Dep.) at 22:9-23:11.  Individuals who are in an administrative segregation tank (individual cells)

11   have access to phones for one hour a day.  *Id.* at 22:9-15.  Other units with single cells permit

12   access for four hours a day.  *Id.* at 22:16-21.  Individuals held in dorm style settings have access to

13   phones at all times.  *Id.* at 22:21-25.

14       33.    All Housing Unit Phone calls can be monitored and recorded, although such

15   calls are not routinely monitored.  *Id.* at 67:15-19.

16       34.    In order to use the Housing Unit Phones, detainees must pay an initiation

17   fee of $3.20, and per-minute rates ranging from $.06-$330.  *See* Ha Dec., Exh. 43.

18       35.    Phone calls are limited to twenty minutes.  Ha Dec., Exh. 27 (Vaughn Dep.)

19   at 116:6-9.

20       36.    Like Housing Unit Phones at other facilities, the Housing Unit Phones at

21   Yuba have a positive acceptance requirement, with the phone playing an outgoing message

22   identifying the caller as an "inmate at the Yuba County Jail."  Berg Report at 10.  The recipient

23   must then accept the call.  *Id.*

24       37.    Detainees are also not permitted to make three-way calls.  Ha Dec., Exh. 31

25   (Philbin Dep.) at 85:9-11.

26       38.    From the Housing Unit Phones, detainees can access the Talton Free Call

27   Platform.  Berg Report at 9; *see also* Takei Dec., at DSC00129, 148, 188, 253, 254.  The free call

28   numbers do not include local government offices or local courts, and do not include all offices on

**United States District Court**
For the Northern District of California

1    Defendants' free legal services list.  *Compare* Takei Dec. at DSC00129, 188 with Ha Dec., Exh. 9.

2          39.    Yuba provides a phone room that contains two phones for detainees to

3    make free calls.  Shinners Dec., Exh. 27 (Gil Dep.) at 24:19-24.

4          40.    The Yuba phone room is generally available for use between 8 a.m. and 4

5    p.m., and sometimes earlier if a detainee needs to contact someone on the east coast.  Shinners

6    Dec., Exh. 27 (Gil Dep.) at 25:19-23.

7          41.    Detainees are limited to one 20-minute legal call per week in order "to

8    provide reasonable and equitable access for all detainees," and it takes about one week to process

9    a request.  Ha Dec., Exh. 19; Berg Report at 15 ("As of August 2015, there was a 1 to 2-week

10   backlog in providing these calls at Yuba.").

11         42.    Phones in this room retain the positive acceptance requirement.  Berg

12   Report at 13.

13         43.    Finally, the official policy is that the free legal telephone calls are limited to

14   phone calls made directly to a legal representative, preventing detainees from using the phone

15   room to call local agencies, potential witnesses or sponsors, or family members to gather evidence.

16   Ha Dec., Exh. 19; *see also* K.M. Dec. at ¶ 14; Docket No. 120-6 (O.A. Dec. at ¶ 23).

17         44.    Yuba also permits free calls from a phone in the booking area.  Shinners

18   Dec., Exh. 27 (Gil Dep.) at 21:22-23.

19         45.    Yuba maintains a system for receiving incoming messages from attorneys.

20   *Id.* at 68:18-20.  An attorney can call the facility, and facility staff are to deliver the message to the

21   detainee within hours.  *Id.* at 68:22-17.  An attorney can also e-mail or fax the facility a message to

22   be delivered to the detainee.  *Id.* at 69:18-70:7.

23         5.    <u>Mesa Verde</u>

24         46.    Mesa Verde is a medium-security facility that houses only ICE detainees,

25   including those with high classifications.  Shinners Dec., Exh. 8 (Murray Dep.) at 40:1-43:23;

26   Berg Report at 10.

27         47.    Mesa Verde has four Units, and each of the Units has ten phones, many of

28   which are placed in large banks of telephone installations immediately adjacent to each other,

**United States District Court**
For the Northern District of California

9

**United States District Court**
For the Northern District of California

1  separated by Plexiglas partitions.  Berg Report at 10; *see also* Takei Dec. at DSC00740, 754.  The

2  holding cells are also equipped with a single telephone unit on wheels that can be rolled up to the

3  cell door.  Berg Report at 10.

4         48.  Housing Unit Phone calls can be monitored and recorded (although such

5  calls are not routinely monitored), except for calls to the Pro Bono Platform or to attorneys

6  registered with the facility and/or the phone provider, which are never recorded or monitored.

7  Shinners Dec., Exh. 10 (Bonnar Dec.) at ¶¶ 16-18.

8         49.  Housing Unit Phones require no initiation fee, and per-minute rates are $.10

9  for domestic calls and $.15-35 for international calls.  Ha Dec., Exh. 44.  Phone calls are limited to

10  180 minutes.  Docket No. 144-1 (Yee-Garcia Dec.), Exh. 60 (Talton Dep.) at 155:5-10.

11         50.  Housing Unit Phones have a positive acceptance requirement, with the

12  phone playing an outgoing message stating: "This is an Intelmate automated operator with a

13  [PREPAID, FREE, COLLECT] from [RESIDENT'S NAME] at [FACILITY NAME]."  Ha Dec.,

14  Exh. 7.  The recipient is then given the option to accept or deny the call.  *Id.*

15         51.  Three-way calls are not permitted and will be blocked.  *Id.*

16         52.  Toll free numbers, *i.e.*, calls to 800, 866, 900 area codes, are blocked.  Ha

17  Dec., Exh. 40 (Murray Dep.) at 95:3-19.

18         53.  Detainees can access the Talton Free Call Platform from the Housing Unit

19  Phones.  Berg Report at 10; *see also* Takei Dec., at DSC00711, 712, 739, 752.  The free call

20  numbers do not include local government offices or local courts, and do not include all offices on

21  Defendants' free legal services list.  *Compare* Takei Dec. at DSC00616 with Ha Dec., Exh. 9.

22         54.  Mesa Verde has several visitation rooms equipped with direct dial phones.

23  Mesa Verde's stated policy is that free calls are permitted to the immigration court, federal and

24  state courts, consular offices, legal service providers, government offices, and other individuals if

25  there is a personal or family emergency or other compelling need.  Shinners Dec., Exh. 17; Exh.

26  11 (Harvey Dep.) at 37:3-15; *see also* Shinners Dec., Exh. 10 (Bonnar Dec.) at ¶ 22 ("The facility

27  does not limit legal calls from the private room to calls to attorneys or legal representatives.  The

28  facility will allow private legal calls to be made to courts; government agencies; witnesses; and

**United States District Court**
For the Northern District of California

1    other verifiable, case-related contacts.").

2        55.    Mesa Verde informs detainees of this private phone option via the Mesa

3    Verde detainee handbook.  *See* Plaintiffs Mot. at 18 (arguing that access to Phone Rooms at Yuba,

4    Contra Costa, and RCCC's library option are "not made known to Plaintiffs through policy

5    documents or handbooks"); *see also* Docket No. 120-5 (R.K. Dec.) at ¶ 45 ("I read in a handbook

6    or posting somewhere in the facility that detainees can make free, private calls to attorneys.").

7        56.    Mesa Verde also allows callers to leave messages for detainees in two ways.

8    First, voicemails can be left for detainees; the cost of leaving a voicemail message is $1.20 per

9    message.  Shinners Dec., Exh. 11 (Bonnar Dec.) at ¶ 31.  These voicemail messages are accessible

10   directly by the detainee, without having to be transcribed by a Mesa Verde employee.  Ha Dec.,

11   Exh. 39 (Harvey Dep.) at 55:19-56:10.  Second, legal representatives may also call the facility and

12   leave messages at no cost.  *Id.* at ¶ 32.  Emergency messages may be left using this latter system at

13   no cost.  *Id.*  Using this system, messages are written down and delivered no less than three times

14   a day.  Ha Dec., Exh. 38 (Andrews Dep.) at 84:10-14.  Because they are written down by a staff

15   member, they are not considered private.  Ha Dec., Exh. 39 (Harvey Dep.) at 57:2-5.

16   B.    Disputed Facts

17       The parties dispute a number of facts, primarily related to the availability of private phone

18   calls at each Facility.

19   •    For the Contra Costa phone room, the parties dispute whether detainee calls are limited to

20        attorneys only, and the availability of these phone rooms.  Defendants assert that detainee

21        calls have been made to non-attorneys from the phone rooms, and that the phone rooms are

22        available at any time upon request.  *See* Shinners Dec., Exh. 20 (Bonthron Dep.) at 38:18-

23        20 (stating that detainees have 24/7 hour access to the private phone line in the phone

24        rooms); Shinners Dec., Exh. 24 (Lyon Dep.) at 66:16-24 (stating that detainees generally

25        cannot use phones during lockdown time, but that he was permitted to make a call because

26        his attorney had made a request for a call during that particular time beforehand); Shinners

27        Dec., Exh. 25 (V.V. Dep.) at 94:25-95:4; Shinners Dec., Exh. 37 (phone logs indicating

28        calls with family members).  Plaintiffs contend that access is granted at the discretion of

11

**United States District Court**
For the Northern District of California

individual deputies, and that many detainees are denied access outside of free-time hours. Ha Dec., Exh. 36 (Neria-Garcia Dep.) at 61:22-62:1 ("In Contra Costa we -- we were only allowed to use the phone during our free time, which was an hour per day."); Phillips Dec., Exh. P (Lyon Dep.) at 48:23-49:2 (stating that phone room access was usually limited to "free time, but it depends on the deputy, he can let you use it.").  Plaintiffs also present evidence that until at least October 2015, the phone rooms were limited to attorney calls only.  Berg Report at 12 ("Detainee interviews confirmed that the phone rooms can only be used to call attorneys and only during free-time hours, with some exceptions based on the discretion of deputies").  For example, Lieutenant Bonthron explained in his August 2015 deposition that Contra Costa expanded its policy to allow phone use not just with attorneys; however, Plaintiffs' expert, Mr. Berg, reported that during his visit to Contra Costa in October 2015, the deputies who demonstrated the phone system informed him that they would disconnect the call if they determined that the call was not to an attorney's office.  Shinners Dec., Exh. 20 (Bonthron Dep.) at 123:21-24; Berg Report at 12.

- At RCCC, the parties dispute whether the option to make phone calls from the law library is truly private, as the phone is located on the library officer's desk, close to where the deputy sits, and is within earshot of other detainees using the library.  Berg Report at 13; *see also* Takei Dec., at DSC00422, 423, 428.  There is also evidence that detainees are not given advance notice of when they may use the library phone, and therefore cannot schedule calls with their attorneys or other individuals.  *See* Docket No. 120-8 (M.G. Dec.) at ¶ 24; Docket No. 120-12 (I.P. Dec.) at ¶ 24.

- For the Yuba phone room, the parties dispute whether this phone room is truly private, as there is no barrier between the phones.  Berg Report at 13; *see also* Takei Dec., at DSC00190.  Furthermore, under normal circumstances, it is expected that both telephones will be used simultaneously, although Yuba's policy states that "[w]hen a detainee specifically requests a private phone call, they may be placed into the room alone."  Ha Dec., Exh. 19.

- For the Mesa Verde phone rooms, the parties dispute whether calls to non-attorneys are

12

**United States District Court**
For the Northern District of California

permitted.  Plaintiffs point to policies which explain the policy for obtaining legal calls as submitting a detainee request (kite) to the shift supervisor with the phone number of the attorney, which will then be verified by onsite staff.  Ha Dec., Exh. 16.  Plaintiffs also cite to deposition testimony, in which Mesa Verde officials expressed uncertainty as to whether a legal call would include witnesses.  *See* Ha Dec., Exh. 40 (Murray Dep.) at 91:5-14 (stating that he did not know if a legal call included calls to witnesses); Yee-Garcia Dec., Exh. 54 (Harvey Dep.) at 74:15-75:20 (stating that she had not scheduled a call to a potential witness for a pro se detainee, but also noting that she had "never had anybody ask that, so I don't really have an understanding of calling a witness.").

C.    Named Plaintiffs' Experiences

Although the parties' characterizations of these facts may differ, the parties do not dispute the following facts regarding each of named Plaintiffs' experiences.

1.    Jose Astorga-Cervantes

57.    Named Plaintiff Jose Astorga-Cervantes was detained at RCCC for ninety days beginning on or about November 20, 2013.  *See* Docket No. 14-3 (Astorga-Cervantes Dec.) at ¶ 4; Shinners Dec., Exh. 7 (Astorga-Cervantes Dep.) at 33:16-17.

58.    Beyond his thirty-second free phone call, he was unable to speak with his family due to the costs of phone calls, except for once on December 17 when a fellow inmate allowed him to use his phone credit.  Astorga-Cervantes Dec. at ¶ 7.

59.    With the assistance of his fellow detainees, Mr. Astorga-Cervantes was able to use the Pro Bono Platform on the housing unit phones to contact several legal aid groups, including Catholic Charities and another in Palo Alto.  Shinners Dec., Exh. 7 (Astorga-Cervantes Dep.) at 17:20-23.  Both Catholic Charities and the group in Palo Alto informed him that they could not pick up any more cases.  *Id.* at 19:8-15.

60.    Mr. Astorga-Cervantes was able to obtain an attorney for his first immigration hearing on December 18, 2013.  *Id.* at 40:3-16.

61.    On January 23, 2014, the immigration judge granted Mr. Astorga-Cervantes release on bond, which he paid on February 20, 2014.  *Id.* at 60:17-61:10.

2.      Nancy Neria-Garcia

62.     Named Plaintiff Nancy Neria-Garcia was detained at Yuba from June 26, 2014 to March 26, 2015, at Mesa Verde from March 26, 2015 to June 3, 2015, and at Contra Costa from June 4, 2015 until her release on October 22, 2015.  Docket No. 120-7 (Neria-Garcia Dec.) at ¶¶ 7-10; Shinners Dec., Exh. 36 (Neria-Garcia Dep.) at 18:11-15.

63.     Ms. Garcia retained immigration counsel, who she was able to meet with in-person and speak to on the phone while being held at Yuba.  *See* Shinners Dec., Exh. 36 (Neria-Garcia Dep.) at 27:3-9, 28:8-12.

64.     Ms. Neria-Garcia's access to phones varied depending on which housing unit she was at.  Neria-Garcia Dec. at ¶¶ 14-17.  For example, in one housing unit, Ms. Neria-Garcia was locked down in a cell for 23 hours a day, and could only access the telephone during one hour of "hallway time."  *Id.* at ¶ 17.

65.     Ms. Neria-Garcia was uncomfortable talking to her attorney about her case on the housing unit phones due to lack of privacy.

66.     It was not until October 2014 that she was informed by another detainee that she could make free telephone calls from the phone room, although she had to share the phone room with another detainee.  *Id.* at ¶ 20.

67.     Ms. Neria-Garcia had problems calling coworkers for assistance in her case due to the positive acceptance requirement on the Housing Unit Phones; coworkers would not pick up her calls because they did not know who was calling them from jail.  Shinners Dec., Exh. 36 (Neria-Garcia Dep.) at 54:3-24.

68.     While at Mesa Verde, Ms. Neria-Garcia read in the detainee handbook that detainees could make private calls to their attorneys.  Neria-Garcia Dec. at ¶ 25.

69.     She would write requests to speak to her attorney, to varying degrees of success; for example, one request was granted the next day, one was granted four days later, and one was denied because she had to wait a few days before making another request.  *Id.* at ¶ 26.

70.     Ms. Neria-Garcia was able to make between eight and ten short calls to her attorney from the Housing Unit Phones.  Shinners Dec., Exh. 36 (Neria-Garcia Dep.) at 141:13-

14

18.

71.     Ms. Neria-Garcia was held at Mesa Verde while her case was on appeal, and has admitted that the telephone situation at Mesa Verde did not interfere with her case or her ability to seek release on bond.  *Id.* at 125:24-126:9.

72.     While at Contra Costa, Ms. Neria-Garcia was able to meet her attorney in-person between seven and ten times, and to speak with him using the phone room at least fifteen times (but never the Housing Unit Phone).  *Id.* at 143:23-145:16.

3.     Audley Barrington Lyon, Jr.

73.     Named Plaintiff Audley Barrington Lyon, Jr. was detained at Contra Costa from October 22, 2013 to April 23, 2015.  Docket No. 120-9 (Lyon Dec.) at ¶ 5; Compl. at ¶ 11; Answer at ¶ 11.

74.     Mr. Lyon was able to make phone calls using the Pro Bono Call platform by December 3, 2013.  Shinners Dec., Exh. 24 (Lyon Dep.) at 98:11-14.

75.     Prior to obtaining representation, Mr. Lyon attempted to gather documents on his own.  Lyon Dec. at ¶ 5.  During that time, he continued his case three times, for two to three weeks each time, while he tried to gather documentation in support of his U visa application.  *Id.* at ¶¶ 5-7.

76.     Relying on himself and his wife's assistance, he tried to obtain a police report from the East Palo Alto Police Department and records from the victims services unit of the San Mateo District Attorney's Office.  *Id.* at ¶ 7.  However, he was unable to call either the police department or the victims services unit, as neither was willing to accept his call.  *Id.* at ¶ 8.

77.     Mr. Lyon's wife was also unable to obtain the police report because the police department would only release it to Mr. Lyon or Mr. Lyon's legal representative.  *Id.* at ¶ 11.

78.     Mr. Lyon had difficulty communicating with his wife because she could not afford to pay for telephone calls; instead, they would communicate by writing letters, a process he considered slow and inefficient as a simple question caused a delay of several days.  *Id.* at ¶ 9-10.

79.     Mr. Lyon was eventually able to retain counsel in early 2014.  *Id.* at 28:1-

23.  After he obtained counsel, Mr. Lyon was able to communicate with his attorney because she would come to the building so that he did not need to call her.  Shinners Dec., Exh. 24 (Lyon Dep.) at 94:2-8.

### III.   DISCUSSION

A.   Standard of Review

The Court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence in support of the [non-moving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252.  At the same time, "all reasonable inferences must be drawn in favor of the non-movant." *John v. City of El Monte*, 515 F.3d 936, 941 (9th Cir. 2008).

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the non-moving party has the ultimate burden of proof, the moving party may prevail on a motion for summary judgment by pointing to the non-moving party's failure "to make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* at 322.

B.   Immigration and Nationality Act (INA)

First, Plaintiffs allege that their rights to counsel and to present evidence, as articulated by the INA, are violated by the Facilities' phone conditions.  Plaintiffs Mot. at 25.  The INA itself does not dictate the precise level of telephone access required for detainees.  Instead, Plaintiffs rely on 8 U.S.C. § 1229a(b)(4) to establish their rights under the INA.  Section 1229a governs removal proceedings generally, while section 1229a(b)(4) delineates an alien's rights in proceedings, which include:

> (A) the alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings,

> (B) the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government but these rights shall not entitle the alien to examine such national security information as the Government may proffer in opposition to the alien's admission to the United states or to an application by the alien for discretionary relief under this chapter, and[8]
>
> (C) a complete record shall be kept of all testimony and evidence produced at the proceeding.

Plaintiffs argue that a necessary condition of these statutory rights include the ability to retain or consult with counsel under section 1229a(b)(4)(A), and to obtain evidence under section 1229a(b)(4)(B).

     1.   <u>Right to Counsel</u>

     Because removal proceedings are civil rather than criminal proceedings, "litigants in removal proceedings have no Sixth Amendment right to counsel." *Torres-Chavez v. Holder*, 567 F.3d 1096, 1100 (9th Cir. 2009) (citation omitted).  However, the Ninth Circuit has also recognized that "[t]he right to counsel in immigration proceedings is rooted in the Due Process Clause and codified at 8 U.S.C. § 1362 and 8 U.S.C. § 1229a(b)(4)(A)." *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005).

     Plaintiffs contend that a detainee's statutory rights under the INA should be informed by Sixth Amendment cases concerning the rights of criminal defendants to counsel.  Plaintiffs Mot. at 22, 25.  In support, Plaintiffs cite *Montes-Lopez v. Holder*, in which the Ninth Circuit found that a petitioner's right to be represented in removal proceedings was violated when the immigration judge (IJ) refused to continue the hearing when the petitioner's attorney failed to appear.  694 F.3d 1085, 1086 (9th Cir. 2012).  In concluding that an alien need not show prejudice where an alien is denied a statutory right to be represented by counsel, the Ninth Circuit drew in part on the "logic that has guided [its] interpretation of the Sixth Amendment." *Id.* at 1092-93.  However, the Ninth

---

[8] 8 U.S.C. § 1362 likewise states that: "In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose."

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  Circuit did not so go far as to suggest that courts should import rights due under the Sixth

2  Amendment to the immigration context; instead, the Ninth Circuit acknowledged that "[t]he Sixth

3  Amendment does not apply in the immigration context." *Id.* at 1092.

4          Other Ninth Circuit decisions have declined to apply rights and standards owed under the

5  Sixth Amendment in the immigration context.  For example, the Ninth Circuit has held that

6  "*Miranda* warnings are not required before questioning in the context of a civil deportation

7  hearing . . . because deportation proceedings are not criminal prosecutions, but are civil in nature."

8  *United States v. Solano-Godines*, 120 F.3d 957, 960 (9th Cir. 1997); *see also id.* at 960-61 ("The

9  full panoply of procedural and substantive safeguards which are provided in a criminal proceeding

10  are not required at a deportation hearing") (internal modifications and citation omitted).  The

11  Ninth Circuit has also noted that with respect to ineffective assistance of counsel, the Sixth

12  Amendment framework does not apply; instead, "aliens shoulder a heavier burden of proof in

13  establishing ineffective assistance of counsel under the Fifth Amendment than under the Sixth

14  Amendment."[9]  *Torres-Chavez v. Holder*, 567 F.3d 1096, 1100 (9th Cir. 2009) (citation omitted).

15          Given that the Ninth Circuit has generally recognized that the Sixth Amendment does not

16  apply to removal hearings because they are civil proceedings, the Court declines to adopt

17  Plaintiffs' suggestion that Sixth Amendment cases should be applied to determine what rights are

18  required to satisfy the INA's right to counsel.  *See* Docket No. 141 (Plaintiffs Opp.) at 23.  The

19  Ninth Circuit has never so held, and the Court is reluctant to so interpret the INA absent any

20  indication that Congress intended to import full Sixth Amendment standards into the INA.

21  Plaintiffs have not submitted any such indication.

22          The Court must therefore look to existing precedent.  The Ninth Circuit has thus far only

23  found violations of the statutory right to counsel where conditions were "tantamount to denial of

24  _____

25  [9] While *Torres-Chavez* analyzed the plaintiff's ineffective assistance of counsel claim by applying
    the Sixth Amendment framework, that was because the Sixth Amendment applied a higher

26  standard; thus, "[i]f an attorney's performance passes muster under *Strickland*, it cannot render an
    alien's proceeding fundamentally unfair.  In other words, there is no violation of the alien's Fifth

27  Amendment right to due process if the alien's counsel was effective for Sixth Amendment
    purposes."  567 F.3d at 1100.  *Torres-Chavez* does not suggest that courts should apply rights due

28  under the Sixth Amendment, as Plaintiffs contend.  *See* Plaintiffs Opp. at 23.

**United States District Court**
For the Northern District of California

counsel." *Biwot*, 403 F.3d at 1099 (finding that IJs should grant reasonable continuances to give an alien sufficient time to locate counsel and permit counsel to prepare for a hearing); *see also Rios-Berrios v. INS*, 776 F.2d 859, 862-63 (9th Cir. 1985) (finding that IJ should have continued the hearing to provide the petitioner reasonable time to locate counsel where petitioner was effectively given only two business days to obtain an attorney, was in custody, spoke only Spanish, had limited education, was unfamiliar with the country and legal procedures, and was 3,000 miles from his only friend in the country).

Here, while Plaintiffs present evidence that telephone restrictions result in difficulty locating, retaining, and consulting with counsel, Plaintiffs have not presented evidence that these restrictions were "tantamount to denial of counsel." For example, Plaintiffs acknowledge that many of their witnesses did eventually find counsel after months of searching and with assistance from friends or family. *See* Plaintiffs Opp. at 4, fn. 9. There are also available means of communicating with counsel, whether by non-private calls, legal mail, in-person meetings, and scheduling private calls. While these options may limit the effectiveness of communications with counsel, Plaintiffs have not shown that they are tantamount to an outright *denial* of counsel. For this reason on this record, the Court finds that Defendants are entitled to summary judgment on this claim.

            2.    Right to a Full and Fair Hearing Under Section 1229a(b)(4)(B)

Next, Plaintiffs contend there is a right to a full and fair hearing -- which includes a reasonable opportunity to prepare the case, including the gathering of evidence -- based on Section 1229a(b)(4)(B) on the INA. Plaintiffs Mot. at 23; Compl. at ¶ 107. Again, section 1229a(b)(4)(B) require that "the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government . . . ." However, none of the cases examining the INA cited by Plaintiffs discuss a general right to gather evidence in preparation for a hearing; instead, they focus primarily on whether an IJ's denial of a continuance of a hearing resulted in the exclusion of evidence. *See Cruz Rendon v. Holder*, 603 F.3d 1104, 1110 (9th Cir. 2010) ("When determining whether an IJ has abused her discretion, we consider a number of factors, including: (1) the nature of the

evidence excluded as a result of the denial of the continuance . . . .); *Baires v. INS*, 856 F.2d 89, 92 (9th Cir. 1988) (petitioner's statutory right to present evidence was violated where IJ denied request for a continuance and change of venue, preventing petitioner from presenting the testimony of his expert witness and two other potential witnesses).[10]

Plaintiffs' reliance on *Dent v. Holder* is misplaced.  In *Dent v. Holder*, the Ninth Circuit found that the ICE was statutorily required to provide documents in the petitioner's A-file which were relevant to the petitioner's citizenship claim.  627 F.3d 365, 369, 374 (9th Cir. 2010).  *Dent* is distinguishable on two grounds.  First, *Dent* was not decided on statutory grounds, but on due process grounds, as the Ninth Circuit found that the failure to provide the A-file documents violated the petitioner's Fifth Amendment right to due process (including the right to a full and fair hearing).[11]  *Id.* at 374.  Second, the Ninth Circuit's finding that the petitioner was entitled to his A-file was premised on section 1229a(c)(2)(B), which expressly gives an alien access to his entry document and any other non-confidential records pertaining to the alien's admission or presence in the country.  *Id.*  Thus, there was a direct violation of the plaintiff's right to particular evidence as specifically required by statute.

---

[10] In *Cruz Rendon* and *Baires*, the evidence was available for the hearing, but could not actually be presented at the hearing because of the IJ's action.  *See Cruz Rendon*, 603 F.3d at 1109 (IJ precluded Cruz Rendon from testifying as to any topic that was mentioned in her son's psychological evaluation, including "the life she had created for [her son] in the United States, [her son's] medical and educational needs, and the hardships [her son] would face if forced to relocate to Mexico"); *Baires*, 856 F.2d at 92 (denial of continuance precluded  present of evidence because "[t]he necessary arrangements for the testimony of these potential witnesses could not be completed by April 15, nor was the expert able to travel to Florence").  The challenged conduct in these cases was more proximate to the presentation of evidence at the hearing than the alleged interference with the investigation and gathering of evidence at issue in the instant case.

[11] Plaintiffs' other cases do not rely on the statutory right to present evidence under section 1229a(b)(4)(B), but instead rely on due process grounds, *see Ibarra-Flores v. Gonzales*, 439 F.3d 614, 621 (9th Cir. 2006) (holding that petitioner's due process rights were violated where IJ refused to order the INS to produce petitioner's voluntary departure form), or the failure to provide a petitioner with a reasonable opportunity to examine the evidence against him in the hearing.  *See Singh v. Holder*, 405 Fed. Appx. 193, 194 (9th Cir. 2010) (holding that petitioner's statutory right to examine the evidence against him was violated where the IJ refused to grant a continuance to allow the petitioner to conduct a forensic analysis of the original letters that the government had failed to provide even though the government knew the petitioner wanted to use the letters in his defense against the government's allegations).

**United States District Court**
For the Northern District of California

1    In contrast, Plaintiffs' concern in the instant case is the process of gathering evidence in

2    advance of a hearing, evidence such as that from family members, the community, and other

3    government agencies (such as local police departments); the INA does not expressly address the

4    process of gathering such evidence.  Neither the language of the statute (which provides only for

5    the reasonable opportunity to *present* evidence) nor any existing case precedent cited by Plaintiffs

6    supports Plaintiffs' expansive reading of the INA that would provide for a general right to

7    investigate and gather evidence in advance of and in preparation for a removal hearing.[12]  Thus,

8    the Court holds that Defendants are also entitled to summary judgment on this statutory claim.

9    C.    Due Process

10    Plaintiffs assert that their rights to counsel and to a full and fair hearing under the due

11    process clause have been violated.  In general, "[t]he Fifth Amendment guarantees due process in

12    deportation proceedings.  As a result, an alien who faces deportation is entitled to a full and fair

13    hearing of his claims and a reasonable opportunity to present evidence on his behalf."  *Colmenar*

14    *v. INS*, 210 F.3d 967, 971 (9th Cir. 2000) (citations omitted).  A decision can be reversed on due

15    process grounds "if the proceeding 'was so fundamentally unfair that the alien was prevented from

16    reasonably presenting his case.'"  *Id.* (quoting *Platero-Cortez v. INS*, 804 F.2d 1127, 1132 (9th

17    Cir. 1986).  The alien must also "show prejudice, which means that the outcome of the proceeding

18    may have been affected by the alleged violation."  *Id.*

19    1.    Substantive Due Process

20    Plaintiffs contend that their confinement violates substantive due process in two ways: (1)

21    being housed in conditions identical to county prisoners awaiting criminal trials and serving

22    criminal sentences is unconstitutionally punitive, and (2) restrictions and denial of telephone

23    access prolong Plaintiffs' detention without any compelling justification.  Plaintiffs Mot. at 44-45.

24    a.    Conditions of Confinement

25    First, the Court finds that Defendants are correct in that Plaintiffs did not expressly plead a

---

[12] To the extent Plaintiffs again rely on *Montes-Lopez* and *Torres-Chavez*, the Court finds for the reasons stated above that neither of these cases stands for the proposition that rights under Sixth Amendment jurisprudence should be applied in the immigration context.

claim regarding the conditions of confinement.  Plaintiffs' complaint is focused specifically on the alleged failure to provide adequate phone access; it does not challenge the practice of confining detainees in conditions identical to criminal prisoners.  *See* FAC at ¶ 91 (class wide allegation that Defendants have engaged in a common course of conduct of denying and restricting Plaintiffs' telephone access).  While Plaintiffs do allege due process violations, which could encompass both procedural and substantive due process violations, Plaintiffs' due process violations are still related to the failure to provide adequate phone access, and the resulting impacts.  FAC at ¶¶ 100-109.  Because Plaintiffs did not plead any claims or facts challenging their confinement in conditions identical to criminal prisoners, no such claim is at issue, and the Court finds that summary judgment in favor of Defendants on this claim is appropriate.

> b.    Prolonged Imprisonment

Second, the Court finds that Plaintiffs do not have a claim for substantive due process as to prolonged imprisonment.  Unlike their challenge to the conditions of confinement, Plaintiffs did make specific allegations of prolonged incarceration.  FAC at ¶¶ 69-70.  Specifically, Plaintiffs allege that "Defendants' restriction and denial of telephone access to immigrants held in ICE custody substantially prolongs Plaintiffs' incarceration pending removal hearings [because a] master calendar hearings, Plaintiffs are forced to ask the immigration judge for a continuance to retain counsel, to prepare their cases, or simply to obtain legal advice . . . ."  *Id.* at ¶ 69.

In *Zadvydas v. Davis*, the Supreme Court found that a statute which permitted aliens to be detained following a final order of removal did not permit indefinite detention.  533 U.S. 678, 682, 690 (2001).  In so ruling, it recognized a six-month (180 days) period in which an alien can be held, after which "once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing."  *Id.* at 701.

Subsequent decisions have recognized this six-month incarceration period.  For example, in *Demore v. Kim*, the Supreme Court rejected a respondent's habeas corpus action, in which the respondent argued that his detention under section 1226(c) violated due process because no determination had been made that he posed either a danger to society or a flight risk.  538 U.S.

510, 514 (2003).  The Supreme Court distinguished *Zadvydas* in two respects.  First, it explained that *Zadvydas* dealt with aliens who challenged their detention following final orders of deportation but "for whom removal was 'no longer practically attainable.'"  *Id.* at 527 (quoting *Zadvydas*, 533 U.S. at 690).  In such cases, the purpose of detention (to hold people in preparation for removal) "no longer bears a reasonable relation to the purpose for which the individual was committed" because for those individuals, removal was not possible.  *Id.* (quoting *Zadvydas*, 533 U.S. at 690).  By contrast, *Demore* involved detention of deportable criminal aliens pending their removal proceedings, and "[s]uch detention necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the alien will be successfully removed."  *Id.* at 527-28.  Second, the Supreme Court concluded that *Zadvydas* was "materially different" because it involved an indefinite and potentially permanent duration, whereas *Demore* involved detention "of a much shorter duration."  *Id.* at 528.  It noted that in most cases, detention lasted "less than the 90 days we considered presumptively valid in *Zadvydas*," as in 85% of the cases in which aliens were detained pursuant to section 1226(c), removal proceedings were completed in an average time of 47 days and a median of 30 days.  *Id.* at 529.  Even in the remaining 15% of cases, in which the alien appealed, the appeal took an average of four months.  *Id.*  "In sum, the detention at stake under § 1226(c) lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal."  *Id.* at 530.  While the respondent had been detained for six months, the Supreme Court noted that "respondent himself had requested a continuance of his removal hearing."  *Id.* at 531.  Based on these distinctions, the Supreme Court rejected the respondent's habeas claim.

The Ninth Circuit has also recognized that prolonged incarceration typically requires incarceration of at least 180 days.  *See Diouf v. Napolitano*, 634 F.3d 1081, 1091 (9th Cir. 2011); *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1138 (9th Cir. 2013) ("As a general matter, detention is prolonged when it has lasted six months and is expected to continue more than minimally beyond six months") (quotation omitted).  In *Diouf*, at issue were DHS regulations that provided for custody reviews within 90 days, 180 days, and 18 months of confinement.  *Id.* at

23

1089.  During the 90-day removal period, DHS was required to detain the alien, after which continued detention was at the discretion of the Attorney General.  *Id.*  The Ninth Circuit found that there were no serious constitutional concerns with the initial 90-day review period because its focus was "on *prolonged* detention."  *Id.* at 1091.  As to the time between the 90-day and 180-day review period, the Ninth Circuit found that "[d]etention during this period certainly affects aliens' interests in freedom from confinement, and requires that adequate procedural safeguards be in place to protect against the erroneous deprivation of liberty.  But given the relatively limited period of detention involved, and in view of the *Mathews* factors as a whole, the period afforded by the DHS regulations is adequate."  *Id.*  However, after the 180-day period, the Ninth Circuit found that the alien's detention could be prolonged an additional year; thus, "[a]t this point, the alien's continuing detention becomes prolonged."  *Id.*

In the instant case, Plaintiffs cite no cases in which a court found a violation of substantive due process for prolonged incarceration that lasted less than the presumptively valid six-month period in the immigration context.[13]  Here, Plaintiffs themselves present evidence that the average time of detention between June 1, 2014 and May 30, 2015 was about 36 days, and the majority of stays (59%) were less than three weeks.  Docket No. 119-6, Exh. A (Levy Report) at ¶ 6.  While there are a few individuals who have been detained for more than 180 days, including Mr. Lyon (detained October 2013 and April 2015) and Ms. Neria-Garcia (detained between June 2014 and October 2015), Plaintiffs' expert notes that in general, "[m]any detainees are held for very short periods of time, while a few are held for very long periods of time."[14]  *Id.*

---

[13] Plaintiffs do cite *Zavala v. Ridge*, 310 F. Supp. 2d 1071 (N.D. Cal. 2004); however, this case was a challenge to a regulation which automatically stayed the IJ's decision to grant bond.  *Id.* at 1075.  As the district court explained, this automatic stay, "which permits unilateral government detention of individuals without a case-by-case determination after a reasoned finding that they do not pose threat to safety or a risk of flight, violates the Due Process Clause because no special justification exists that outweighs the individual's constitutionally protected interest in avoiding physical restraint."  *Id.* at 1077.  In short, *Zavala* challenged the *detention* itself, not the length of the detention, which is the issue in this case.

[14] Notably, even the Mesa Verde numbers, which Dr. Levy notes "are distorted because of the transfer of long-term detainees from other facilities," note an average stay of 157.4 days, below the 180-day period that the Ninth Circuit found significant.

**United States District Court**
For the Northern District of California

1          Here, it cannot be said that the class is subject to a systemic prolongation of detention

2   which applies "generally to the class" which would make injunctive relief "appropriate respecting

3   the class as a whole," as contemplated by Fed. R. Civ. P. 23(b)(2).  With the exception of the two

4   named Plaintiffs, Plaintiffs' evidence shows that the vast majority of detainees are held for less

5   than three weeks.  Based on the evidence in the record, Plaintiffs have failed to show that as a

6   class they have established a substantive due process claim based on systemic prolonged

7   detention.  Thus, Defendants are entitled to summary judgment on this claim.[15]

8          2.          Procedural Due Process

9                       a.          Actual Injury Requirement

10          The parties dispute whether Plaintiffs must show an actual injury in order to assert a

11   procedural due process claim, as was required in *Lewis v. Casey*.  In *Lewis*, the Supreme Court

12   found that the actual right at issue was not the right to a law library and legal assistance programs;

13   instead, access to a law library and legal assistance programs were a "means for ensuring a

14   reasonably adequate opportunity to present claimed violations of fundamental constitutional rights

15   to the courts."  518 U.S. at 351 (quotation omitted).  Thus, to bring a claim, the Supreme Court

16   found that the inmates had to show that they had actually been hindered in pursuing their legal

17   claims, *i.e.*, by demonstrating that an inmate was unable to file a complaint or had a complaint

18   dismissed for failure to observe a technicality.  *Id.*  As applied in the instant case, Defendants

19   argue that Plaintiffs must show that telephone restrictions "have actually hindered Plaintiffs from

20   pursuing their cases or requests for release on bond."  Defendants Mot. at 28.

21          Plaintiffs in turn argue that *Lewis* is distinguishable because that case concerned sentenced

22   prisoners, whereas here Plaintiffs are civil detainees facing immigration proceedings.  Plaintiffs

23

24   ─────────────────────

[15] While the Court finds that there is no substantive due process claim, this does not preclude a

25   *procedural* due process claim. *See Prieto-Romero v. Clark*, 534 F.3d 1053, 1065 (9th Cir. 2008)
     ("Even if Prieto-Romero's continued detention is permitted by statute, however, due process

26   requires 'adequate procedural protections' to ensure that the government's asserted justification
     for physical confinement 'outweighs the individual's constitutionally protected interest in

27   avoiding physical restraint.'").  This is particularly so in light of the discussion which follows
     which concludes the injury requirement to make a procedural due process claims has a degree of

28   flexibility.

United States District Court

For the Northern District of California

Opp. at 26.  The Court agrees.  In *Benjamin v. Fraser*, the Second Circuit declined to apply the *Lewis* actual injury requirement to a case challenging conditions affecting attorney visitation, use of restraints, restrictive housing, inmate correspondence, and law libraries.  264 F.3d 175, 179, 185 (2d Cir. 2001).  First, the Second Circuit explained that *Lewis* did not concern a direct constitutional right, but an opportunity to present claimed violations of constitutional rights.  The *Benjamin* case, however, concerned conditions which interfered with an individual's ability to consult with counsel, which itself was a constitutional right.  *Id.*  Second, the Second Circuit reasoned that the interest of a convicted prisoner is distinct from the interest of a pretrial detainee; in short:

> The access claims at issue in *Lewis* concerned the ability of convicted prisoners to attack their sentences, directly or collaterally, and to challenge the conditions of their confinement.  By contrast, here we are concerned with the Sixth Amendment right of a pretrial detainee, in a case brought against him by the state to utilize counsel in his defense.  It is not clear to us what "actual injury" would even mean as applied to a pretrial detainee's right to counsel.

*Id.* at 186 (internal quotations and modifications omitted).  In other words, "pretrial detainees need access to the courts and counsel is not to present claims to the courts, but to defend against the charges brought against them."  *Id.*

Here, Plaintiffs are not seeking phone access in order affirmatively to present constitutional claims, like the prisoners in *Lewis*.  Rather, Plaintiffs contend that phone conditions have impaired their right to gather and present evidence in *defending themselves* against the government's effort to deport them.  In this context, detainees have a Fifth Amendment guarantee to a full and fair hearing, and this includes access to counsel (of their own choosing).  *See Oshodi v. Holder*, 729 F.3d 883, 889 (9th Cir. 2013) ("It is well established that the Fifth Amendment guarantees non-citizens due process in removal proceedings.  Therefore, every individual in removal proceedings is entitled to a full and fair hearing.  A vital hallmark of a full and fair hearing is the opportunity to present evidence and testimony on one's behalf.") (internal quotations omitted); *Rios-Berrios*, 776 F.2d at 862 (Although a deportation hearing is not a criminal matter and [an alien] had no Sixth Amendment right to appointment of counsel at

26

**United States District Court**
For the Northern District of California

government expense, due process mandates that [an alien] is entitled to counsel of his own choice at his own expense under the terms of the [INA].") (citation omitted).

Furthermore, like *Benjamin*, Plaintiffs are not convicted inmates but civil detainees who are defending themselves in proceedings brought by the government.  Thus, the Court finds *Lewis* does not apply, and thus Plaintiffs are not required to show actual injury or actual hindrance of detainees' ability to pursue their cases in order to assert a procedural due process claim.

Instead, under circumstances outside of *Lewis*, the Ninth Circuit has held that the court looks not to whether the outcome of a hearing was actually affected by an alleged violation, but at whether "the outcome of the proceeding *may* have been affected by the alleged violation." *Colmenar*, 210 F.3d at 971 (emphasis added); *see also Zolotukhin v. Gonzales*, 417 F.3d 1073, 1076 (9th Cir. 2005) ("For us to grant the petition for review on due process grounds, Petitioner must show prejudice, which means that the outcome of the proceedings *may have been affected* by the alleged violation.") (internal quotation omitted) (emphasis in original).

In *Walters*, the Ninth Circuit upheld the district court's finding that the INS's procedure for obtaining waivers in document fraud cases violated the plaintiffs' rights to due process of law. *Walters v. Reno*, 145 F.3d 1032, 1036 (9th Cir. 1998).  There, the plaintiffs brought a class action, alleging that the INS issued complex, confusing forms to aliens charged with violating the INA's document fraud provisions, which failed to adequately inform aliens of the steps they had to take in order to contest the charges brought against them.  *Id.*  In challenging the district court's finding, the government argued that there was insufficient evidence that the plaintiff class suffered prejudice as a result of the constitutionally deficient proceedings.  *Id.* at 1044.  The Ninth Circuit found that the issue of prejudice "overlap[ped] with the question whether the plaintiffs suffered actual injury to justify injunctive relief," before explaining that plaintiffs had made the required showing of prejudice.  *Id.* at 1044 n. 7.  It first reiterated that "[w]hen it is necessary to demonstrate prejudice as a result of a constitutional violation, the alien must show that the inadequate procedures occurred in a manner so as *potentially* to affect the outcome of the proceedings."  *Id.* at 1044 (emphasis added) (citations omitted).  Thus, "there must be *plausible scenarios* in which the outcome of the proceedings would have been different, absent the

**United States District Court**
For the Northern District of California

1   constitutional violation." *Id.* (emphasis added).

2         Thus, Plaintiffs are not required to show actual injury, as defined by *Lewis*.  Instead,

3   Plaintiffs need only establish that the outcome of immigration proceedings *may* have been affected

4   by the alleged violation.  So defined, the Court finds that there is sufficient evidence of prejudice

5   to the class as a result of telephone restrictions.  For example, Mr. Lyon stated in his December

6   2013 declaration that he was unable to obtain a police report he needed for his U-visa application,

7   as he was unable to call the East Palo Alto Police Department because the police did not take

8   collect calls.  Lyon Dec. at ¶ 8.  Mr. Lyon's wife, who was assisting him, also could not obtain the

9   police report because the police would only release the report to Mr. Lyon or his legal

10  representative, which he did not have at the time.  *Id.* at ¶¶ 9, 11.  It was not until he retained

11  counsel (which at the time of his declaration, he could not afford) that he could obtain the police

12  report.

13        Similarly, B.M. testified that he was able to retain an attorney, but that he was not able to

14  get through to his attorney from the Housing Unit Phones because his attorney did not accept

15  collect calls.  Docket No. 120-16 (B.M. Dec.) at ¶¶ 13, 14.  Between June 16, 2014 and August 20,

16  2014, B.M. was only able to see his attorney once, when his attorney was at Contra Costa to visit

17  another detainee.  *Id.* at ¶ 15.  At this time, B.M.'s attorney informed him that he had a hearing on

18  August 20, 2014, but they were otherwise unable to speak about what that hearing would entail.

19  *Id.* at ¶¶ 15-17.  At the August 20, 2014 hearing, the IJ informed B.M. that he would need to get

20  documents from Kenya and Somalia; when B.M. explained it would be difficult to make those

21  calls from detention, the IJ said his attorney would help.  *Id.* at ¶ 18.  In September 2014, Contra

22  Costa opened the phone room, permitting free calls that were usually limited only to 5-10 minutes.

23  *Id.* at ¶ 21.  B.M. was able to get in contact with his attorney more often, but communication was

24  still difficult because his attorney did not always answer his calls (which were unpredictable due

25  to the limited time and the number of other attorneys who needed to use the phone).  *Id.* at ¶ 22.

26  In December 2014, B.M. learned from an ICE officer that the IJ denied asylum, after which

27  B.M.'s attorney informed him that he would not help appeal the decision.  *Id.* at ¶ 23.  B.M. then

28  began calling free legal service organizations to find another attorney, and learned from a Centro

United States District Court
For the Northern District of California

Legal de la Raza attorney that a large part of the reason why his asylum case was denied was because he did not prove his evidence with available evidence. *Id.* at ¶ 24.  B.M. states that his attorney did not help him get the evidence to prove his identity (which he could not obtain himself due to phone restrictions), and that B.M. did not realize how ineffective his attorney was because he communicated with his attorney so rarely. *Id.* at ¶ 25.  The Centro Legal de la Raza attorney has since helped get B.M. released on bond and filed a motion to reopen the case based on ineffective assistance of counsel. *Id.* at ¶ 26.

Other declarants have discussed the impacts of limited phone access on their ability to gather evidence, although it is less clear what impact that failure to gather evidence had on the outcome of a hearing. *See* O.A. Dec. at ¶ 14 (inability to contact a gang prevention program for documents, likely attributable to the gang prevention program's refusal to accept a call that stated it was from an unspecified "inmate" at Yuba County Jail); Docket No. 120-11 (J.H. Dec.) at ¶ 12 (inability to contact the criminal court and Kern county public defender in order to work on vacating his criminal conviction because the county offices hang up when they hear the recording that the call is from a detention facility); I.P. Dec. at ¶¶ 6, 42-43 (delaying bond hearing by a month because of the delay in gather evidence due to high phone costs; bond was granted at the continued hearing); Docket No. 120-13 (H.S. Dec.) at ¶ 15 (inability to speak freely about his case on Housing Unit phones because his claim for relief is based on sexual orientation, and expressing fear that he would be harassed and physically attacked if his sexual orientation is discovered); Docket No. 120-14 (F.L. Dec.) at ¶ 36 (fear of speaking about his case on Housing Unit Phones because applying for a U-Visa and concerned about being physically attacked if other detainees or county inmates learn that he is cooperating with the police); *see also* Berg Report at 6 (concluding that "the telephone policies and practices challenged in this case significantly limit the ability of detainees to retain and communicate with counsel and gather evidence for their cases"), 17 ("The detainees I interviewed expressed frustration, resignation, and hopelessness related to the difficulty of pursuing their cases with the limited telephone access provided to them.  This situation, many times, motivates detainees to simply sign removal papers"); Supp. Vincent Dec. at ¶ 13 (attorney declaration explaining hesitation to take on complex cases for detained immigrants

because "telephone access is too unreliable to provide adequate legal representation"); Docket No. 120-18 (Lee Dec.) at ¶ 12 (attorney declaration explaining that in her experience, "[i]n comparison to my non detained clients, detained clients are prevented from playing an active role in their removal proceedings because of the current telephone restrictions"); Docket No. 120-22 (Prasad Dec.) at ¶ 12 (attorney declaration stating "[w]e regularly see detainees not represented by counsel denied bond or discretionary relief who, in my experience, may not have been denied if they had been able to contact family to obtain documents").

This evidence, along with the nature and breadth of the systemic phone restrictions and their potential impact upon detainees' ability to communicate with counsel, relatives, government agencies, etc., are sufficient to establish a real risk for class members that the restrictions "may" or "potentially" affect the outcome of removal proceedings; there are "plausible scenarios" in which outcomes are affected. *Colmenar*, 210 F.3d at 971; *Zolotukhin*, 417 F.3d at 1076; *Walters*, 145 F.3d at 1049.

Plaintiffs need not demonstrate every member of the class has suffered from an adverse effect on the outcome of their renewal hearing. The Ninth Circuit has made clear that "[i]t is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole. Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate." *Walters*, 145 F.3d at 1047. This is particularly the case in a Rule 23(b)(2) class action, where the defining feature is whether "the party opposing the class has acted or refused to act on grounds that apply *generally* to the class . . . . ," and whether injunctive relief is appropriate respecting the *class as a whole*.[16] Fed. R. Civ. P. 23(b)(2)

---

[16] By way of example, if a prison hospital had a policy of not sterilizing its equipment, resulting in significantly increased risk of infection or spread of a disease (such as HIV), the fact that not every class member or even the named plaintiff contracted the disease would not preclude an injunction. Every person, indeed not even a majority of the class, need not be infected with a life-threatening disease before relief may be granted. The purpose of an injunction under Rule 23(b)(2), after all, is to prevent future injury that may occur as a result of the complained of policy. *See Dittimus-Bey v. Taylor*, 244 F.R.D. 284, 291 (D.N.J. 2007) (prison-crowding case in which the Court found that "Rule 23 does not require that the representative plaintiff have endured precisely the same injuries that have been sustained by the class members, only that the harm complained of be *common* to the class, and that the named plaintiff demonstrate a personal interest or threat of injury that is real and immediate, not conjectural or hypothetical").

(emphasis added).  *See Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988) ("That the claims of individual class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy."); 7AA Charles Alan Wright et al., *Federal Practice and Procedure* § 1775 (3d ed. 1998) ("All the class members need not be aggrieved by or desire to challenge defendant's conduct in order for some of them to seek relief under Rule 23(b)(2).").  As Professor Rubenstein explained:

> The first requirement under Rule 23(b)(2) is that "the party opposing the class has acted or refused to act on grounds that apply generally to the class."  While the Rule looks for grounds that "apply generally" to the class, it is well-settled that the defendant's conduct described in the complaint need not be directed or damaging to every member of the class.  The framers of the Rule stated that: "Action or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class."
>
> Courts have followed the Advisory Committee's approach, finding that certification of a Rule 23(b)(2) class is proper despite the fact that not all class members may have suffered the injury posed by the class representatives so long as the challenged policy or practice was generally applicable to the class as a whole. The requirement focuses on the defendant and questions whether the defendant has a policy that affects everyone in the proposed class in a similar fashion. That scrutiny ensures that the class's interests are related in a manner that makes aggregate litigation appropriate -- because one class member's litigation will invariably affect everyone in the class -- and therefore efficient.

William B. Rubenstein et al., *Newberg on Class Actions* § 4:28 (5th ed.) (citations omitted).[17]

---

[17] Thus, rights of the class under Rule 23(b)(2) are not measured solely by the facts and circumstances of the named representatives.  For example, in reviewing mental health care provided by the California prison system, the court in *Coleman v. Wilson* did not limit its factual findings to the claims of the named plaintiffs; it considered the testimony of inmate witnesses and declarations of expert witnesses, whose reports were based in part on interviews with numerous inmates, unnamed members of the class.  No. CIV S-90-0520 LKK JFM P, 1994 U.S. Dist. LEXIS 20786, at \*9-12, \*23 at fn. 15 (E.D. Cal. June 6, 1994), *report and recommendation adopted as modified by Coleman v. Wilson*, 912 F. Supp. 1282, 1324 (E.D. Cal. 1995).  Similarly, in *Plata v. Schwarzenegger*, the district court looked at the system as a whole, giving a "few representative examples from the testimonial and documentary evidence" of the effects of inadequate health care in the California prison system; evidence was not confined to the named plaintiffs.  Case No. C01-1351 TEH, 2005 U.S. Dist. LEXIS 43796, at \*16-19 (N.D. Cal. Oct. 3, 2005); *see also Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1507 (C.D. Cal. 1988) (reviewing testimony from class members, not just the named plaintiffs, to determine there was a procedural due process violation); *Perez-Funez v. Dist. Dir., I.N.S.*, 619 F. Supp. 656, 657, 661 (C.D. Cal. 1985) (reviewing the testimony of both the named plaintiffs and fourteen other class members to determine whether plaintiffs were signing a voluntary departure form without being advised of their rights).  *Cf. Moss*

**United States District Court**
For the Northern District of California

1    Accordingly, the Court finds that based on the record, there is substantial undisputed

2   evidence of prejudice suffered by the class as a whole based on conduct which applies generally to

3   the class; this is sufficient to satisfy the injury requirement for a procedural due process claim.

4           b.    <u>Legal Framework</u>

5    Finding the injury requirement is satisfied starts but does not end the due process inquiry.

6   The Court must examine the merits of the constitutional claim, viewed in the context of a custodial

7   setting.

8    The parties dispute whether in reviewing Plaintiffs' due process claim, the Court should

9   apply *Mathews v. Eldridge*'s balancing test or *Turner v. Safley*'s four-factor test. *Mathews*

10  requires that the court consider: (1) the interest at stake for the individual, (2) the risk of an

11  erroneous deprivation of the interest through the procedures used as well as the probable value of

12  additional or different procedural safeguards, and (3) the interest of the government in using the

13  current procedures rather than additional or different procedures.  424 U.S. 319, 224 (1976).  In

14  contrast, *Turner* starts with the principle that "[a] prison regulation that impinges on an inmate's

15  constitutional right 'is valid if it is reasonably related to legitimate penological interests.'"  *Valdez*

16  *v. Rosenbaum*, 302 F.3d 1039, 1048 (9th Cir. 2002) (quoting *Turner v. Safley*, 482 U.S. 78, 89

17  (1987)).  In determining reasonableness, the court must consider four factors: (1) whether there is

18  a "valid, rational connection" between the prison regulation and the legitimate governmental

19  interest put forward to justify it; (2) whether there are alternative means of exercising the right that

20  remain open to prison inmates; (3) whether accommodation of the asserted constitutional right will

21  have significant impacts on guards, other inmates, and the allocation of prison resources generally;

22  and (4) whether ready alternatives are absent (or whether obvious, easy alternatives exist).

23  *Turner*, 482 U.S. at 89-90.

24    *Mathews* and *Turner* are not mutually exclusive; the application of one test does not

25  ────────────────────────────────

26  *v. Lane*, 471 F.2d 853, 854-55 (4th Cir. 1973) (rejecting trial court's conclusion that because the
    plaintiff had not proved his discrimination case, the class action also failed because "the

27  subsequent dismissal or mootness of his individual claim . . . will not operate as a dismissal or
    render moot the action of the class, or destroy the plaintiff's right to litigate the issues on behalf of

28  the class.").

prohibit the use of the other.  Instead, the Court finds that in the instant case, application of both *Mathews* and *Turner* is necessary.  As a predicate to applying the *Turner* four-factor test, the Court must first find that there is a prison regulation that "*impinges on inmates' constitutional rights*."  *Turner*, 482 U.S. at 89 (emphasis added).  If there is no such impingement, then the Court need not reach the *Turner* four-factor test.  The Court must therefore first apply the *Mathews* balancing test in order to determine if Plaintiffs' due process rights have been impinged by the telephone restrictions at issue.  If the Court finds that Plaintiffs' constitutional rights have been impinged, the Court will then apply the *Turner* four-factor test.

Plaintiffs contend *Turner* has no application to the case at bar.  In *Demery v. Arpaio*, the Ninth Circuit declined to apply *Turner* in an action alleging violations of substantive due process based on the installation of live-streaming webcams in a prison facility used exclusively to house pretrial detainees.  378 F.3d 1020, 1024 (9th Cir. 2004).  The court found that *Turner* was inapposite because: (1) "*Turner* dealt with convicted prisoners, not pretrial detainees," and (2) "*Turner* involved an Eighth Amendment cruel and unusual punishment challenge, not a claim brought under the Substantive Due Process Clause of the Fourteenth Amendment."  *Id.* at 1028-29.  However, although the Ninth Circuit has not expressly overruled *Demery*, the Ninth Circuit has since applied the *Turner* four-factor test to pre-trial detainees.  *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1209 (9th Cir. 2008); *see also Bull v. City & Cnty. of S.F.*, 595 F.3d 964, 974 n.10 (9th Cir. 2010) (en banc) ("We have never distinguished between pretrial detainees and prisoners in applying the *Turner* test, but have identified the interests of correction facility officials responsible for pretrial detainees as being 'penological' in nature.  [Citations]  While penological interests in punishment or rehabilitation may not be applicable outside of a prison setting, the penological interest in security and safety is applicable in all correction facilities."); *United States v. Loughner*, 672 F.3d 731, 751 (9th Cir. 2012) ("So long as Loughner is a pretrial detainee, and lawfully held, his rights are limited by the facility's legitimate goals and policies, and his dangerousness to himself or to others may be judged by the same standard as convicted detainees.").  The Ninth Circuit has further acknowledged that the Supreme Court has "'made quite clear that the standard of review [in *Turner*] applies to all circumstances in which the needs of prison administration

33

implicate constitutional rights.'" *Bull*, 595 F.3d at 974 (quoting *Washington v. Harper*, 494 U.S. 210, 224 (1990)); *see also Washington*, 494 U.S. at 224 (principles articulated in *Turner* "apply in all cases in which a prisoner asserts that a prison regulation violates the Constitution, not just those in which the prisoner invokes the First Amendment.").

The Court thus finds that the appropriate legal framework is to first apply the *Mathews* balancing test to determine if the complained of phone restrictions would result in a putative constitutional violation.  If it does, the Court must apply *Turner* to determine whether the phone restrictions which impinges upon due process rights nonetheless may be upheld because they are "reasonably related to legitimate penological interests."[18]  482 U.S. at 89.

      c.   Application

        i.   *Mathews* and Constitutional Violation

The threshold question is whether the complained of regulations violate detainees'

---

[18] Plaintiffs contend, however, that they are unaware of any cases that have applied *Turner* deference to detention conditions of civil detainees who alleged that their conditions impacted procedural rights in pending civil proceedings.  Docket No. 160 (Plaintiffs Supp.) at 1 fn. 1.  As discussed above, the Supreme Court has taken a broad view that *Turner* should apply to all circumstances in which the needs of prison administration implicate constitutional rights, and that *Turner* is a recognition of "the need to reconcile our longstanding adherence to the principle that inmates retain at least some constitutional rights despite incarceration with the recognition that prison authorities are best equipped to make difficult decisions regarding prison administration." *Washington*, 494 U.S. at 223-24.  The Supreme Court has long recognized the government's interest in "manag[ing] the facility in which the individual is detained . . . . For example, the Government must be able to take steps to maintain security and order at the institution and make certain no weapons or illicit drugs reach detainees." *Bell v. Wolfish*, 441 U.S. 520, 540 (1979); *see also Turner*, 482 U.S. at 84-85 ("Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government.  Prison administration is, moreover, a task that has been committed to the responsibility of these branches, and separation of powers concerns counsel a policy of judicial restraint.").  In order to give the necessary deference to the government's interests in institutional order and security, the Court will apply the *Turner* four-factor test.  *Compare with Flemings v. Gray*, 1:14-cv-01248 LJO DLB PC, 2015 U.S. Dist. LEXIS 93433, at *9 (E.D. Cal. July 17, 2015) (reviewing claim for deprivation of property without procedural due process and finding that "[a]uthorized deprivations of property are permissible if carried out pursuant to a regulation that is reasonably related to a legitimate penological interest); *Casper v. Baker*, 3:12-cv-00204-LRH-VPC, 2013 U.S. Dist. LEXIS 183058, at *31 (D. Nev. Aug. 23, 2013), *report and recommendation adopted by Casper v. Baker*, 2014 U.S. Dist. LEXIS 3108 (D. Nev. Jan. 10, 2014) (same); *Patrick v. Bonner Cnty. Sheriff's Dep't*, Case No. 2:11-cv-00113-EJL-REB, 2013 U.S. Dist. LEXIS 84027, at * (D. Idaho June 13, 2013) (same); *Dudley v. Cesolini*, No. CV 11-0387-PHK-SMM (LOSA), 2012 U.S. Dist. LEXIS 190818, at *15 (D. Ariz. May 11, 2012) (same).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

constitutional rights, in this case their due process right to a full and fair hearing and access to counsel.  *See* Compl. at ¶¶ 100-109.  Again, *Mathews* requires that the court consider three factors: (1) the interest at stake for the individual, (2) the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different procedural safeguards, and (3) the interest of the government in using the current procedures rather than additional or different procedures.  424 U.S. at 224.

The Ninth Circuit has found that "conclusions regarding the due process . . . claims present mixed questions of law and fact since they involve a determination of whether factual findings satisfy undisputed rules of law."  *Nat'l Ass'n of Radiation Survivors v. Derwinski*, 994 F.2d 583, 587 (1992) (applying *Mathews* to due process claim).  In particular, when there are factual disputes underlying legal determinations, such questions must be resolved by the factfinder.  *See Wheaton v. Webb-Petett*, 931 F.2d 613, 617 (9th Cir. 1991) (remanding plaintiff's due process claim because the plaintiff "has raised genuine factual issues on whether his constitutional right to pretermination process was respected").

(a)   Plaintiffs' Interests

The parties do not appear to seriously dispute that Plaintiffs have a significant interest in avoiding deportation, the ultimate consequence and hence interest at stake.  In applying *Mathews* in the immigration context, the Ninth Circuit has found that "[i]t is clear that the plaintiffs' interests in this case are significant."  *Walters*, 145 F.3d at 1043 (citing *Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (alien's interest in deportation proceedings "is, without question, a weighty one" because "[s]he stands to lose the right to stay and live in this land of freedom [and] may lose the right to rejoin her immediate family, a right that ranks high among the interests of the individual.")).  Thus, the Court finds that Plaintiffs have a significant interest.

(b)   Risk of Erroneous Deprivation of Rights

Plaintiffs next argue that the telephone restrictions create a risk of depriving Plaintiffs of their rights because they "effectively den[y] Plaintiffs a means of accessing the counsel and evidence needed to present their cases."  Plaintiffs Mot. at 30.  However, as to this factor, the Court finds that there are numerous factual disputes that make summary judgment on this issue

35

United States District Court
For the Northern District of California

1    inappropriate at this time.  First, there are outstanding disputes at each of the facilities as to the

2    adequacy of the private phone options at each of the Facilities.  Specifically, the parties dispute

3    whether detainee calls are limited to attorneys only at both Contra Costa and Mesa Verde, the

4    availability of phone rooms at Contra Costa, and whether RCCC and Yuba's private phone options

5    are in fact private.  The availability of private phone options can affect detainees in a number of

6    ways; for example, detainees have testified that their inability to communicate with their attorneys

7    was specifically the result of the lack of privacy, especially when the case involves sensitive

8    personal information that could lead to physical harm.  *E.g.*, Docket No. 120-12 (I.P. Dec.) at ¶¶

9    36-38 (RCCC detainee explaining difficulty in communicating with his attorney due to lack of

10   privacy because his case involved sensitive personal information concerning his sexual

11   orientation, and did not want his sexuality known in a jail setting due to fear of harm from other

12   detainees or deputies); H.S. Dec. at ¶ 15 (RCCC detainee explaining difficulty using non-private

13   phones to discuss his case with his attorneys as his claim was based on his sexual orientation, and

14   had previously been harassed and physically attacked because of his sexual orientation).  There is

15   also evidence that limiting the private phones to attorney calls only – another factual issue in

16   dispute – can impede individuals from gathering evidence, particularly individuals who have no

17   attorney or when the private phone is the only available phone option without a positive

18   acceptance requirement.  *See* Lyon Dec. at ¶ 8 (Contra Costa detainee explaining inability to call

19   the East Palo Alto Police Department to obtain a police report he needed for his U-visa application

20   because the department did not accept collect calls); Docket No. 120-8 (M.G. Dec.) at ¶ 13

21   (RCCC detainee explaining inability to call extended family members, Fresno Police Department,

22   and corroborating witness to gather evidence for his U-visa case); Docket No. 120-6 (O.A. Dec.)

23   at ¶ 14 (Yuba detainee explaining inability to contact gang prevention program for evidence likely

24   because the program did not want to accept a call from an unspecified inmate at Yuba County

25   Jail); Docket No. 120-5 (R.K. Dec.) at ¶¶ 19-20 (Contra Costa detainee explaining inability to call

26   contacts at the Marin County Probation Department and Health and Human Services Department

27   for support in bond hearing because they would not accept a collect call).  These disputes over the

28   actual availability of private phone options may affect the due process analysis.

**United States District Court**
For the Northern District of California

The Court also finds that the record on notice is not fully developed.  For example, during the hearing on this matter, the parties debated whether Plaintiffs had demonstrated any harm based on the ban on three-way calling.  Docket No. 157 at 38:20-14.  Defendants argued that Plaintiffs had failed to "point[] to any facts where the request was made to make a three-way call to use an interpreter for legal purposes," to which Plaintiffs responded that detainees are informed by policies and handbooks that three-way calling is prohibited, and thus would not think that is an available option to request.  *Id.*; *see also id.* at 47:4-14 (Defendants argument that there is no evidence detainees asked to use the private phones to connect with counsel who were not on the pro bono platform, to which Plaintiffs responded that many detainees did not even know there was a private phone option until informed by other detainees or an ACLU lawyer).  In short, even assuming that these options are available (which was not clear from the record), if detainees are not informed of the availability and are even given legitimate reasons to believe that they are not available (whether by wrong information being stated in detainee handbooks, postings, or staff), it may be difficult for Defendants to argue that there is no evidence of harm simply because no detainee has ever asked for an accommodation that they were explicitly told was prohibited.

Because there are outstanding factual disputes which may materially affect whether there is a risk of erroneous deprivation, the Court finds that summary judgment is not appropriate at this time.

### (c)    Government Interest

Finally, the Court must consider the government's interest in using the current procedures rather than additional or different safeguards.  The Supreme Court has recognized that "[t]he government's interest in efficient administration of the immigration laws at the border also is weighty."  *Landon*, 459 U.S. at 34.  It has also found that "[t]he Government also has legitimate interests that stem from its need to manage the facility in which the individual is detained . . . . For example, the Government must be able to take steps to maintain security and order at the institution and make certain no weapons or illicit drugs reach detainees."  *Bell*, 441 U.S. at 540.  Furthermore, "[s]triking a balance between these two strong competing interests cannot be done in the abstract."  *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 980 (9th

United States District Court
For the Northern District of California

1   Cir. 2012).  The Court must "carefully assess the precise 'procedures used' by the government,

2   'the value of additional safeguards,' and 'the burdens of additional procedural requirements.'"  *Id.*

3          The Court finds that there are a number of outstanding disputes with respect to the

4   government's interest.  For example, there is an issue regarding the calling rates.  Defendants do

5   not appear to provide any justification for the rates, instead arguing that they are irrelevant given

6   the FCC's regulations.  Defendants Mot. at 13.  Defendants argued that issues regarding cost "will

7   soon be largely irrelevant . . . because the Federal Communications Commission ('FCC') has

8   undertaken regulation of inmate and detainee calling, which would impose caps on interstate and

9   intrastate calling rates and eliminate connection fees.  Defendants Mot. at 13; FCC, 15-136, Rates

10  for Interstate Inmate Calling Services, at ¶¶ 22, 101, *available at*

11  http://apps.fcc.gov/edocs_public/attachmatch/FCC-15-136A1.pdf (last accessed Feb. 2, 2016);

12  Docket No. 120-24, Exh. A (Wood Report) at 12 (table of rate caps).  Plaintiffs' expert, Mr.

13  Wood, agreed that "the recent action by the FCC . . . represents a useful tool that will help ensure

14  reasonable rates for ICS [Inmate Calling Services]."  Wood Report at 12.  The rules and

15  requirements governing rates and connection fees were to be made effective on June 20, 2016.

16  Defendants Reply at 7 n.10; FCC, WC Docket No. 12-375, Wireline Competition Bureau

17  Announces the Comment Cycle and Effective Dates for the *Inmate Calling Second Report and*

18  *Order and Third FNPRM*, at 2, *available at* http://apps.fcc.gov/edocs_public/attachmatch/DA-15-

19  1484A1.pdf (last accessed Feb. 2, 2016).  However, given the D.C. Circuit's decision staying

20  implementation of the FCC regulations, this issue will need to be fully developed to determine

21  what, if any, government interest exists for justifying the phone costs.  *See* Docket No. 161-1

22  (order staying FCC, 15-136).

23          With respect to the automatic cutoffs at Contra Costa, Defendants argue that time limits on

24  call duration promote safety and security by reducing the possibility of fights for telephone access

25  while promoting equitable access to phones.  Defendants Mot. at 15.  Yet Plaintiffs have presented

26  evidence showing that Contra Costa's officials were unable to explain why there is a cutoff on the

27  Talton Free Call Platform, and stated that the cutoff "doesn't make any sense."  Ha Dec., Exh. 37

28  (Grant Dep.) at 77:4-18.  Plaintiffs further argue that short cut-offs are also not applied across-the-

United States District Court
For the Northern District of California

board; for example, Mesa Verde has a 180-minute limitation, which is only in place to prevent

people from forgetting to hang up the phone.  Docket Yee-Garcia Dec., Exh. 60 (Talton Dep.) at

155:11-19 (explaining that the security precaution for the 180-minute limit is so that detainees

"can't leave the phone off the hook.  You know, after they get on the phone, they just drop the

phone.  Let's say they walk away, and the next day, you know, the clock is still ticking, you know.

So in other words, the call has to end at some point.").  It is unclear whether there is sufficient

justification where the limitations appear to vary widely.  Given that all reasonable inferences

must be drawn against the non-moving party, summary judgment is not appropriate.

There is also a dispute as to whether there is any government interest in Contra Costa's

requirement that Housing Unit Phones be paid for by the recipient, which has affected the ability

of detainees to obtain information if the recipient is not willing (or able) to pay for the call, even if

the detainee is willing to pay for the call.  Defendants only explain that Contra Costa doesn't have

the ability to assign a pin number to the detainees, but is "currently exploring obtaining a new jail

management system."  Defendants Mot. at 15.  It is not clear that this is a legitimate governmental

purpose, but Defendants at this juncture is entitled to the benefit of reasonable inferences.

Similarly, it is unclear whether the time restrictions on when detainees can access phones

are reasonably related to a government interest, particularly with respect to Contra Costa.

Defendants argue they have an interest in limited hours to ensure that violent or unruly individuals

are segregated, or to protect individuals from other detainees who may harm them.  However, the

applicability of this policy to the Facilities raises some questions; as Plaintiffs point out, Contra

Costa imposes the greatest time restrictions on detainees use of their Housing Unit Phones (with

only 1.5 hours during regular business hours); yet Contra Costa has the lowest percentage of

medium-high and high risk prisoners.  Plaintiffs Opp. at 14; *see* Shinners Dec., Exh. 32.  The

record on this point is spare.

Finally, there is an overarching question of whether application of the ICE's 2011

Performance Based National Detention Standards (2011 PBNDS) could be readily implemented, a

question which goes to whether the government has an interest in using the current procedures

rather than additional or different procedures.  *See* U.S. Immigration and Customs Enforcement,

United States District Court
For the Northern District of California

1  Performance-Based National Detention Standards 2011, *available at*

2  https://www.ice.gov/detention-standards/2011 (last accessed Feb. 5, 2016).  Currently, RCCC,

3  Yuba, and Contra Costa must comply with ICE's 2000 National Detention Standards (2000 NDS),

4  while Mesa Verde must comply with the 2011 PBNDS.  Plaintiffs Mot. at 18; Hackett Report at ¶

5  5.  Plaintiffs argue that the 2011 PBNDS "require many of the outcomes Plaintiffs seek in this

6  litigation."  *Id.* at 19.  This includes reasonably priced telephone calls (2011 PBNDS at §

7  5.6.V.A.2); providing direct or free calls to offices, including federal and state courts, legal

8  representatives, legal services, and government offices to obtain relevant documents (2011

9  PBNDS at § 5.6.V.E); providing private legal calls (2011 PBNDS at § 5.6.V.F.2); allowing

10  incoming legal calls and messages (2011 PBNDS at § 5.6.V.J); and providing adequate notice of

11  telephone access opportunities, including in other languages (2011 PBNDS at § 5.6.V.C).

12  Plaintiffs' expert, Mr. Berg, explains that while the 2000 NDS and 2011 PBNDS both "require

13  reasonable and equitable access to telephones and prohibit facilities from unduly limiting a

14  detainee's efforts to obtain legal representation, the newer standards are significantly more

15  detailed, which makes expectations for detention facilities more clear."  Berg Report at 20.  Thus,

16  the 2011 PBNDS are "generally more rigorous than the 2000 NDS because ICE recognized that

17  there were opportunities for improvement and best practices had evolved since the issuance of the

18  2000 NDS."  *Id.* at 20 (citation omitted).

19       However, the parties' experts dispute whether the 2011 PBNDS can be readily

20  implemented.  For example, Plaintiffs' expert opines that the fiscal and administrative costs to

21  adopt better procedures, such as the 2011 PBNDS, and hire additional staff would be minimal.

22  Berg Report at 26-29.  Mr. Berg takes the daily income of the RCCC, Contra Costa, and Yuba

23  facilities for housing ICE detainees, and compares it with the average starting annual salary for a

24  correctional officer for these counties.  *Id.* at 28.  Based on these numbers, Mr. Berg contends that

25  it will take RCCC 4.3 contract days to pay for one correctional officer, Contra Costa 3.6 contract

26  days to pay for one correctional officer, and Yuba 2.7 days to pay for one correctional officer.

27  Defendants' expert, Mr. Hackett, counters that Mr. Berg's calculations ignore the costs of jail

28  operations and employee costs beyond base salary, such as benefits, recruitment, and training.

United States District Court

For the Northern District of California

1    Hackett Report at ¶ 34.  Mr. Hackett also argues that implementation of the 2011 PBNDS is

2    affected by factors other than cost, such as facility construction, geographic location, and staffing

3    limitations.  *Id.* at ¶ 33.

4         There are disputes of material fact in the record as to the government's interest.  This

5    together with the requirement that all reasonable inferences must be drawn against the moving

6    party where the record is inconclusive requires the summary judgment be denied.  Moreover,

7    application of the *Matthews* balancing test is a mixed question of law and fact which is normally

8    for the trier of fact to decide.  *See Nat'l Ass'n of Radiation Survivors*, 994 F.2d at 587.

9              ii.    <u>*Turner* "Rationally Related to a Legitimate Penological Objective"</u>

10        In addition to the dispute over the application of *Mathews*, there are disputes as to whether

11   Defendants could satisfy the four-factor *Turner* test.[19]  Like the *Mathews* balancing test, the Ninth

12   Circuit has found that the *Turner* four factor test is a mixed question of law and fact.  *See*

13   *Friedman v. Arizona*, 912 F.2d 328, 331 (9th Cir. 1990), *superseded by statute on other grounds*

14   (finding that whether a particular regulation "impermissibly restricts [the plaintiffs'] first

15   amendment right is a mixed question of law and fact" and applying *Turner*).  However, "[t]he

16   legitimacy of prison officials' asserted penological interests are findings of fact.  *Henderson v.*

17   *Terhune*, 379 F.3d 709, 712 (9th Cir. 2004); *see also Cal. First Amend. Coal. v. Woodford*, 299

18   F.3d 868, 880 (9th Cir. 2002) (finding that the district court's findings on whether there was a

19   ready alternative to the challenged procedure under *Turner* constituted factual findings).

20        In *Hrdlicka v. Reniff*, the Ninth Circuit overturned the district court's grant of summary

21   judgment, finding that there were "questions of material facts" as to the district court's application

22   of *Turner*.  631 F.3d 1044, 1046 (9th Cir. 2011).  There, the publisher of the magazine "Crime,

23   Justice & America" (CJA) brought suit against two county jails that refused to distribute

24   unsolicited copies of CJA to its inmates, alleging First Amendment violations.  *Id.*  After

25   recognizing the existence of a First Amendment interest, the Ninth Circuit looked at each of the

26

27   _____

     [19] This is unsurprising, given that neither party briefed how *Turner* would apply in practice to the

28   instant case, as Defendants did not raise the issue until after briefing was completed.

**United States District Court**
For the Northern District of California

1    *Turner* factors.

2         The first *Turner* factor, which requires a "valid, rational connection" between the prison

3    regulation and the government interest, "is a *sine qua non*: If the prison fails to show that the

4    regulation is rationally related to a legitimate penological objective, we do not consider the other

5    factors." *Id.* at 1051 (internal quotation omitted).  The Ninth Circuit looked at each of the

6    justifications forwarded by the county jails.  First, the jails asserted that refusing to distribute

7    unsolicited copies of CJA promoted jail security by reducing the likelihood of contraband entering

8    the jail and the amount of clutter (thereby reducing the risk of fires and promoting efficient cell

9    searches).  While the Ninth Circuit did not question the importance of these goals, it found that the

10   defendant's general statements were "undercut by the specific evidence they offer in an attempt to

11   show the degree to which these purposes are actually served by a refusal to allow the requested

12   distribution of CJA." *Id.*  The Ninth Circuit pointed to one of the jail's decision to stop

13   distributing unsolicited copies of newspapers, noting that the decision was based on the monetary

14   cost and not security risks. *Id.*  It also found that the other prison had admitted that inmates had

15   access to paper that they could use for improper purpose, and that there was no specific evidence

16   that distribution of CJA would increase the rate of misuse of paper. *Id.* at 1052.  Second, the jails

17   asserted that allowing delivery of unsolicited copies of CJA would require additional staff time.

18   The Ninth Circuit rejected this as well, as there was no estimate of how many additional personnel

19   hours would be required for CJA to be delivered.  Furthermore, neither jail had suggested that

20   unsolicited publications were more difficult to inspect than solicited publications. *Id.* at 1053.

21   Third, one of the jails argued that accepting unsolicited CJA would create a "slippery slope" that

22   would require the jail to accept other unsolicited publications. *Id.*  However, the Ninth Circuit

23   pointed out that this "slippery slope" problem was not a concern when the jail accepted or ceased

24   accepting unsolicited copies of newspapers, and that there had only been three requests to

25   distribute unsolicited publications. *Id.*  Finally, one of the jails contended that it had an interest in

26   maintaining control over advertising of bail in the jail, as the jail had an existing contract with an

27   organization to operate bulletin boards on which bail bond agents could post advertisements. *Id.*

28   The Ninth Circuit found that it was not clear how distribution of CJA would be inconsistent with

**United States District Court**
For the Northern District of California

that contract, and that in any case, there was no legitimate penological interest "in protecting a profit made by impinging on inmates' First Amendment rights." *Id.*

The Ninth Circuit then reviewed the second *Turner* factor, which looked at whether other avenues are available for the exercise of the asserted right. *Id.* Although the jails argued that CJA could still be distributed to inmates who request it, "there is a material question of fact whether, as a practical matter, Plaintiffs can effectively reach county jail inmates if they can delivery CJA only upon request." *Id.* at 1054. Specifically, the Ninth Circuit noted that it is difficult to create broad awareness of CJA when inmate populations turn over quickly, resulting in many inmates having left the jail before they could learn about CJA's existence, request it to be sent, and then receive it. *Id.*

The Ninth Circuit also found "material questions of fact" as to the third *Turner* factor, which looks at the impact accommodation of the asserted constitutional right will have on guards and other inmates. *Id.* Specifically, the Ninth Circuit explained that there were questions about "whether, and to what degree, the jails should be forced to expend significant additional resources if CJA was delivered by either of the two methods sought by Plaintiffs." *Id.* For example, the publisher had proposed delivering only one copy of CJA for every ten inmates each week, and offered to either do a general delivery or individually addressed mailings. *Id.* The jails, in turn, had not explained how mail inspectors would distinguish between a copy of CJA that is solicited and that is not, or why a complete ban on unsolicited mail did not consume more prison resources than accepting such mail if the jail had to compile subscription lists and compare incoming mail to those lists. *Id.*

Finally, the Ninth Circuit analyzed the fourth *Turner* factor, which looked at whether there was the existence of easy and obvious alternatives which would indicate that the challenged regulation is an exaggerated response by prison officials. *Id.* "'This is not a "least restrictive alternative" test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint.'" *Id.* at 1054-55 (quoting *Turner*, 482 U.S. at 90-91). However, an alternative that fully accommodates the asserted rights at *de minimis* cost suggests that the regulation does not satisfy the reasonable

43

United States District Court
For the Northern District of California

relationship standard.  *Id.* at 1055.  As applied in *Hrdlicka*, the Ninth Circuit found that it was undisputed that CJA was distributed in more than 60 countries throughout 13 states, including 32 California county jails, thus "suggest[ing] that the response of the two jails in this case may be exaggerated."  *Id.*  Further, the "weak, and to some degree contradictory, specific evidence" offered by the jails in support of their cited penological purposes suggested that the challenged policies were an exaggerated response.  *Id.*  Taken together, the Ninth Circuit concluded that the jails were not entitled to summary judgment.

In the instant case, the parties raise similar questions as to whether the asserted regulations are reasonably related to the penological purposes being asserted by Defendants.  In general, the Supreme Court has recognized that the government has legitimate interests in managing detention facilities, including the maintenance of security and order at the institution.  *See Bell*, 441 U.S. at 540.  There is also evidence that the government has an interest in controlling phone use in particular, including to prevent inmates from making threatening or harmful calls to the community.  Shinners Dec., Exh. 33 (Berg Dep.) at 46:23-47:18, 50:14-20, 122:11-17; *see also generally* Shinners Dec., Exh. 34 (Hackett Report).

However, as discussed above, there are several disputes as to specific justifications made by Defendants for various technical limitations, such as whether there is a penological interest in the time limits, Contra Costa's requirement that calls made from Housing Unit Phones be paid for by a recipient, and time restrictions on when detainees can access phones.  There is also a significant question as to whether the 2011 PBNDS can be readily implemented, a question which goes to whether Defendants' telephone policies are an "exaggerated response" where there is an obvious alternative.  Viewed as a whole, the Court finds that there are disputes of material fact which make summary judgment improper in the instant case, particularly in view of the reasonable inferences that must be drawn in the non-moving party's favor along with the fact that application of *Turner* is a mixed question of law and fact.

D.     Right to Petition

Plaintiffs contend that per their right to petition the government for redress of grievances, they have a right to obtain governmental records, benefits, or actions, as well as hire and consult

**United States District Court**
For the Northern District of California

attorneys.  Plaintiffs Mot. at 46.  Defendants in turn contend that an application for immigrant status is not a lawsuit or airing of a political grievance, but is an affirmative application for a discretionary benefit from the government, which should not be considered a petition for redress of grievances.  Defendants Mot. at 36-37.  However, the Ninth Circuit has found that "the First Amendment extends to the right to petition an administrative agency . . . ."  *Nat'l Ass'n of Radiation Survivors*, 994 F.2d at 595 (concerning applications for Veterans' Administration benefits based on exposure to ionizing radiation during service).  Given the stakes at issue in removal proceedings, the Court sees no reason why the right to petition does not apply here.  The Court therefore finds that the petition clause can extend to the immigration proceedings which Plaintiffs allege are impacted by telephone restrictions.

However, for the same reasons discussed with respect to Plaintiffs' procedural due process clause, the Court finds that summary judgment on Plaintiffs' First Amendment claim is inappropriate at this time.  In *National Association of Radiation Survivors*, the Ninth Circuit found that both the due process and First Amendment claims were about "meaningful access to the VA benefits process," such that "the focus of the First Amendment analysis is essentially the same as that under the Due Process Clause."  994 F.2d at 595.  As the Ninth Circuit had already determined that there was no due process violation, it summarily found that there was no First Amendment violation.  *Id.*  As in *National Association of Radiation Survivors*, the focus of Plaintiffs' First Amendment claim is essentially the same as that under the due process clause, as both claims are related to how telephone restrictions affect detainees' ability to gather evidence to present at their immigration hearing and to contact, retain, and consult with attorneys.  *See* Compl. at ¶¶ 103 (due process claim based on Defendants having "violated Plaintiffs' right to representation of counsel by denying and severely restricting Plaintiffs' ability to make telephone calls to locate, consult with, and retain counsel, and Plaintiffs' ability to communicate with retained counsel"); 108 (due process claim based on Defendants having "violated Plaintiffs' right to a full and fair hearing by denying and severely restricting Plaintiffs' ability to make telephone calls to gather information and obtain evidence in support of their immigration cases); 112 (First Amendment claim based on Defendants having "violated Plaintiffs' right to petition the

United States District Court
For the Northern District of California

1  government by denying and severely restricting the telephone access necessary to seek legal

2  representation and obtain documents and evidence in support of their applications for immigration

3  benefits"). For the reasons the Court denies summary judgment on Plaintiffs' procedural due

4  process claim, it denies summary judgment on the First Amendment claim.

### IV.    CONCLUSION

6  The Court **GRANTS** Defendants' motion for summary judgment with respect to Plaintiffs'

7  INA statutory claims and substantive due process claims. Based on undisputed facts, the Court

8  finds Plaintiffs have satisfied the injury requirement for a procedural due process claim. However,

9  the Court **DENIES** the cross-motions for summary judgment with respect to Plaintiffs' procedural

10  due process and First Amendment claims for the reasons stated above.

11  Having viewed the record, the Court observes that there do not appear to be many issues of

12  dispute with respect to present conditions in the Facilities. The primary factual disputes under the

13  *Matthews* analysis concern, as the Court noted, the availability of private phone options and how

14  much notice is provided to detainees about the available phone options. As to *Turner*, there are a

15  number of factual disputes and an inclusive record relative to the justification and penological

16  interests asserted by Defendants.

17  The Court thus **ORDERS** the parties to meet and confer, in order to reach a stipulation to

18  undisputed facts (as found and set forth in this Order) for trial and to determine which specific

19  facts need to be tried. Those areas should be limited in scope as indicated herein, and the evidence

20  for trial herein shall be so limited. The Court will also set a Case Management Conference for

21  March 23, 2016 at 10:00 a.m. to delineate the scope and nature of the trial.

22  This order disposes of Docket Nos. 120 and 139.

24  **IT IS SO ORDERED**.

26  Dated: March 18, 2016

_____
EDWARD M. CHEN
United States District Judge
46